UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA     :
    :
          v.              :
    :    No. 20-CR-66 (RDM)
MURALI VENTAKA,         :
    :
         Defendant.     :
    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## SENTENCING MEMORANDUM OF MURALI VENKATA

Kamil R. Shields
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

Katherine M. Savarese
Jared H. Rosenfeld
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

# TABLE OF CONTENTS

Page

BACKGROUND ...........................................................................................................1

    A.    Mr. Venkata's Background and Circumstances.......................................1

    B.    Mr. Venkata's Offense and Plan for a Productive and Law-Abiding Future ..........3

ARGUMENT ................................................................................................................5

I.     SENTENCING GUIDELINES CALCULATION ...............................................5

    A.    Guidelines Calculation..............................................................................5

    B.    Issues in Dispute .......................................................................................6

        1.    Loss Amount ................................................................................. 6

        2.    Role Adjustment for Use of a Special Skill ............................... 10

        3.    Minimal or Minor Role Adjustment ......................................... 11

II.    THE 18 U.S.C. § 3553(A) FACTORS SUPPORT A SENTENCE OF PROBATION.............................................................................................16

    A.    The Nature and Circumstances of the Offense Support a Sentence of Probation ................................................................................................16

    B.    Mr. Venkata's History and Characteristics Support a Sentence of Probation ................................................................................................17

    C.    A Sentence of Probation Is Sufficient, but Not Greater than Necessary, to Comply with the Purposes of Sentencing ..........................................20

    D.    A Sentence of Probation Is Available and May Be Imposed to Satisfy the Minimum Term of the Applicable Guideline Range ...............................21

CONCLUSION...........................................................................................................22

Above-referenced counsel respectfully submits this sentencing memorandum on behalf of Murali Venkata in connection with his sentencing, which is currently scheduled for January 4, 2024.

Both the probation office, pursuant to its Presentence Investigation Report ("PSR"), and the government have proposed differing guidelines ranges. Mr. Venkata submits that neither is correct.[1] As described further below, Mr. Venkata respectfully maintains that the correct advisory Sentencing Guidelines range is 0-6 months' imprisonment. In light of Mr. Venkata's background and circumstances, his plan for a productive and law-abiding future, and his limited role in the offense conduct, Mr. Venkata respectfully requests that he be sentenced to a term of probation. The proposed sentence is consistent with the statutory directive that the Court impose a sentence "sufficient, but not greater than necessary," to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

## BACKGROUND

### A.     Mr. Venkata's Background and Circumstances

Mr. Venkata was born in Chennai, India in 1965 and had a positive childhood in a loving family with two older siblings. PSR ¶¶ 93, 96. He received a bachelor's degree in Commerce from the University of Madras in India in 1987. *Id.* ¶ 112. In 1997, Mr. Venkata married his wife, Madhavi Yamazula Krishna, in India. *Id.* ¶ 97. Mr. Venkata and Ms. Krishna have one child, a teenage daughter, who just started her first year of college. *Id.* ¶ 98. Mr. Venkata has devoted much of his life to supporting his family, including his parents while they were still alive, as well as his wife and daughter. *Id.* ¶ 97.

---

[1]     The PSR calculated the applicable Guidelines Range as 70-87 months of incarceration, PSR ¶ 151, and the government calculated it as 37-46 months of incarceration, Gov't Mem. at 8.

In 1999, Mr. Venkata emigrated to the United States on an H-1 Visa as a skilled laborer and has worked hard to create a life for himself and his family in this country ever since. *Id.* ¶ 100.  Mr. Venkata became a naturalized U.S. citizen in 2009.  *Id.*  His wife emigrated to the United States two years after Mr. Venkata in 2001, and is also a naturalized U.S. citizen.  *Id.* ¶ 97.  From 2004 to 2017, Mr. Venkata worked in public service as a government contractor and government employee.  From 2004-2010, Mr. Venkata worked in software development for the U.S. Postal Service Office of Inspector General in positions with Serco, Lockheed Martin, and Northrop Grumman.  *Id.* ¶¶ 121-23.  In 2010, Mr. Venkata began working at the Department of Homeland Security Office of Inspector General ("DHS-OIG") as an IT specialist.  *Id.* ¶ 117.  In 2017, Mr. Venkata was put on leave from DHS-OIG in connection with this matter.  *Id.* Although he had initially hoped to clear his name and be reinstated in his role at DHS-OIG, Mr. Venkata resigned following his trial in 2022.  *Id.*

Mr. Venkata has and is currently the primary breadwinner for his family. Mr. Venkata and his family reside in Aldie, VA in a home that he has owned since 2015.  *Id.* ¶ 137.  Since being placed on leave, Mr. Venkata has had little to no income and has accrued significant credit card debt.  *Id.* ¶ 129.  Mr. Venkata's wife suffers from some minor health issues.  *Id.* ¶ 97.  Prior to 2022, she did not work outside of the home, but that year she sought work as a teacher's assistant, although she was unsure of whether her position would be needed this year.  *Id.* ¶¶ 99, 129.  Should Mr. Venkata be incarcerated, the family will lose its primary provider and his wife will become the sole caretaker for their daughter.  *Id.* ¶ 98.

Mr. Venkata has no prior criminal history, has never used drugs or alcohol and has generally been an upstanding citizen.  *Id.* ¶¶ 87, 109.

**B.      Mr. Venkata's Offense and Plan for a Productive and Law-Abiding Future**

Mr. Venkata's offenses stem from longstanding professional relationships with

Charles Edwards, the former Acting Inspector General of DHS-OIG, and Sonal Patel,

Mr. Venkata's former supervisor at DHS-OIG.  Unquestionably, given that both Mr. Edwards

and Ms. Patel were Mr. Venkata's supervisors, these relationships were hierarchical in nature.

Although Mr. Edwards and Ms. Patel were instrumental in helping Mr. Venkata advance his

career of public service, they also held enormous power over Mr. Venkata's future prospects and

even his job at DHS-OIG.

Mr. Venkata and Mr. Edwards first met in 2004, when Mr. Edwards was working

at the U.S. Postal Service Office of Inspector General ("USPS-OIG") and he hired Mr. Venkata

as a contractor for the agency.  Trial Tr. Afternoon Session, 19, Mar. 29, 2022.  Mr. Edwards

subsequently transferred to DHS-OIG, where he encouraged Mr. Venkata to apply and discussed

his application with Ms. Patel.  *Id.* at 20.  Similarly, Ms. Patel met Mr. Venkata in 2004 or 2005

while working at USPS-OIG, and encouraged him to apply to his job at DHS-OIG, where she

became his supervisor.  Trial Tr. Afternoon Session, 81-83, Apr. 5, 2022.

While Mr. Venkata worked at DHS-OIG—and during the period of the alleged

conspiracy—Ms. Patel had full control over his  schedule and assignments.  *See id.* at 9-10.  And

while Mr. Venkata was rarely in direct contact with Mr. Edwards, Ms. Patel was in contact with

Edwards nearly every single day.  Trial Tr. Morning Session, 121, Mar. 30, 2022.

Mr. Venkata regularly accomodated Ms. Patel with respect to work assignments.

As one colleague stated, "a lot of work was extracted from him," Trial Tr. Morning Session, 24,

Apr. 5, 2022, and even Ms. Patel acknowledged that Mr. Venkata never pushed back on any

projects she assigned him, Trial Tr. Afternoon Session, 56, Apr. 5, 2022.  Indeed, few employees

challenged Ms. Patel, who was known to retaliate those who disagreed with her and had the

-3-

power to put her employees on a training rotation or even terminate them.  Trial Tr. Morning

Session, 12-13, 16, Apr. 5, 2022.

It was in this atmosphere of fear, but also trust in his superiors, that Mr. Venkata

made the mistake of helping Mr. Edwards in his plan to develop a new case management system.

After leaving DHS-OIG, Mr. Edwards devised a plan to start a business to build and sell a new

and improved case management system to various federal offices of the inspector general.  In

order to build his new program, he sought help from Ms. Patel and, later, Mr. Venkata in setting

up a copy of DHS-OIG's existing EDS in order to show it to a team of software developers so

that they could reverse engineer a similar program.  Trial Tr. Afternoon Session, 13, Mar. 29,

2022.  Specifically, Mr. Edwards asked Mr. Venkata to help configure demo versions of EDS—a

program that Mr. Venkata knew that Mr. Edwards had originally built and designed—on

Mr. Edwards's home servers and a laptop.  *See* PSR ¶¶ 38-41.  At the request of Mr. Edwards,

Mr. Venkata also provided information and demonstrations of an "eSubpoena" module he had

developed within EDS.  *See id.* ¶ 36.  However, there is no evidence that Mr. Venkata intended

to, or was even aware of any plan to, mislead or harm the government.  Indeed, no actual harm

resulted directly from the alleged fraud, since the government's use of EDS, PARIS, and STARs

was never interrupted, and the government never ultimately agreed to purchase EDS 2.0 from

Mr. Edwards.  Importantly, every witnesses whose personal identifying information was

compromised testified at trial that they suffered no loss or harm.

The government established a conspiracy at trial—a conspiracy whose key

members were Mr. Edwards and Ms. Patel.  As the "most junior" member of the conspiracy, see

Gov't Mem. at 5, Mr. Venkata's role was limited to helping Mr. Edwards and Ms. Patel, again,

the primary members of the conspiracy, with certain discrete tasks.  Mr. Venkata was at most a

disposable helper who provided technical support and troubleshooting, which could have been accomplished by any other IT Specialist.  It was Mr. Edwards and Ms. Patel who met with Peter Paradis to discuss the sale of the new EDS 2.0—a discussion in which Mr. Venkata's name came up only once, in passing.  *See* Trial Tr. Morning Session, 82-86, Mar. 30, 2022.  It was Mr. Edwards who traveled to India to meet with developers, and Ms. Patel who contacted them to provide a demonstration—there is no evidence that Mr. Venkata ever spoke to the software developers in India.  *Id.* at 103.  It was Mr. Edwards and Ms. Patel who would have reaped the benefits of the conspiracy, had the sale of the product they were building been completed.  Trial Tr. Afternoon Session, 11, Mar. 30, 2022.  Mr. Venkata never received, asked for, or expected any compensation, gain, or profit from his actions.  Trial Tr. Afternoon Session, 79, Apr. 5, 2022.

Not only did Mr. Venkata gain nothing from helping Mr. Edwards and Ms. Patel; he lost everything, including the job he loved.  Throughout his life, Mr. Venkata has endeavored to always to help those in need and be a source of strength to his daughter and family. Mr. Venkata has consistently volunteered in his community, helps out family and friends, and maintains a positive attitude towards his own problems.  After serving his sentence, Mr. Venkata hopes to get a fresh start with a new job, provide additional support for his wife and daughter, and work toward making restitution.

## ARGUMENT

### I.     Sentencing Guidelines Calculation

#### A.     Guidelines Calculation

We respectfully submit that the following offense level calculation applies to Mr. Venkata, although it may be impacted by the resolution of Mr. Venkata's pending motions to dismiss certain counts of conviction:

| USSG § 2B1.1 | Base Offense Level | 7[2] |
|---|---|---|
| USSG § 3B1.2 | Mitigating Role | -4 or -2 |
| USSG § 3C1.1 | Obstruction of Justice | +2[3] |
| USSG § 4C1.1 | Zero-Point Offender | -2 |

Total   3 or 5[4]

Mr. Venkata has a criminal history score of zero and is therefore in criminal history category I. PSR ¶ 85-91.

**B.      Issues in Dispute**

**1.      Loss Amount**

Based on information provided by the government, the PSR indicates that Mr. Venkata "is accountable for a loss of $3,511,620.30, specifically the value of the property copied and obtained" and therefore applies an 18-point increase to his offense level. PSR ¶¶ 50 n.6, 77. The government concedes that it "subsequently determined that the value of the stolen property is not an appropriate measure of loss under U.S.S.G. § 2B1.1." Gov't Mem. at 8 n.2.

The government now contends that Mr. Venkata should receive a 12-point increase to his offense level pursuant to USSG § 2B1.1(b)(1)(G) for the "government's out-of-

---

[2]      To the extent that the Court grants certain of Mr. Venkata's pending motions to dismiss additional counts of conviction, the base offense level may need to be calculated based on a different section of the Guidelines. For example, if the only remaining count of conviction was Count Sixteen, the base offense level would be 12. *See* USSG § 2J1.2.

[3]      To the extent that the Court grants Mr. Venkata's pending motions to dismiss Counts One, Two, and Eleven, and the remaining count of conviction is Count Sixteen, this two-point enhancement would no longer be applicable. *See* USSG § 3C1.1, cmt. n.7.

[4]      To the extent that the Court grants Mr. Venkata's pending motions to dismiss Counts One, Two, and Eleven, and the remaining count of conviction is Count Sixteen, the total offense level would be 6 (12-4-2) or 8 (12-2-2).

pocket loss consist[ing] of approximately $400,000 spent on notifying the victims," whom the government contends are the DHS employees whose PII was put at risk, "and providing them credit monitoring services." Gov't Mem. at 9. This is wrong.

        The Guidelines define loss as the "greater of actual loss or intended loss," further defining actual loss to be "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt. n.3. The government concedes that there is no evidence of "intended loss," nor "gain that resulted from the offense," which can provide an alternative measure of loss. Gov't Mem. at 9; *see also* USSG § 2B1.1, cmt. n.3(A)(ii), n.3(B). Accordingly, the government's sole basis for its proposed loss enhancement is "actual loss," which the government proposes to calculate based on the cost of remediation of the breach of PII.

        Under the Guidelines, however, "[a] defendant's relevant conduct does not include the conduct of members of the conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." USSG § 1B1.3, cmt. n.3(B); *see also, e.g.*, *Cook* v. *United States*, 2006 WL 3333068, at *7 (S.D.N.Y. Nov. 15, 2006) ("[C]onspirator liability only extends to reasonably foreseeable conduct after the defendant has joined the conspiracy, and . . . the consideration of conduct preceding that event is inappropriate."). Even after joining a conspiracy, "the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct." USSG § 1B1.3, cmt. n.3(B). Courts have repeatedly vacated sentences based on activity not within the scope of the defendant's agreement. *See*, *e.g.*, *United States* v. *Graham*, 83 F.3d 1466, 1479 (D.C. Cir. 1996) ("When

determining relevant conduct, we have repeatedly emphasized that the sentencing judge should

not automatically hold each defendant accountable for the total amount of cocaine involved in

the conspiracy, but must instead make individualized findings as to the specific amount of drugs

'each appellant might have reasonably foreseen his or her agreed-upon participation would

involve.'  Recognizing that findings are necessary 'to ensure careful adherence to . . . limitations

on co-conspiratorial liability,' we have not hesitated to remand for resentencing when the district

court has failed to make these individualized findings."); *United States* v. *Khandrius*, 613 F.

App'x 4, 7-8 (2d Cir. 2015) (vacating sentence because "the court gave undue weight to [the

defendant]'s knowledge of the fraud" rather than the scope of his agreement); *United States* v.

*Getto*, 729 F.3d 221, 235 (2d Cir. 2013) ("The District Court erred by sentencing defendant

based on the conduct of co-conspirators without making the requisite particularized findings . . .

regarding the scope of the defendant's agreement in the conspiracy and the foreseeability to the

defendant of the co-conspirators' conduct."); *United States* v. *Capri*, 111 F. App'x 32, 35-36 (2d

Cir. 2004) (vacating sentence where "[t]he court made no particularized findings concerning the

scope of the conspiracy agreed upon by [the defendant]").

The costs associated with remediating Mr. Edwards's and Ms. Patel's theft of PII

cannot, and should not, be attributed to Mr. Venkata.  Simply put, the evidence at trial clearly

established that Mr. Edwards and Ms. Patel fraudulently acquired the systems containing the PII

at issue long before Mr. Venkata joined the purported conspiracy.  *See, e.g.*, Trial Tr. Afternoon

Session, 43:7-13, 57:4-18, April 5, 2022 ("Q. Now, in 2009, Mr. Edwards provided you with a

USP -- excuse me, USPS-OIG information by DVD; is that right?  A. That's correct."); Trial Tr.

Morning Session, 69:12-19, March 30, 2022 ("Q. Now, in 2014, you had Ms. Patel copy EDS

source code, including the eSubpoena module, database files from DHS-OIG, the computer

network onto an optical disc, is that right?  A. I had her copy it, but I'm not sure that eSubpoena

was in existence at that time."); *see also* Indictment ¶ 5 ("In and around 2009, Defendant

EDWARDS provided Patel with a CD containing USPS-OIG's STARS database, source code,

scripts, and file server contents, which included the personally identifiable information ('PII') of

USPS employees."); *id.* ¶ 16(a) ("On or about October 14, 2014, after Defendant EDWARDS

had left DHS-OIG, Patel copied the EDS source code, which included the eSubpoena module,

and database files from the DHS-OIG computer network onto an optical disk.").  In short, the

Guidelines make clear that Mr. Venkata cannot be held responsible for losses associated with the

theft of either USPS-OIG PII or DHS-OIG PII because the evidence at trial showed that it was

stolen by Mr. Edwards and Ms. Patel long before Mr. Venkata's involvement, which the

government asserts occurred in the spring of 2016 (years after the initial thefts in 2009 and

2014).  *See* Gov't Mem. at 3.

       Moreover, in claiming that the sole pecuniary loss chargeable to Mr. Venkata

amounts to remediation costs, the government has effectively conceded Mr. Venkata's argument

in his Motion for Judgment of Acquittal and New Trial (ECF No. 166):  there was neither any

asportation nor a "serious interference with ownership rights," as required to prove stealing or

conversion, respectively, under 18 U.S.C. § 641.  Now, the government acknowledges, "the

offense conduct involved *copying rather than removing the property* and therefore *did not result*

*in the actual loss of its full value*."  Gov't Mem. at 9 (emphasis added).  But this is precisely

what proof of stealing and conversion require, as laid out in Mr. Venkata's memorandum in

support of his motion.  *See, e.g.*, *United States* v. *Collins*, 56 F.3d 1416, 1420 (D.C. Cir. 1995)

("The interference is of such a magnitude that the converter must pay the rightful owner the full

value of the property converted."); *United States* v. *Barlow*, 470 F.2d 1245, 1251 (D.C. Cir.

1972) (noting that stealing under section 641 is basically the common law crime of larceny, which "requires a wrongful taking and carrying away (asportation) of personal property of another with fraudulent intent to deprive the owner of his property without his consent").

Because the only loss proven at trial was based on the cost of remediating thefts of PII by Mr. Edwards and Ms. Patel that occurred years prior to Mr. Venkata allegedly joining the conspiracy, such conduct and loss amount cannot be attributed to Mr. Venkata under the Guidelines. Accordingly, no loss-based enhancement should be applied.

### 2. Role Adjustment for Use of a Special Skill

Both the PSR and the government assert that a two-level increase for "abuse of a position of trust or use of special skill" should be applied to Mr. Venkata under USSG § 3B1.3, but neither provides an adequate justification for the enhancement, and it is not applicable here.

In support of the enhancement, the PSR states that Mr. Venkata "used his position at DHS-OIG to access and copy Multiple Activation Keys and a Key Management Services Code for defendant Edwards and his business, DBS. Defendant Venkata's position within the DHS-OIG significantly contributed to facilitating the commission of the offense." PSR ¶ 60. In an email to counsel on March 20, 2022, and during a pretrial conference on March 21, 2022, however, the Government confirmed that it did not intend claim that Mr. Venkata stole the Activation Keys. Rather, the government conceded that it was Ms. Patel—not Mr. Venkata— who had in fact stolen those keys. *See* Pretrial Conference Hearing Tr. 15, 27, Mar. 21, 2022. The government accordingly did not offer any proof of the allegations against Mr. Venkata at trial. The theft of the activation keys thus cannot provide a basis for the enhancement as to Mr. Venkata.

The PSR also states that Mr. Venkata "worked on USPS-OIG's case management systems, including USPS-OIG's STAR database, as well as USPS-OIG's PARIS

applications.  As such, defendant Venkata was intimately familiar with USPS-OIG's PARIS applications and the STARS database."  PSR ¶ 60.  For its part, the government contends that Mr. Venkata "used a special skill, namely his expertise in computer programming generally and his knowledge of EDS in particular."  Gov't Mem. At 10.  Either way, Mr. Venkata's familiarity with these programs based on his workplace experience does not rise to the level of a "special skill" within the meaning of the Sentencing Guidelines.

Rather, the Guidelines make clear that a "special skill" is one "not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  USSG § 3B1.3, cmt. n.4.  Neither the PSR nor the government have articulated any special skill that comes close to this definition.  Mr. Venkata's role at DHS-OIG was "Information Technology (IT) Specialist," PSR ¶¶ 12, 60, 117, which is not alleged to have required any specialized education, training, or licensing, but rather amounted to an ordinary technical support role.  Indeed, Mr. Venkata holds only a bachelor's degree in "commerce," has no professional or graduate degrees, and has no professional licenses.  *See* Gov't Mem. at 15; PSR ¶¶ 112, 114-15.  The fact that Mr. Venkata became familiar with certain USPS-OIG or DHS-OIG programs in the course of working there over the course of a decade is unsurprising and does not set him apart from any other member of the general public with similar workplace experience.  And neither the PSR nor the government allege that Mr. Venkata's position was senior enough to qualify as a "position of trust."  Accordingly, the two-level enhancement should not be applied here.

### 3.    Minimal or Minor Role Adjustment

The PSR erroneously asserts that Mr. Venkata's conduct was "that of an average participant" and did not apply any role adjustment.  PSR ¶ 59.  Despite conceding that Mr. Venkata "was the most junior member of the conspiracy," the government similarly argues

that Mr. Venkata should not receive a minimal role adjustment.  Gov't Mem. at 5, 11.  The

minimal role adjustment "is intended to cover defendants who are plainly among the least

culpable of those involved in the conduct of a group," USSG § 3B1.2, cmt. n.4.  That is plainly

applicable here given Mr. Venkata's subordinate role to both Mr. Edwards and Ms. Patel.

Because Mr. Venkata's "criminal activity represents the most minimal of roles in a larger

concerted criminal enterprise," *United States* v. *Jackson*, 756 F. Supp. 23, 25 (D.D.C. 1991), he

is entitled to a four-point offense level reduction as a "minimal participant."  USSG § 3B1.2(a).

"The application of section 3B1.2 is inherently fact-bound," *United States* v. *Caballero*, 936 F.2d

1292, 1299 (D.C. Cir. 1991), and all the facts point in favor of a reduction.

   "The court should consider the following non-exhaustive list of factors" in

"determining whether to apply" the minimal role reduction:  "(i) the degree to which the

defendant understood the scope and structure of the criminal activity; (ii) the degree to which the

defendant participated in planning or organizing the criminal activity; (iii) the degree to which

the defendant exercised decision-making authority or influenced the exercise of decision-making

authority; (iv) the nature and extent of the defendant's participation in the commission of the

criminal activity, including the acts the defendant performed and the responsibility and discretion

the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit

from the criminal activity."  USSG § 3B1.2, cmt. n.3(C).

   Each of these factors requires that Mr. Venkata receive a minimal role adjustment.

*First*, Mr. Venkata's understanding of the scope and structure of the criminal activity was

limited.  There is no evidence that Mr. Venkata was aware of the alleged plan to sell the new

case management system back to the government.  Mr. Edwards conceded that he did not tell

Mr. Venkata about the plan himself.  *See* Trial Tr. Afternoon Session, 20:1-6, March 30, 2022

("Q. You, sir, never told him ultimately about why you were engaging these Indian developers, correct, which was to sell a commercial case-management system back to the government? A. If you're asking me if I said those exact words, no, I did not.").  Rather, he claimed Mr. Venkata was told during a "meeting that happened between Ms. Patel and Mr. Venkata" in early May. Trial Tr. Morning Session, 76:11-12, March 30, 2022.  But Ms. Patel testified multiple times that she never told Mr. Venkata about the plan to sell the system to the government.  Trial Tr. Afternoon Session, 68:24-69:5, April 5, 2022 ("Q. Did you ever explicitly tell Mr. Venkata that you were utilizing government information to create a case management system that you would sell back to the government for a profit? Did you ever explicitly have that conversation with Mr. Venkata? A. No."); Trial Tr. Afternoon Session, 94:14-19, April 5, 2022 ("Q. And you testified previously that you never explicitly told Mr. Venkata that Mr. Edwards' new case management system was based on those stolen workflows; is that right, and that you were selling it back for-profit, you never had that explicit discussion? A. That's correct.").  And Mr. Venkata was never involved in any discussions with Peter Paradis.

   *Second*, Mr. Venkata had no role in planning or organizing Mr. Edwards's and Ms. Patel's criminal scheme.  The government asserts Mr. Venkata participated in planning because he "proactively participated in the design of the commercial case management system," but only points to Mr. Venkata making suggestions for how to build an improved system.  *See* Gov't Mem. at 11-12.  Without more, however, there is nothing misleading, criminal, or even wrong with brainstorming ideas for how to improve a case management system, and doing so does not prove that Mr. Venkata had any role in planning a scheme to defraud the government. In fact, he had no such role, as he was never involved in any meetings or contact with Peter Paradis, any other government officials, Russell Barbee, or the computer programmers in India.

-13-

*Third*, Mr. Venkata did not exercise any decision-making authority in the scheme. Indeed, the PSR and the government both acknowledge that it was Mr. Edwards who "recruited and instructed" Mr. Venkata throughout the duration of the scheme.  PSR ¶ 58; Gov't Mem. at 10.  *Fourth*, to the extent that Mr. Venkata performed acts in furtherance of the scheme, they were discrete, limited, and without substantial discretion—he was simply following orders. While Mr. Edwards was travelling to India and meeting with government representatives, Mr. Venkata was merely acting as a technology troubleshooter and courier for DVDs.  PSR ¶¶ 46-47.  *Finally*, Mr. Venkata did not benefit, or expect to benefit, in any way from the criminal activity.  *See* Trial Tr. Afternoon Session, 79, Apr. 5, 2022; Trial Tr. Afternoon Session, 11, Mar. 30, 2022.

Mr. Venkata's role more closely resembles those who have merited a minimal participant adjustment under the Guidelines.  Like a "defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner," Mr. Venkata "received little personal gain."  USSG § 3B1.2, cmt. n.3(A).  Like the minimal participant defendant in *United States* v. *Jackson*, 756 F. Supp. 23 (D.D.C. 1991), Mr. Venkata "never had any hope or intention of receiving payment in currency for [his] efforts."  *Id.* at 25.  A defendant, like Mr. Venkata, "who does not have a proprietary interest in the criminal activity . . . should be considered for an adjustment under this guideline."  USSG § 3B1.2, cmt. n.3(B).

In the alternative, at a minimum, Mr. Venkata is entitled to a two- or three-level reduction under USSG § 3B1.2(b), which is applicable to a defendant "who is less culpable than most other participants in the criminal activity."  USSG § 3B1.2, cmt. n.5.  As shown at trial, Mr. Venkata was plainly less culpable than Mr. Edwards or Ms. Patel, the other participants in the scheme.  Where "the defendant had a lower level of culpability than other participants in the

conspiracy," "[i]t is clear error for a district court not to consider" such an adjustment. *United States* v. *Graham*, 317 F.3d 262, 272 (D.C. Cir. 2003).

This Court has applied the minor role adjustment to similarly situated defendants in other cases. In *United States* v. *Coates*, 294 F.Supp.2d 11 (D.D.C. 2003), the defendant, convicted as part of a drug dealing scheme, was "directed by at least two . . . other individuals" who were romantically involved. *Id.* at 20. Like Mr. Venkata, "the defendant [in *Coates*] had to consult with these individuals" in her role. *Id.* at 20, 21. And like Mr. Venkata, the defendant was far "'less culpable' than the other relevant participants" and this required a downward role adjustment. *Id.* at 21.

The same logic applies to white collar conspiracy cases. In *United States* v. *Schaffer*, 121 F. Supp. 2d 19 (D.D.C. 2000), vacated, 240 F.3d 35 (D.C. Cir. 2001), the Court sentenced a defendant convicted of helping to arrange illegal gratuities to the then-Secretary of Agriculture, including travel to an executive's birthday party. The defendant's conduct involved "contacting the Department of Agriculture and making the travel arrangements," but he "did not extend the invitation, plan the party, or directly furnish any part of the gratuity." *Id.* at 31. Because the defendant's role was that of a "facilitator" and his "culpability was relatively minor compared with that of the others," the Court applied a downward minor participant adjustment. Similarly, while some of Mr. Venkata's conduct might be described as "facilitating" Mr. Edwards's and Ms. Patel's criminal scheme, he hardly "plan[ned] the party." Accordingly, and because the government here concedes he was "the most junior member of the conspiracy," Gov't Mem. at 5, Mr. Venkata is entitled to a minimum two-point reduction under USSG § 3B1.2.

-15-

## II.     The 18 U.S.C. § 3553(a) Factors Support a Sentence of Probation

Following *United States* v. *Booker*, 543 U.S. 220 (2005), the Sentencing

Guidelines are "effectively advisory," *United States v. Picket*, 475 F.3d 1347, 1351 (D.C. Cir.

2008) (en banc), and serve only as "the starting point and the initial benchmark" for the

determination of an appropriate sentence. *Gall* v. *United States*, 552 U.S. 38, 49-50 (2007).

"The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be

*presumed* reasonable." *Nelson* v. *United States*, 555 U.S. 350, 352 (2009); *see also, e.g.*, *Peugh*

v. *United States*, 569 U.S. 530, 536-37 (2013). Accordingly, a District Court may not require a

defendant to present "compelling reasons" to justify a below-Guidelines sentence. *United States*

v. *Terrell*, 696 F.3d 1257, 1262 (D.C. Cir. 2012).

In fashioning an appropriate sentence, sentencing courts must "consider all the

[18 U.S.C.] § 3553(a) factors and then undertake 'an individualized assessment based on the

facts presented.'" *United States* v. *Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (quoting *Gall*, 552

U.S. at 39). Underlying this inquiry is a further imperative for courts to "impose a sentence

sufficient, but not greater than necessary" to accomplish the aims of sentencing set out in

§ 3553(a)(2).

A sentence of probation would be sufficient in the present case to achieve the

purposes of sentencing set out in § 3553(a)(2). In particular, such a sentence is supported by the

nature and circumstances of the offense, and by Mr. Venkata's history and characteristics, plan

for a productive and law-abiding future, and limited role in the offense conduct.

### A.     The Nature and Circumstances of the Offense Support a Sentence of Probation

With respect to the nature and circumstances of the offense, Mr. Venkata agreed

to help Mr. Edwards and Ms. Patel with certain discrete tasks, but there is no evidence that he

-16-

*understood* or *intended to further* any broader plan to defraud the government.  Rather, the evidence supports that Mr. Venkata believed he was helping Mr. Edwards to develop a new and improved case management system, which is not inherently a criminal or problematic goal.  To the contrary, the evidence at trial indicated that the goal was to build a better product, which would improve government efficiency.  Mr. Venkata's role in the misconduct was limited in both scope and duration, as he joined the conspiracy in mid-2016, years after it began, and less than a year before it ended in early 2017.  Importantly, as described in detail above, he joined the conspiracy after the primary alleged harm occurred—the copying of PII of USPS-OIG and DHS-OIG employees—which was carried out by Mr. Edwards and Ms. Patel years earlier.  Moreover, there is no dispute that Mr. Venkata's role was less significant than those of his co-defendants Mr. Edwards and Ms. Patel, and there is no evidence that Mr. Venkata understood that any harm would, could, or did result from his actions.  Prior to his participation in the alleged scheme, Mr. Venkata had worked lawfully all of his adult life, and he earned nothing from assisting Mr. Edwards and Ms. Patel.

**B.      Mr. Venkata's History and Characteristics Support a Sentence of Probation**

Similarly, Mr. Venkata's history and characteristics support a sentence of probation in this case.  Since marrying his wife more than two decades ago and having a daughter, Mr. Venkata has remained steadfastly committed to his family, providing stability and support to both his wife and daughter.  As noted in the PSR, Mr. Venkata has no criminal history, and the instant offense was his first encounter with the law.

Mr. Venkata's character and ties to his family are best described by those closest to him.  In the attached letters of support, Mr. Venkata is described as "the most responsible, reliable and hardworking person" and "always a generally helpful and good-hearted individual" (Ex. A (Letter from Madhavi Yamuzala Krishna)); "the best father I could have ever asked for,"

a person with "honesty and [a] giving nature," and "always . . . the first to reach out" to "anyone in who was in need of help" (Ex. B (Letter from Madhumita Yamuzala)); and "a great person," "an excellent friend," "a generous, kind character," and "hardworking and devoted to his family" (Ex. C (Letter from Stalin Rajaram)).  As described in these letters, Mr. Venkata has always been an integral part of his daughter's life—her "lifeline"—and extended separation from her would be devastating.

Mr. Venkata also benefits from a strong support network and has a plan—to continue working and caring for his daughter—that will give him a fresh start.  Having this support network meaningfully lowers Mr. Venkata's chances of recidivism and significantly improves his likelihood of becoming a productive member of society.  *See, e.g.*, Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 JUST. Q. 382, 385-86 (2011) (surveying research on impact of family ties on recidivism and distilling that "[1] [such] ties have a controlling effect on returning offenders' behavior . . . [2] they provide a provision of emotional support . . . and [3] they facilitate identity transformation").

This Court may properly consider Mr. Venkata's good character, firm familial ties, and dedicated support system—as well as Mr. Venkata's corresponding reduced risk of recidivism—in determining his sentence.  *See, e.g.*, *United States* v. *Blackwell*, 897 F. Supp. 586 (D.D.C. 1995) (imposing below-Guidelines sentence based on combination of factors, including defendant's extraordinary family circumstances and the fact that the offense was an act of aberrant behavior); *United States* v. *Lawrence*, 254 F. Supp. 3d 441, 448 (E.D.N.Y. 2017) (imposing below-Guidelines sentence in part after considering defendant's "family situation"); *United States* v. *Celado*, 2011 WL 4494803, at *6 (S.D.N.Y. Sept. 28, 2011) (same, in part

because defendant had a "family support network"); *United States* v. *Padilla*, 2011 WL 1311843, at *8 (S.D.N.Y. Apr. 1, 2011) (same, in part because of "[d]efendant's personal and family circumstances"); *United States* v. *Butler*, 264 F.R.D. 37, 38 (E.D.N.Y. 2010) (same, in part because defendant's "young child and loving wife suggest the desirability of defendant's early presence at home, working and supporting his family" and defendant had "a strong supportive network of extended family [and] friends"); *see also United States* v. *Mood*, 2020 WL 3256333, at *1 (S.D.N.Y. June 16, 2020) (noting that the "[c]ourt imposed a below-Guidelines sentence" in part because the defendant "enjoyed strong family support").

In addition, given Mr. Venkata's current age of 58 years old, he will pose a significantly reduced risk of recidivism and danger to the community.  As courts have acknowledged, "widely available, definitive research demonstrat[es] that recidivism substantially decreases with age." *United States* v. *Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017).  In fact, the recidivism rate of older offenders (21.3%) is less than half that of offenders under the age of 50 (53.4%).[5]  Despite these telling figures, the Sentencing Guidelines do not consider age in assessing the likelihood of recidivism.  The Court may correct for this omission in the Guidelines by properly factoring Mr. Venkata's age and associated low risk of recidivism into his sentence. *See, e.g.*, *United States* v. *Hamilton*, 323 F. App'x 27, 30-31 (2d Cir. 2009) (remanding Guidelines sentence because sentencing court did not consider defendant's age and reduced recidivism risk); *United States* v. *Mitchell*, 2017 WL 1399754, at *4 (E.D.N.Y. Apr. 11, 2017) (sentencing 30-year-old defendant to term of imprisonment 40 months below Guidelines range in part because, after serving his sentence, defendant "will have reached an age at which recidivism

---

[5]     *See* U.S. Sentencing Commission, *Older Offenders in the Federal System* 43 (July 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

is less likely"); *United States* v. *Calcano*, 2014 WL 148637, at *9 (S.D.N.Y. Jan. 15, 2014)

(concluding that the court "would have imposed a non-trivially different sentence . . . had the

Guidelines been advisory at the time," in part because the likelihood of recidivism was low due

to the defendant's age).

   **C.      A Sentence of Probation Is Sufficient, but Not Greater than Necessary, to
            Comply with the Purposes of Sentencing**

         In sentencing Mr. Venkata, the Court must "'impose a sentence sufficient, but not

greater than necessary, to comply with'" the "purposes of sentencing" set out in 18 U.S.C.

§ 3553(a)(2).  *Dean* v. *United States*, 137 S. Ct. 1170, 1175 (2017) (quoting 18 U.S.C.

§ 3553(a)).  Those aims include the need for the sentence to (i) reflect the seriousness of the

offense, promote respect for the law, and provide just punishment; (ii) afford adequate

deterrence; (iii) protect the public; and (iv) provide educational or vocational training, medical

care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a)(2)(A)-(D).  A sentence of

probation would serve those goals here.

         *First*, a sentence of probation reflects the seriousness of Mr. Venkata's offense,

promotes respect for the law, and provides just punishment.  Theft and fraud are undoubtedly

serious crimes, but as noted above and in Mr. Venkata's pending motions to dismiss,

Mr. Venkata was not responsible for any loss or conversion and did not intend to engage in a

scheme to defraud.  Notably, even assuming the validity of Counts One, Two, and Eleven,

Mr. Venkata is only alleged to have joined the conspiracy in the spring of 2016, years after it

began, and less than a year after it concluded.  And as compared to his co-defendants,

Mr. Venkata's participation was significantly more limited.

         *Second*, a term of probation provides both specific and general deterrence.

Mr. Venkata must face the consequences of a felony conviction, strict probation requirements,

and home or community confinement, and the threat of being separated from his wife and

daughter has been devastating to him.  Mr. Venkata has no intention of putting his loved ones

through any such criminal consequences again.  A sentence of probation is sufficient to deter

Mr. Venkata from engaging in further criminal activity and will advance the interest of general

deterrence by showing that the crime of which Mr. Venkata was convicted is seriously pursued

and punished.

       *Third*, a sentence of probation is sufficient to protect the public.  Mr. Venkata will

be closely monitored and partially segregated from the public during his term of probation and,

as discussed above, the probability that he will reoffend is significantly lower given his familial

ties and support network.

       *Fourth*, a sentence of probation will give Mr. Venkata the opportunity to continue

working in order to provide for his family and make restitution payments, and it would enable

him to continue providing day-to-day support for his daughter.

> **D.    A Sentence of Probation Is Available and May Be Imposed to Satisfy the Minimum Term of the Applicable Guideline Range**

       Finally, probation is among the kinds of sentences available in this case and may

be used to satisfy the minimum term of the applicable Guideline range, to the extent the Court

finds Mr. Venkata's offense level is 11 or less.  Specifically, where the applicable guideline

range is in Zone A of the Sentencing Table, a sentence of imprisonment is not required, USSG

§ 5C1.1(b), and where the applicable guideline range is in Zone B of the Sentencing Table, the

minimum term may be satisfied by "a sentence of probation that includes a condition or

combination of conditions that substitute intermittent confinement, community confinement, or

home detention for imprisonment," *id.* § 5C1.1(c)(3); *see also id.* § 5B1.1(a) (authorizing a

sentence of probation where the applicable guideline range is in Zone A or B of the Sentencing

Table).  Accordingly, a sentence of probation with a term of community confinement or home detention would satisfy the minimum term of the applicable Guideline range here.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court sentence Mr. Venkata to a term of probation.

Dated: New York, New York
        December 27, 2023

_____/s/ Katherine M. Savarese_____
Katherine M. Savarese (*pro hac vice*)
Jared R. Rosenfeld (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com

Kamil R. Shields
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
