**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

MURALI YAMAZULA VENKATA,

*Defendant*.

Criminal Action No. 20-66 (RDM)

**MEMORANDUM OPINION AND ORDER**

After a jury trial, Defendant Murali Yamazula Venkata was convicted of conspiracy in violation of 18 U.S.C. § 371 (Count One); theft of government property in violation of 18 U.S.C. § 641 (Count Two); wire fraud in violation of 18 U.S.C. § 1343 (Count Eleven); aggravated identity theft in violation of 18 U.S.C. § 1028A (Count Thirteen); and destruction of records in violation of 18 U.S.C. § 1519 (Count Sixteen). Dkt. 154 (Jury Verdict Form). Pending before the Court is Venkata's motion for judgment of acquittal or a new trial. Dkt. 166.

In one important respect, Venkata has already prevailed on this motion. After briefing was completed but before oral argument, the Court noted that the Supreme Court had granted *certiorari* in *Dubin v. United States*, No. 22-10, to consider a question closely related to Venkata's challenge to Count Thirteen, *see* Min. Order (Nov. 10, 2022), and the Court subsequently stayed the matter pending the Supreme Court's resolution of the question posed in *Dubin*, *see* Min. Order (Nov. 16, 2022). Then, after the Supreme Court issued its decision in *Dubin*, the government moved voluntarily to dismiss Count Thirteen with prejudice in light of that decision. Dkt. 206. The Court granted that motion, *see* Min. Order (Aug. 10, 2023), and later entered a housekeeping order dismissing Counts Twelve, Fourteen, and Fifteen, which

raised similar allegations of aggravated identity theft that the Court had declined to submit to the jury on grounds of multiplicity, *see* Min. Order (Nov. 14, 2023).

As a result, all that remains are Venkata's challenges to his conspiracy, theft of government property, wire fraud, and destruction of records convictions (Counts One, Two, Eleven, and Sixteen). With the able assistance of pro bono counsel, Venkata raises multiple challenges to each. For the reasons explained below, however, the Court concludes that Venkata is not entitled to a judgment of acquittal or a new trial with respect to any of the remaining charges. The Court will, accordingly, **DENY** his challenges to Count Thirteen as moot, and will otherwise **DENY** his motion on the merits.

## I. BACKGROUND

The Indictment alleged the following: Venkata joined the U.S. Department of Homeland Security-Office of Inspector General ("DHS-OIG") in June 2010 as an Information Technology Specialist in the IT Division. Dkt. 1 at 2 (Indictment ¶ 3). Sonal Patel served as an Enterprise Applications Branch Chief in the DHS-OIG IT Division, and she supervised Venkata. *Id.* at 2–3 (Indictment ¶¶ 4–5). "Patel oversaw the development and maintenance of DHS-OIG's Enforcement Database System ('EDS')." *Id.* at 2 (Indictment ¶ 4). EDS was DHS-OIG's case management system. *Id.* at 3 (Indictment ¶ 8). DHS-OIG "obtained ownership rights to the EDS source code" in 2008 and "subsequently modified and enhanced" the system, including by creating the "eSubpoena module," which Venkata developed under Patel's supervision. *Id.* at 3–4 (Indictment ¶ 8). From February 2008 to December 2013, Charles Kumar Edwards worked at DHS-OIG, including serving for a time as the Acting Inspector General. *Id.* at 1 (Indictment ¶ 2). Edwards was Patel's direct supervisor. *Id.* at 3 (Indictment ¶ 5).

Venkata, Patel, and Edwards had all previously worked for the U.S. Postal Service-Office of Inspector General ("USPS-OIG"). *Id.* at 1–3 (Indictment ¶¶ 2–4). At USPS-OIG, Edwards had supervised Patel. *Id.* at 3 (Indictment ¶ 5).[1] "While at USPS-OIG, Patel worked on USPS-OIG's case management systems, including USPS-OIG's STARS database, which was used primarily for investigations and audits, as well as USPS-OIG's Performance and Results Information System ('PARIS'), which USPS-OIG employees used to interface with the STARS database." Dkt. 1 at 3 (Indictment ¶ 5). In 2009, now at DHS-OIG, Edwards "provided Patel with a CD containing USPS-OIG's STARS database, source code, scripts, and file server contents, which included the personally identifiable information ('PII') of USPS employees." *Id.* At Edwards' direction, Patel subsequently copied "the contents of the CD onto the DHS-OIG server to enhance DHS-OIG's audit system." *Id.*

In September 2015, after leaving DHS-OIG, Edwards founded his own company, known as Delta Business Solutions, Inc. or DBS, with its principal place of business located in Edward's residence in Sandy Spring, Maryland. *Id.* at 2, 3 (Indictment ¶¶ 2, 6). Eventually, Edwards and DBS sought to create and to market "a private, commercially owned version of a case management system to be offered for sale to government agencies." *Id.* at 5 (Indictment ¶ 12). Among other things, Edwards conspired with Patel and Venkata to sell such a system to the U.S. Department of Agriculture-Office of Inspector General ("USDA-OIG"). *Id.* at 5 (Indictment ¶ 11(b)).

[1] At USPS-OIG, Edwards hired Venkata as a contractor to assist with developing USPS-OIG's technology systems. Dkt. 175 at 19 (Tr. 19:15–22) (Edwards).

Count One of the Indictment alleged that Venkata, Patel, and Edwards conspired to commit theft of government property and to defraud the United States. In separate subparagraphs, it alleged, first, that the three conspired:

> to willfully and knowingly steal, purloin, and convert copies of DHS-OIG's EDS system, copies of DHS-OIG's EDS source code and database files, copies of USPS-OIG's case management system, copies of USPS-OIG's STARS database and PARIS system, the PII of approximately 246,167 DHS employees and approximately 6,723 U.S. Postal Service ("USPS") employees . . . [,][2]

*id.* at 4 (Indictment ¶ 11(a)), and, second, alleged that they conspired:

> to defraud the United States by devising and intending to devise a scheme to defraud and for obtaining money and property from the U.S. Department of Agriculture-Office of Inspector General ("USDA-OIG") means of materially false and fraudulent pretenses, representations, and promises, and by concealing material facts[,]

*id.* at 5 (Indictment ¶ 11(b)).

In describing the "manner and means of the conspiracy," the Indictment alleged that "Venkata and Patel accessed and copied (1) DHS-OIG's EDS system; (2) DHS's EDS source code, including the eSubpoena module," which Venkata had created; "(3) DHS-OIG's database, which included the PII of DHS employees; and (4) USPS-OIG's STARS database and PARIS system, which included the PII of USPS employees," and that "Venkata and Patel delivered [those materials] to Edwards after . . . Edwards had left his employment with DHS-OIG." *Id.* at 6 (Indictment ¶ 15(a)) (capitalization altered). The Indictment further alleged that "Venkata and Patel transmitted [the materials to] Edwards to assist . . . Edwards with the creation and development of a private, commercially owned version of a case management system to be

[2] The Indictment also alleged a conspiracy to "steal, purloin, and convert . . . Multiple Activation Keys and a Key Management Services Code associated with various Microsoft software products." Dkt. 1 at 4–5 (Indictment ¶ 11(a)). The Court omitted that allegation, however, in charging the jury. *See* Dkt. 146 at 33–49.

offered for sale to government agencies for the benefit, enrichment, and profit of . . . Edwards and his business DBS," and that Edwards transmitted the material "to software developers in India who were assisting [him] with the creation . . . of [his own] version of a case management system for sale to government agencies." *Id.* at 6–7 (Indictment ¶¶ 15(c) & (e)) (capitalization altered). Finally, the Indictment alleged that "Edwards and Patel concealed their theft of EDS-related software, source code, databases, information, and PII from USDA-OIG . . . to encourage and induce USDA-OIG into purchasing EDS 2.0 for the benefit, enrichment, and profit of . . . Edwards and his business DBS." *Id.* at 7 (Indictment ¶ 15(g)) (capitalization altered).

In addition to these conspiracy allegations, the Indictment further alleged that Edwards and Venkata did, in fact, "willfully and knowingly steal, purloin, and convert copies of DHS-OIG's EDS system, . . . source code and database files, [and] case management system," and "copies of UPS-OIG's STARS database and PARIS system, [and] the PII of approximately 246,167 DHS employees and approximately 6,723 USPS employees" and that the value of this government property exceeded $1,000. *Id.* at 15–16 (Indictment ¶ 18). It alleged that they engaged in wire fraud by "devis[ing] a scheme to defraud USDA-OIG, and to obtain the property of USDA-OIG[,] by means of materially false and fraudulent pretenses, representations, and promises, and by concealing material facts," including the fact that the case management system that Edwards sought to sell to USDA-OIG was developed using stolen U.S. government property. *Id.* at 16 (Indictment ¶ 20). And it alleged that Venkata obstructed justice by destroying records "with the intent to impede, obstruct, and influence" an ongoing investigation. *Id.* at 20 (Indictment ¶ 35).

In total, the Indictment contained sixteen counts. It charged Venkata in eight of the sixteen: Conspiracy to Commit Theft of Government Property and to Defraud the United States

in violation of 18 U.S.C. § 371 (Count One); Theft of Government Property in violation of 18 U.S.C. § 641 (Count Two); Wire Fraud in violation of 18 U.S.C. § 1343 (Count Eleven); Aggravated Identify Theft in violation of 18 U.S.C. § 1028A and 2 (Counts Twelve through Fifteen); and Destruction of Records (Count Sixteen). *See* Dkt. 1. The government charged Patel in a separate information with one count of conspiracy, in violation of 18 U.S.C. § 371. *See* Superseding Information at 1, *United States v. Patel*, No. 19-cr-81 (D.D.C. filed Mar. 22, 2019) (Dkt. 3). Patel pleaded guilty on April 4, 2019. Min. Entry, *Patel*, No. 19-cr-81, (Apr. 4, 2019).

Edwards and Venkata initially entered pleas of not guilty, *see* Min. Entry (Mar. 6, 2020), but Edwards later entered a plea of guilty as to Counts One and Two of the Indictment, *see* Min. Entry (Jan. 14, 2022). Venkata proceeded to trial, which began March 29, 2022. *See* Min. Entry (Mar. 29, 2022). After the government rested its case, Venkata moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, Dkt. 183 at 31 (Tr. 31:2–3), and the Court reserved decision on the motion, *id.* at 98 (Tr. 98:8). The presentation of evidence closed April 7, 2022, and jury deliberations began that same day. *See* Min. Entry (Apr. 7, 2022). In light of Venkata's argument that the four counts alleging aggravated identify theft were multiplicitous, and the government's concession that it would not, in any event, seek consecutive sentences on those counts, the Court sent only one of the aggravated identify theft counts to the jury—Count Thirteen—Dkt. 146 at 46, and the Court subsequently dismissed Counts Twelve, Fourteen, and Fifteen, *see* Min. Order (Nov. 14, 2023). The jury concluded its deliberations on April 11, 2022, and returned a verdict of guilty as to Venkata on each of the remaining charges: Counts One, Two, Eleven, Thirteen, and Sixteen. *See* Min Entry (Apr. 11, 2022); Dkt. 154.

On May 20, 2022, Venkata filed a renewed motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and motion for a new trial pursuant Federal Rule of Criminal Procedure 33. Dkt. 166. The government opposed that motion. Dkt. 169. On November 16, 2022, the Court stayed proceedings on Venkata's pending motions in light of the Supreme Court's decision to grant a writ of certiorari in *Dubin v. United States*, in which the question presented was similar the question posed by Venkata's challenge to his § 1028A conviction. *See* Min. Order (Nov. 16, 2022). After the Supreme Court issued its decision in *Dubin* on June 8, 2023, the government moved pursuant to Federal Rule of Criminal Procedure 48(a) to dismiss Count Thirteen with prejudice. Dkt. 206. The Court granted that motion and dismissed Count Thirteen on August 10, 2023. *See* Min. Order (Aug. 10, 2023).

On August 29, 2023, the Court heard oral argument on Venkata's Motion for Judgment of Acquittal and New Trial, Dkt. 166, and invited the parties to file supplemental briefs addressing the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). Min. Entry (Aug. 29, 2023). Arguing that the government's brief went beyond this limited mandate, Venkata sought leave to file a brief in reply and in further support of his motion, which the Court granted. Dkt. 210; Min. Order (Sept. 11, 2023). Briefing on Venkata's motion was completed on October 3, 2023, when Venkata filed his reply, Dkt. 211.

After these multiple detours, Venkata's motion is now ripe for resolution.

## II. LEGAL STANDARDS

Defendant's motion is premised on Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. Under Rule 29, the Court is required, on a defendant's motion, to enter "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In evaluating a Rule 29 motion, the Court must construe the evidence in the light

most favorable to the government and must affirm the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This analysis further requires the Court to "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences," *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983), which means "a judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt," *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983); *accord United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008). In undertaking this analysis, the Court "owe[s] tremendous deference to [the] jury['s] verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990).

Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning," but the D.C. Circuit has held that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal citations and quotation marks omitted). The defendant bears the burden of demonstrating that a new trial is justified, *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982), and the Court has "broad discretion" in assessing whether the defendant has carried that substantial burden, *Wheeler*, 753 F.3d at 208.

## III. ANALYSIS

Venkata challenges the sufficiency of each of his convictions, and he contends that the Court incorrectly instructed the jury in two respects. The Court takes each of these arguments in turn.

### A. Conspiracy to Defraud and Wire Fraud

Venkata first argues that the jury lacked sufficient evidence to convict him of either conspiracy to defraud the United States under 18 U.S.C. § 371 or wire fraud under 18 U.S.C. § 1343.[3] Dkt. 166-1 at 10. Section 371 provides, in relevant part, that it is a crime for "two or more persons [to] conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose," if a member of the conspiracy commits at least one overt act "to effect the object of the conspiracy." 18 U.S.C. § 371. Section 1343 provides that it is a crime for someone, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," to "transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.]" 18 U.S.C. § 1343. Neither Section 371 nor Section 1343 requires that the defendant (or his co-conspirators) complete the alleged fraud. Section 371 merely requires an agreement among two or more people to commit a fraud and a single overt

---

[3] As discussed further below, Count One charged Venkata in the disjunctive with conspiracy to defraud the United States *and* conspiracy to commit the offense of theft of government property, Dkt. 1 at 4–5 (Indictment ¶ 11(a)–(b)), and the jury convicted him on both theories, Dkt. 154 at 1. Accordingly, to prevail on his motion for judgment of acquittal on Count One, he bears the burden of demonstrating that the evidence was insufficient to support the jury's verdict on either theory. Venkata's separate challenge to the jury's alternative finding that he conspired to commit the offense of theft of government property is discussed in the subsequent section.

act in furtherance of that conspiracy, and Section 1343 merely requires a scheme to defraud and a single interstate "wire" or "radio" communication in furtherance of that scheme.

In support of its conspiracy to defraud charge, the government alleged, in relevant part, that Venkata was a party to an agreement "to defraud the United States by devising [or] intending to devise a scheme to defraud [or] for obtaining money or property from the U.S. Department of Agriculture-Office of Inspector General ('USDA-OIG') [by] means of materially false [or] fraudulent pretenses, representations, [or] promises, [or] by concealing material facts." Dkt. 1 at 5 (Indictment ¶ 11(b)). And, in support of the wire fraud charge, the government alleged that Venkata "knowingly devised a scheme to defraud USDA-OIG, and to obtain property of USDA-OIG by means of material false and fraudulent pretenses, representations, [or] promises, [or] by concealing material facts," *id.* at 16 (Indictment ¶ 20), or that he aided and abetted others in doing so, and that he "transmit[ted] [or] cause[d] to be transmitted by means of wire communications, in interstate commerce" a "[t]elephone call from . . . Edward's cell phone to [his] cell phone to arrange for . . . Edwards to pick up DVDs containing government software and information in the District of Columbia," *id.* at 17–18 (Indictment ¶ 22) (capitalization altered).

Venkata challenges his fraud convictions on the grounds that "[t]he evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that any of the defendants (much less Mr. Venkata) sought to cheat the government, that Mr. Venkata had any knowledge of the scheme, or that the relevant wire communication by Mr. Venkata crossed state lines." Dkt. 166-1 at 11.

**1.**

Venkata first argues that the government did not prove a scheme to defraud because, he asserts, it is not enough to show that the conspirators (or the principal for purposes of aiding and abetting liability) intended to deceive the government in a manner designed to induce a sale. Dkt. 166-1 at 10. Rather, on Venkata's view, proving a scheme to defraud requires also proof of an intent to *harm* the victim of the fraud. Dkt. 170 at 4. He further argues that "[t]here was simply no intent to harm USDA-OIG here, and indeed USDA-OIG suffered no harm—because it both received the free copy of EDS that it sought, never came close to parting with any money, and would still have received what it bargained for it if had paid for the new program." *Id.* at 5.

To the extent Venkata contends that no rational jury could have found for the government on the fraud charges because USDA-OIG "never came close to parting with any money," that argument fails. The government was not required to prove that the conspirators (or principal and aider and abettor) succeeded in their scheme to sell USDA-OIG a case management system developed using stolen property—what mattered is whether they "conspired" to defraud, 18 U.S.C. § 371, or "devised or intend[ed] to devise a scheme" to defraud, 18 U.S.C. § 1343. The fact that USDA-OIG was not actually defrauded is immaterial. *See United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) ("It is the scheme to defraud and not actual fraud that is required."); *United States v. Han*, 280 F. Supp. 3d 144, 153 (D.D.C. 2017) ("A defendant who devised a scheme to bilk a victim out of her money using wire communications but never received any property can be guilty of wire fraud." (cleaned up)).

Here, moreover, the scheme progressed well beyond the thresholds that Congress specified in Section 371 and Section 1343. With respect to Section 371, there was ample evidence that a named conspirator committed one or more of the over forty overt acts listed in

the Indictment. Dkt. 1 at 7–15 (Indictment ¶ 16). Most notably, the evidence supported the allegation that Patel and Edwards met with the Deputy Assistant Inspector General for Investigations at the USDA, Peter Paradis, Dkt. 175 at 24–25 (Tr. 24:23–25:3) (Edwards), on or about May 26, 2016, "to give a sales pitch to Mr. Paradis on the benefits of [Edward's] version of the next generation EDS," *id.* at 35 (Tr. 35:23–35:25) (Edwards), which was "well down the road of being near production ready for visual demonstration," Dkt. 178 at 45 (Tr. 45:12–45:13) (Paradis). The evidence also showed that Edwards discussed potential pricing with Paradis—$150,000 for the first year and roughly $40,000 for "out-year operation" and maintenance fees. *Id.* at 46 (Tr. 46:10–16) (Paradis). And, as to Section 1343, there was ample evidence, as discussed further below, that Venkata spoke with Edwards by telephone on March 22, 2017, to arrange for Edwards to pick up the DVDs containing government software and information and that Venkata was in the District of Columbia and Edwards was in Maryland, when this call occurred. *See* Dkt. 176 at 6–7 (Tr. 6:9–7:10) (Edwards). There was also evidence sufficient to permit a reasonable jury to find beyond a reasonable doubt that Venkata was aware of the alleged scheme to defraud by then, *see*, *e.g.*, Dkt. 175 at 43–44 (Tr. 43:21–44:11) (Edwards), and, accordingly, that the communication was in furtherance of that scheme.

Venkata's second argument—that there was no intent to harm, and thus no fraud, because the government would have received precisely what it bargained for—wades into a circuit split (and perhaps an intra-circuit split) on what is required to prove an intent to defraud. Venkata grounds his argument in a line of Second Circuit decisions following *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), and the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). *See* Dkt. 166-1 at 12. Under the Second Circuit view, "[a]lthough the government is not required to prove actual injury, it must, at a

minimum, prove that defendants *contemplated* some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) (citing *Regent Office*, 421 F.2d 1174). These cases draw "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also Starr*, 816 F.2d at 98 ("[T]he deceit must be coupled with a contemplated harm to the victim," and "the harm contemplated must affect the very nature of the bargain itself."). Or, in the words of the Eleventh Circuit, "if a defendant does not intend to harm the victim—'to obtain, by deceptive means, something to which [the defendant] is not entitled'—then he has not intended to defraud the victim." *Takhalov*, 827 F.3d at 1313 (quoting *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011)) (alteration in original). This is true, moreover, "even if the transaction would not have occurred but for the trick." *Id.*

The government, in contrast, invokes a line of decisions upholding wire and mail fraud convictions where the defendants misrepresented their eligibility and preferred-status to compete for government contracts. In *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), for example, the Seventh Circuit upheld the conviction of the defendants, who misrepresented themselves as minority- or women-owned businesses in order to qualify for certain city contracts. In doing so, the court rejected the defendants' argument that "the city would ostensibly have paid the same for the services regardless" and it thus "lost no money," holding instead that neither the wire fraud nor the mail fraud statute requires "the government to prove either contemplated harm to the victim or any loss." *Id.* at 786–87. As the court explained, the object of the fraud must be

money or property, but that does not mean that that the victim must suffer a financial loss. *Id.* at 787. Rather, it is sufficient that "the scheme precisely and directly target[s] [the victim's] coffers." *Id.* at 788.

Similarly, in *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), the Eleventh Circuit upheld wire and mail fraud convictions, where the defendant obtained contracts set aside for disadvantaged business enterprises ("DBEs") by falsely representing that certain work required under the contracts would be performed by a qualifying DBE. Like the Seventh Circuit in *Leahy*, the Eleventh Circuit rejected the contention—central to Venkata's argument here—that no fraud can occur when the alleged victim received the precise services that it sought. *Id.* at 1302. As in *Leahy*, the court held that it was sufficient that the defendant "obtained . . . contracts and substantial payments . . . for which it was not eligible." *Id.* at 1303.

In the Court's view, *Leahy* and *Maxwell* are true to the plain language of Section 1343 and, by extension, to the plain language of Section 371. Section 371 makes it a crime to conspire to "defraud the United States, or any agency thereof in *any* manner or for *any* purpose." 18 U.S.C. § 371 (emphasis added). This language is, if anything, more expansive than the language contained in the first clause of the bank fraud statute, which makes it a crime "knowingly [to] execut[e] or attempt[] to execute[] a scheme . . . to defraud a financial institution." 18 U.S.C. § 1344(1); *cf. Loughrin v. United States*, 134 S. Ct. 2384 (2014) (construing the first and second clauses of § 1344 as independent prohibitions). Yet, in *Shaw v. United States*, 580 U.S. 63 (2016), the Supreme Court rejected an interpretation of the first clause of the bank fraud statute much like the argument that Venkata presses here. As the Court explained, "the statute, while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* at 67. Then, borrowing from an opinion penned

by Judge Learned Hand, the Court added: "'A man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)). Applying that logic here, the Court has little difficulty concluding that Section 371 contains no financial-loss requirement.

Section 1341 is equally clear—if not clearer. It makes it a crime to "devise any scheme . . . to defraud" and then adds, by way of explanation, *see McNally v. United States*, 483 U.S. 350, 358–59 (1987), that this denotes a scheme to obtain "money or property by means of false of fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. To be sure, this includes "only schemes to deprive people of traditional property interests." *Ciminelli v. United States*, 598 U.S. 306, 308–309 (2023). But, as the Learned Hand quote conveys, one can be deprived of a traditional property interest even the absence of a quantifiable economic loss; it might take some of the sting out of the theft of your car, for example, to receive a cashier's check in the mail from the guilt-ridden thief, but you have, nonetheless, been deprived of a traditional property interest. Moreover, as *Leahy* and *Maxwell* convincingly explain, the plain language of the wire fraud statute makes it a crime "to devise any scheme" to "*obtain*[] money or property by means of a false or fraudulent pretense[], representation[], or promise[]," 18 U.S.C. § 1341 (emphasis added). The statutory requirement that the defendant seek to enrich himself—that is, to "obtain[] money or property"—does not mean that the victim must suffer a commensurate loss.

Indeed, even under the Second Circuit's own precedent, it seems that a misrepresentation (or, presumably, a material omission) regarding a bidder's qualification to enter into a contract can violate the wire fraud statute, even in the absence of a quantifiable loss. In *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), the defendants "did not disclose that the [military]

equipment" that they sought to purchase were to be shipped "to prohibited destinations," *id.* at 413–14, and, at other times, affirmatively misrepresented the "end destinations[s]" for the equipment, *id.* at 414. On appeal, the defendants sought to set aside their conviction for defrauding the vendor, arguing the vender "never suffered any economic harm." *Id.* at 420. The Second Circuit was unpersuaded and held that, although an intent to harm the victim is required, that harm "need not be pecuniary in nature." *Id.* Rather, all that is required is that "the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck." *Id.* As a result, the district court correctly instructed the jury that "the government must prove the defendant contemplated harm," but that harm need not "be monetary in nature," and "[i]t is sufficient if the contemplated harm goes to some essential element of the bargain." *Id.* It is sufficient, for example, "if the defendants intended by fraud or misrepresentation to obtain from [the vendor military] equipment that [the vendor] would not otherwise have sold to the defendants, were it not for the fraudulent representations." *Id.* Finally, after endorsing these instructions, the Second Circuit distinguished its earlier decisions in *Regents* and *Starr* by explaining that, in those cases, the "false representations were collateral to the bargain and did not cause a discrepancy between benefits reasonably anticipated and actual benefits received." *Id.*; *see also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (reaffirming this reasoning). Venkata repeatedly invokes the language from *Shellef*, 507 F.3d at 108, that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes," without including the second half of the sentence, which specifies that "schemes that depend for their completion on a misrepresentation of an essential element of the bargain . . . do violate the mail and wire fraud statutes," 507 F.3d at 108.

Under any of these formulations of the relevant test, the government presented sufficient evidence at trial to permit a reasonable jury to find the requisite scheme to defraud. Paradis testified that he was assigned responsibility to identify an electronic case management system for USDA-OIG and that "cost was a severe consideration because of budgetary constraints." Dkt. 178 at 37, 39 (Tr. 37:13–23, 39:10–11) (Paradis). Paradis contacted Patel and others at DHS-OIG to discuss EDS, with the understanding that because EDS was built by government employees and was government owned, it could be transferred to USDA-OIG "at no cost or minimal cost." *Id.* at 40 (Tr. 40:5). Eventually, Patel told Paradis that "she was aware of another product that [Paradis] might be interested in," that Edwards "was working on a similar case management system," and that "it would be worth [his] while to become acquainted with that particular product." *Id.* at 42 (Tr. 42:9, 42:16–18) (Paradis). Although Paradis initially assumed that the new product was government-created and that, accordingly, it could be made available to USDA-OIG for free, he was eventually disabused of that notion and was told that it would cost about $150,000 "its first year" and roughly "$40,000 in out-year operation and [maintenance] fees." *Id.* at 46 (Tr. 46:12–16).

Despite multiple conversations with Patel and Edwards, Paradis was never told that the new product—referred to as EDS 2.0—was developed using the government's EDS and PARIS computer code. Most notably, Paradis testified that he understood "from what Mr. Edwards and Ms. Patel had told him that the new system was being built from scratch." Dkt. 178 at 78 (Tr. 78:19–25). He further testified as follows:

> Q. Were you ever informed that the new system was being built using source code from case management systems belonging to DHS-OIG and USPS-OIG?
>
> A. No.

Q. Were you ever informed that they had copied the software of DHS-OIG and USPS-OIG to develop this new system?

A. No, I was not told that.

Q. Were you ever informed that they had transferred the software of DHS-OIG and USPS-OIG to coders in India to aid in developing the new system?

A. No, definitely not.

Q. Were you ever informed that they had used the personally identifiable information of employees of DHS and USPS to help develop and test the new system?

A. No.

*Id.* at 79 (Tr. 79:1–15).

Paradis also testified that these misrepresentations and omissions were not only material, but were of critical importance, to the proposed contract—both to the value of the proposed product and to whether USDA-OIG would have even contemplated entering into such a contract. Paradis testified as follows:

Q. If you knew the new system had been built using software copied from case management systems used at DHS-OIG and USPS-OIG, would it have mattered to you?

A. Yes.

Q. Why?

A. It would have been illegal, and it would have resulted in multiple procurement acquisition violations, ethics violations, conflict of interest, et cetera. And I would have immediately contacted Mr. Horton[, the DHS-OIG Chief Information Officer,] directly, absent my chain of command, in order to make him aware of that, of the seriousness of it.

Q. If you knew the new system had been built using source code transferred to another country along with U.S. Government employees' personal information, would it have mattered to you?

A. Yes.

Q. Why?

A. For the same reasons, that that would be a violation of ethics rules, conflict of interest, multiple laws. And it would have been—I would have been concerned about my own involvement at that point in engaging in furtherance of the pursuit.

Q. If you knew the new system was developed using stolen government property, would that have affected what price you were willing to pay for the new system?

A. Yes.

Q. Can you explain that?

A. Yes. From my experience over 34 years doing undercover work, if you're—in my capacity purchasing stolen goods, you pay a much reduced price on the dollar. It's like buying counterfeit money, you pay 50 cents on the dollar, things of that sort. So, I would not definitely pay full price for something if I knew it was stolen.

*Id.* at 79–80 (Tr. 79:16–80:23). Based on this testimony alone, a reasonable jury could have found beyond a reasonable doubt that the misrepresentations and intentional omissions went to "the essence of the contract" in order to convince the government to pay for a product it would not otherwise have bought.

In response, Venkata takes issue with Paradis's testimony and argues that there was no evidence that Edwards was seeking to sell the federal government its own computer code; rather, on Venkata's telling, Edwards was using programmers in India to write new computer code from scratch and was using the DHS-OIG computer code only as model to guide the coders. Dkt. 211 at 2. Yet, even the evidence that Venkata points to for this proposition does not entirely support that conclusion. For instance, Patel's statement that the original EDS's architecture is ten to fifteen years old while the defendants' system is "current in 5 years former" does not precisely support the theory that their system was yet to be built and was going to be re-written entirely

from scratch. *Id.*; Gov't Ex. 10A at 4. But, more importantly, even accepting that premise, Paradis's testimony and the government's theory of the fraud remain sound. What Paradis said—and what was central to the fraud—was that Edwards, with assistance from Patel and Venkata, was "using software" stolen from DHS-OIG to build his competing system, which he sought to sell back to the United States without revealing that the stolen code was "used" to develop his product. Dkt. 178 at 79–80 (Tr. 79:1–80:23) (Paradis). And a reasonable jury could readily have found beyond a reasonable doubt that that is exactly what the defendants were doing.

With help from Patel and Venkata, Edwards went to great lengths to reconstruct (on multiple occasions) an operating version of EDS on his home servers and laptop computer, Dkt. 175 at 41–42, 44–48 (Tr. 41:3–42:1, 44:21–48:9) (Edwards), and then planned to use the "investigative case management system" stolen from DGH-OIG to develop his commercial platform, *id.* at 45 (Tr. 45:7). Edwards testified that he sought to "tie" EDS "into [his] new system so [he] could go back to [Paradis] and say this is what my new system is going to be," *id.* (Tr. 45:12–15); that one of the key components that Paradis sought was the DHS-OIG eSubpoena module that Venkata built; and that he "need[ed] the eSubpoena requirements to build [his] commercial platform," *id.* at 55 (Tr. at 55:15–17), which Venkata provided, *id.* (Tr. 55:4–11); Gov't Exs. 27 & 28. Edwards testified that the Indian coders needed these requirements to build the commercial platform, Dkt. 175 at 56–57 (Tr. 56:11–57:23); that, more generally, he needed a "working version" of EDS on his laptop to show to "the Indian company," *id.* at 59 (Tr. 59:15–16); but that it was not working until Venkata configured the code on Edwards' laptop in July 2016, *id.* at 57–63 (Tr. 57:13–63:7); Gov't Ex. 19. Edwards flew to India with the laptop containing a copy of EDS, which he gave to the programmers, Dkt. 175 at

66 (Tr. 66:2–9) (Edwards), that because that laptop was "really slow, the Indian programmers needed to access [Edwards' home] server [remotely] to look to see how EDS functioned" so they could "build [Edwards'] next version of EDS," *id.* at 71 (Tr. 71:11–14). Further, with Venkata's help, Edwards installed a second, fully functional version of EDS on a separate server because "the Indian programmers were complaining that [the first server] was running out of space," *id.* at 88 (Tr. 88:20–24), and the programmers were working remotely on Edwards' servers so they could access to EDS and the related PII files, *id.* at 90 (Tr. 90:4–9).

On cross-examination, Edwards reaffirmed that he "used" the stolen management system and data to create his own version of EDS. He testified as follows:

> Q. [. . .] As you testified yesterday, you wanted to build a case management system and then sell it back to the government for profit, right?
>
> A. Yes.
>
> Q. And that was based on stolen government information, right?
>
> A. Yes.

Dkt. 176 at 70–71 (Tr. 70:20–71:2) (Edwards). From all of this (and additional) testimony, a reasonable jury would have had little difficulty finding beyond a reasonable doubt that defendants schemed to create a new version of EDS "based on stolen government information" and to sell that new version back to the government without disclosing that the new system was built "using" the government's own property. *See also, e.g.*, Dkt. 68 (Tr. 68:5–23) (Patel) ("'So, in short, it would be a case-management system based on a government system that would be sold to the government for a profit; is that fair?' 'But—yes.'"). And for the reasons Paradis gave, a reasonable jury could readily have found beyond a reasonable doubt that the defendants' misrepresentations and omissions were not merely material, but that they "'went to the essence of the [contemplated] contract.'" Dkt. 211 at 7 (citations omitted).

Venkata takes issue with this conclusion, arguing that the evidence shows that the plan was not to sell the government stolen property and that, instead, it shows that Edwards intended to re-write the relevant code. Dkt. 211 at 3. But little turns on whether he intended to borrow portions of the existing EDS code to recreate (and then to improve upon) the existing EDS or to write new code using the old code as a map to recreate (and then to improve upon) the existing EDS. Either way, the defendants "used" property stolen from the government to create a new product, and the jury could reasonably have found that, had this perfidy been disclosed, government procurement rules would have categorically barred the purchase and that, in any event, the tainted product would have been worth far less than a product developed without the benefit of stolen government property. Finally, the jury could reasonably have found that the tainted product was worth less because it was developed using stolen PII and concealing this fact from USDA-OIG could have "expose[d] the [agency] to costly legal entanglements" apart from the value of the electronic management system itself. *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 972 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999); *see also United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996) (explaining that "[i]ntent to harm . . . can be inferred from exposure to potential loss," including "exposing [the target] to an unwanted risk" through the deceit).

At oral argument and in supplemental briefing, Venkata suggests the government's theory of fraud-in-the-inducement is irreconcilable with the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). In particular, he argues that *Ciminelli* held that "information needed to make discretionary economic decisions is not a traditional property interest" that is protected by the wire fraud statute and that the evidence offered at trial, even if viewed in the light most favorable to the government, proved nothing more than this type of

intangible, informational harm. Dkt. 211 at 7; *see also* Aug. 29, 2023 Hrg. Tr. (Rough at 18–19). This argument understates what the evidence actually established, and it overstates what the Court held in *Ciminelli*.

To start, as just explained, the evidence presented at trial was sufficient to permit a reasonable jury to have found beyond a reasonable doubt that defendants schemed to sell the government a product that the government never would have purchased had it known the truth; that the product, in any event, was worth far less than the government was led to believe it was worth, since it was developed "using" stolen property; and that the product carried with it undisclosed risks, since it was developed using the PII of thousands of unwitting individuals. In his final, post-trial brief, Venkata concedes that, even after *Cimenelli*, the wire fraud statute applies to misrepresentations that go "to the essence of the contract" so long as they are intended to obtain traditional property interests. Dkt. 211 at 7. Viewing this evidence in the light most favorable to the government, there was ample basis for the jury to have found that defendant's misrepresentations and intentional omissions went to the essence of the proposed contract.

Venkata's argument also overstates what *Ciminelli* held. Venkata's argument is correct—to a point. The Supreme Court did hold that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests," 598 U.S. at 309, and that the Second Circuit stretched this concept of "property" too far in holding that the fraud statutes apply to "'scheme[s] [that] den[y] . . . victim[s] the right to control [their] assets by depriving [them] of information necessary to make discretionary economic decisions,'" *id.* at 314. (quoting *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)). But that holding did not address whether the fraud statutes apply to fraud in the inducement and, if so, what types of misrepresentations or omissions are sufficient. Rather, the Court was focused on the types of "property" that can

qualify as "'an object of their fraud.'" 598 U.S. at 312. At times, Venkata's briefing appears to conflate the materiality required of the misrepresentation or omissions with the requirement that the conspiracy be aimed at obtaining a traditional property interest. *See, e.g.*, Dkt. 211 at 7. But here, in contrast to *Ciminelli*, the Court instructed the jury that it needed to find that the defendants "intended to deprive" the victim—that is, USDA-OIG—"of money or property or [to] bring about some financial gain to the person engaged in the scheme." Dkt. 146 at 43; *cf.* *Ciminelli*, 598 U.S. at 311 ("[T]he District Court instructed the jury that the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'"). And there was sufficient evidence for the jury to find beyond a reasonable doubt that the "object of the fraud" was an unduly lucrative contract, which would have enriched Edwards (and arguably Patel and Venkata). As Justice Alito explained in his concurring opinion *Ciminelli*, the majority opinion did not address whether the government could retry the defendant "on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, *viz*., valuable contracts." 598 U.S. at 317–18 (Alito, J., concurring). This case falls squarely within the type of case that Justice Alito envisioned: a case in which the defendants schemed to obtain a traditional form of "money or property"—about $150,000 in the first year and roughly $40,000 a year thereafter.

Venkata also argues that the D.C. Circuit's decision in *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983), requires a judgment of acquittal on the facts of this case. In *Lemire*, applying pre-*McNally v. United States*, 483 U.S. 350, 360 (1987), honest-services-wire-fraud doctrine, the court held that a breach of fiduciary duty that results from a failure to disclose a conflict of interest is not itself a sufficient intangible interest to support a conviction under the wire fraud statute. *Id.* at 1337. But, even putting aside the substantial developments in the

relevant law since 1983, the court was explicit that its "holding [did] not remove from the ambit of wire fraud undisclosed conflicts that, accompanied by activity on the part of the employee, carry a significant risk of identifiable harm to the employer apart from the loss of his employee's loyalty and fidelity." *Id.* As the court further explained, this means that "a non-disclosure is material only if the [defendant] 'has reason to believe that the information would lead a reasonable [victim] to change its business conduct.'" *Id.* at 1338 (quoting *United States v. Ballard*, 663 F.2d 534, 541 (5th Cir. 1981)). Accordingly, even if *Lemire* remains good law, it would pose little difficulty to the government's case, which relied on evidence that defendants' misrepresentations and omissions were designed to obtain a government contract that was over-priced, that was barred by government procurement regulations, and that risked exposing USDA-OIG to "costly legal entanglements" relating to the pilfered PII.

Finally, in the last couple sentences of his supplemental brief, Venkata argues that the government's case relied "almost entirely on a pure omission theory" and that "[a]dopting the government's theory . . . would 'vastly expand[] federal jurisdiction without statutory authorization.'" Dkt. 211 at 7 (quoting *Ciminelli*, 598 U.S. at 315). This argument carries little weight. To start, Venkata does not even argue that the government relies exclusively on omissions; only that it relies "almost" entirely on omissions. But, more importantly, it is well settled that a pure omission theory can suffice, if the concealment is material, intentional, and calculated to defraud the victim out of "money or property." *Cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009) ("[E]ven partially true statements can be actionable fraud if intentionally misleading as to facts."); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) ("A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive

another out of money or property.”). Indeed, Venkata seems to concede as much by arguing that “the pure omission of information unrelated to the quality, adequacy, or price of goods being sold, or to any other aspect of a contract . . . cannot form the basis of a scheme to defraud.” Dkt. 211 at 7. Here, the evidence included testimony regarding a series of half-truths about EDS 2.0, which omitted any reference to the fact that this product was built using the government’s own property, *see* Dkt. 169 at 8, and those half-truths were—for the reasons the government has explained—“related to” the value of the product and to other core “aspects of [the proposed] contract.” Dkt. 211 at 7.

The question is not whether this is the only possible understanding of the evidence, but only whether “any rational trier of fact” could find these or similar facts beyond a reasonable doubt. *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010) (quoting *United States v. Andrews*, 532 F.3d 900, 903 n.1 (D.C. Cir. 2008)). The government clears that modest hurdle.

**2.**

Venkata also argues that insufficient evidence was offered at trial to permit a reasonable jury to find that he was aware of the scheme to defraud. Dkt. 166-1 at 11; *id.* at 13 n.2. Again, although it possible to view the evidence in the manner that Venkata urges, that is not the test at this point in the proceeding. The Court must, instead, “view the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and ‘giving full play to the right of the jury to determine the credibility, weigh the evidence and draw all reasonable inferences of fact.’” *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Battle*, 613 F.3d at 264). Considered through this lens, Venkata’s argument fails.

Edwards testified that in early May 2016, Venkata agreed to help him build a commercial case management system, Dkt. 175 at 30, 34, 37 (Tr. 30:7–22, 34:19–22, 37:2–12), which

Venkata had predicted would be worth millions of dollars, *id.* at 35 (Tr. 35:4–7). Venkata was aware, moreover, that Edwards was using proprietary DHS-OIG and USPS-OIG material to build his commercial platform and was aware that Edwards planned to meet with Paradis to pitch this platform to USDA-OIG, *id.* at 43–45 (Tr. 43:4–45:17) (Edwards). Edwards also testified that Venkata delivered some of the government-owned material to him, *id.* at 107–10 (Tr. 107:11–110:13); that Venkata repeatedly helped make the EDS and PARIS programs run on Edwards' home servers and laptop, *see, e.g.*, *id.* at 126 (Tr. 126:7–12); *id.* at 97 (97:15–104:7); Gov't Ex. 25; and that Venkata was aware that the Indian programmers were remotely accessing Edwards' servers to build the new program using EDS and PARIS as their model, *see, e.g.*, *id.* at 126 (Tr. 126:7–12). And Venkata showed Edwards how the eSubpoena module to EDS worked because that aspect of the system was developed after Edwards had left DHS-OIG, *id.* at 42–43 (Tr. 42:5–43:12), and that module was critical to Edwards' efforts to sell EDS 2.0 to Paradis, *id.* at 36 (Tr. 36:19–24).

On cross-examination, Edwards' testimony was even more definitive. He testified as follows:

> Q. Right, okay. And it's your contention that the first time my client sort of learned about this conspiracy and wanted to engage in this conspiracy was in early May, is that right?
>
> A. Right.
>
> Q. And that's before the meeting with Mr. Paradis, right?
>
> A. Yes.
>
> Q. That he was involved before that meeting?
>
> A. Right.

Dkt. 176 at 74 (Tr. 74:11–20). Although the defense then attempted to impeach this testimony, the effectiveness of that impeachment was a question for the jury—not the Court. To take just one example, defense counsel asked Edwards whether he ever told Venkata "about why [he was] engaging the[] Indian developers, . . . which was to sell a commercial case-management system back to the government," and Edwards responded, "If you are asking me if I said those exact words, no, I did not." Dkt. 177 at 20 (Tr. 20:1–6). Defense counsel then made the strategic decision (presumably a wise one) not to follow up by asking whether he had ever conveyed that fact in any other words. It was well within the province of the jury to decide to accord that cross-examination only limited weight.

The same is true of the testimony of Sonal Patel, who the defense called as a witness. Defense counsel asked, for example, whether Patel "ever explicitly [told] Mr. Venkata that [she was] utilizing government information to create a case management system that [she] would sell back to the government for a profit," and Patel responded, "no." Dkt. 185 at 68–69 (Tr. 68:24–69:5) (Patel). But counsel made the strategic decision to limit her question to any "explicit" statement, leaving the jury room to conclude based on other evidence—including Venkata's knowledge of the plan to sell EDS 2.0 to the government and his help in providing Edwards and the Indian programmers with access to a working version of EDS—that the concept was conveyed in other terms. And, indeed, on cross examination, Patel testified that she "involve[d] him" in the conspiracy. *Id.* at 84 (Tr. 84:13).

It would demand too much to require the government to offer proof of an "explicit" agreement to support a conspiracy charge, since those involved in criminal misconduct are often careful to avoid such obvious admissions of illegality. For this reason, the Supreme Court has repeatedly held that "[t]he agreement need not be shown to have been explicit" and that an

agreement "can instead be inferred from the facts and circumstances of the case." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 711–13 (1943)). Here, the jury had sufficient evidence to infer that Venkata was aware of the illegal purpose of the conspiracy and agreed to join in that scheme to defraud. *See United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) ("[S]ince a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence." (quoting *United States v. Morris*, 836 F.2d 1371, 1373 (D.C. Cir. 1988))); *United States v. Vega*, 826 F.3d 514, 523 (D.C. Cir. 2016) ("In most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence, and therefore proof must be inferred from circumstantial evidence instead." (internal citation and quotation marks omitted)).

**3.**

Finally, Venkata argues that the government offered insufficient evidence to permit a rational trier of fact to find beyond a reasonable doubt that he engaged in at least one wire or radio communication in furtherance of the alleged scheme to defraud. *See* 18 U.S.C. § 1343. The Indictment cites just one such interstate communication—a March 22, 2017, telephone call from Edwards' cell phone to Venkata's cell phone to arrange for Edwards "to pick up DVDs containing government software and information in the District of Columbia," Dkt. 1 at 17–18 (Indictment ¶ 22)—and the government limited its argument and proof to that single communication. Venkata claims that "[a]lthough [the Government] established that Mr. Edwards was in Maryland during the March 22, 2017 call with Mr. Venkata that it charged as the relevant 'wire,' the Government did not elicit testimony or adduce any other evidence about Mr. Venkata's whereabouts during the call." Dkt. 166-1 at 6.

That is incorrect—there was, in fact, ample direct and circumstantial evidence from which the jury could infer beyond a reasonable doubt that when the called occurred, Edwards was in Maryland and Venkata was not, and that, accordingly, the call constituted an interstate wire or radio communication made in furtherance of the scheme to defraud. The evidence shows that on March 21, 2017, Patel texted Venkata, indicating that she "left a package on [his] chair with two DVDs" and that Edwards would contact him the next day to get them. Gov't Ex. 17 at 9. Venkata confirmed that he would deliver the DVDs to Edwards. *Id.* The next morning, Edwards texted Venkata: "Sonal told me that she is leaving 2 dvds with u[.] Can I come by at 11.15 and pick it up[.]" Gov't Ex. 19 at 12. Venkata responded: "Sure Charles." *Id.* And then, at 10:09 a.m. on March 22, 2017, Edwards placed a cell phone call from Columbia, Maryland to Venkata's cell phone to arrange to pick up the DVDs. *See* Dkt. 176 at 7 (Tr. 7:2–7:10) (Edwards); Gov't Ex 36B at 18 (14:09:10 UTC). About ninety minutes later, Edwards again called Venkata to tell him that he was "going to pull in front of DHS-OIG headquarters at Vermont Avenue for [Venkata] to come out and give [Edwards] the two DVDs." Dkt. 175 at 107 (Tr. 107:15–107:17) (Edwards); Gov't Ex. 36B at 19 (15:36:22 UTC). Edwards further testified that Venkata did, in fact, come out and give him the DVDs. Dkt. 175 at 107 (Tr. 107:18–19).

That evidence, plus two additional pieces of evidence, suffices. First, Venkata's office was located in the District of Columbia. Dkt. 182 at 35 (Tr. 35:12–19) (Steel). And second, the jury heard testimony that Venkata's residence was in Aldie, Virginia, *see id.* at 52 (Tr. 52:1–2), and that his neighbor, Narasimha Ambati, regularly commuted with him on the 6:30 a.m. bus, which the neighbor testified was the only viable bus option, *see* Dkt. 180 at 48–49 (Tr. 48:9–49:14) ("We only had limited buses in the morning, one at 6:30 in the morning. So there was no

options.") (Ambati). So, in sum, the jury heard evidence that Venkata was in the District of Columbia around 11:30 a.m. at his office, and that he regularly took the 6:30 a.m. bus from Virginia to the District, which would place him in the District—and certainly not in Maryland—for the 10:09 a.m. call.

Venkata argues that this evidence is insufficient because the 11:30 a.m. meeting in the District does not show where Venkata was ninety minutes earlier, and the neighbor's testimony does not establish that Venkata took the bus to the District on that particular morning. This case, however, is a far cry from the case on which Venkata relies, *United States v. Izydore*, 167 F.3d 213, 219 (5th Cir. 1999), in which the government presented *no* evidence of a defendant's location at the time the telephone calls in question occurred and thus no evidence that "the telephone calls . . . crossed state lines." Here, in contrast, the government offered evidence from which a reasonable jury could infer that Venkata was in the District of Columbia when he received the call that Edwards placed from Maryland. Although the jury was required to find beyond a reasonable doubt that the interstate communication occurred, it was entitled to rely on both direct and circumstantial evidence in reaching its finding. *See United States v. Castellanos*, 731 F.2d 979, 984 (D.C. Cir. 1984) ("[N]o legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict."). When reviewing a conviction for sufficiency of the evidence, courts must "give full play to the right of the jury to . . . draw justifiable inferences of fact." *United States v. Tucker*, 12 F.4th 804, 826 (D.C. Cir. 2021) (cleaned up); *see also United States v. Slatten*, 865 F.3d 767, 792 (D.C. Cir. 2017) ("[T]he jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.") (cleaned up). Here, the inferences of fact were both supported by the record and entirely reasonable.

Although it is, of course, possible that some unique circumstances occurred on morning of March 21, 2017, which could show that Venkata broke from his usual routine of traveling to work in the District of Columbia by bus at 6:30 a.m.; that he instead traveled to Maryland, where he spoke to Edwards by telephone; and that he then arrived late at work but in time deliver the DVDs to Edwards. But that remote possibility, which finds no support anywhere in the record, is insufficient to conclude that no rationale jury could have found beyond a reasonable doubt that he was, in fact, at work in the District of Columbia. *Cf. United States v. Moody*, 903 F.2d 321, 333 (5th Cir. 1990) (concluding "that the circumstantial evidence of the Foundation's business practices . . . offers sufficient circumstantial evidence for a jury reasonably to deduce that the United States mails had been employed for the purpose of defrauding the Foundation").

**B. Theft of Government Property**

Venkata next challenges his conviction under 18 U.S.C. § 641 for stealing and/or converting DHS-OIG's EDS system, the EDS code and database files, USPS-OIG's case management system, USPS-OIG's STARS database and PARIS code, and the PII of thousands of government employees. Dkt. 1 at 15–16 (Indictment ¶ 17–18); Dkt. 154 at 2. On that charge, the government was required prove that Venkata "embezzle[d], st[ole], purloin[ed], or knowingly convert[ed] to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or any department of agency thereof." 18 U.S.C. § 641. A violation of Section 641 constitutes a felony unless "the value of such property in the aggregate . . . does not exceed the sum of $1,000," in which case the violation is a misdemeanor. *Id.* The statute defines "value" to mean "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." *Id.* Venkata argues that the government failed to prove that he stole or converted any U.S. property and that, even if he did, the government failed

to offer sufficient proof that the stolen goods had a value over $1,000. The Court is unpersuaded and concludes that the government offered sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Venkata unlawfully stole or converted U.S. property in violation of Section 641 (or aided and abetted Edwards and Patel in their efforts to do so) and that he joined a conspiracy to commit the crime of theft of government property.[4]

As the Supreme Court explained in *Morissette v. United States*, 342 U.S. 246 (1952), Congress employed the sweeping terms used in Section 641 "to avoid gaps and loopholes between offenses," *id.* at 272–73. The drafters of Section 641 were concerned, in particular, that "gaps or crevices [had] separated particular crimes of this general class[,] [allowing] guilty men [to] escape[] through the breaches," and they "wanted to reach all . . . instances" in which "one may take wrongful advantages from [the government's] property." *Id.* at 271. Congress, accordingly, painted with a broad brush, employing "overlapping" terms, including "embezzlement, stealing, purloining, and knowing conversion," in a single statute. *Id.* Although little turns on whether the theft of government property is characterized as stealing or conversion, the Court is persuaded that a rational jury could have found for the government under both theories.[5]

---

[4] Venkata objects to the jury instructions on the Section 371 conspiracy charge on the ground that the conspiracy charged in the Indictment, at least on his telling, was to defraud *by* stealing/converting rather than to defraud and steal/converting. *See infra* at 58–60. He does not, however, raise specific challenges in the alternative as to conspirator liability for the theft of government property.

[5] Venkata did not argue at trial and does not now argue that stealing and conversion constitute distinct legal grounds for liability such that the jury had to make a unanimous finding at to each, or such that the insufficiency of the evidence as to one theory but not the other would require a new trial. The jury did, moreover, make separate findings with respect to each of the forms of government property set forth in Count Two of the Indictment. *See* Dkt. 154 at 2.

**1.**

To start, there was ample evidence that the co-conspirators stole government property. As the Supreme Court explained in *Morissette*, "'[t]o steal means to take away from one in lawful possession without right with the intention to keep wrongfully.'" 342 U.S. at 271 (quoting *Irving Trust Co. v. Leff*, 171 N.E. 568, 571 (N.Y. 1930)). Here, the government presented evidence that Edwards, Patel, and Venkata planned to work together to develop the "next generation" of EDS, Dkt. 175 at 35 (Tr. 35:24) (Edwards); that Patel made a copy of the EDS source code and related databases from DHS-OIG's servers onto two DVDs and gave them to Edwards, Dkt. 175 at 39–40 (Tr. 39:25–40:3) (Edwards); Dkt. 179 at 95 (Tr. 95:23–25) (Reynolds); that long after Venkata was aware of the plan to use government code to develop EDS 2.0, and after Edwards told Venkata that the server in Edwards' home that was running PARIS and STARS ("Server 3") had crashed, Edwards asked Patel to obtain new copies of PARIS and STARS from DHS-OIG, Dkt. 175 at 106 (Tr. 106:6–12) (Edwards); Dkt. 185 at 77–78 (Tr. 77:4–78:8) (Patel); that because Patel was working from home at the time, she asked Venkata to deliver the DVDs to Edwards, *id.*; that just three days after Edwards informed Venkata that the server at his home that was running PARIS and STARS had crashed, Venkata took the DVDs from DHS-OIG and gave them to Edwards, Dkt. 175 at 104, 107 (Tr. 104:22–104:25, 107:18–19) (Edwards); and that just three days after that, Edwards messaged Venkata indicating that he had Server 3 running again, "except the investigation side," *id.* at 110 (Tr. 110:18–23); that Venkata responded by asking Edwards to confirm the remote log-in credentials for the "PARIS server," *id.* at 111 (Tr. 111:6–15); that when Venkata continued to have difficulty logging in, Edwards told him that the "Indian programmers [were] logged in and [did not] seem to have any issue," *id.* at 115 (Tr. 115:6–7); and, then, finally, Venkata was able to

log-in to the server running PARIS and STARS and to address the problem that Edwards had identified, *id.* at 116 (Tr. 116:10–21).

Based on this testimony and the sequence of events, a rational jury could have found beyond a reasonable doubt—at the very least—that Venkata physically removed two DVDs from DHS-OIG headquarters that contained the PARIS case management system and the STARS database and that he knew what he was doing. There was also an abundance of evidence that Venkata knew that he was not authorized to do so. Gov't Ex. 1 (Venkata Computer Access Agreement); Gov't Ex. 9 (EDS End User Agreement); Dkt. 174 at 31–35, 37, 40–44, 47–50 (Tr. 31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel); Finally, the government offered evidence that it suffered significant losses due to the removal of this system and database, including incurring costs to provide credit monitoring services to the individuals whose PII was stolen. Dkt. 174 at 60–67 (Tr. 60:12–67:8) (Steel).

This evidence is sufficient to establish that Venkata stole or aided and abetted Edwards and Patel in stealing the USPS-OIG's case management system, the PARIS computer code, the STARS database, and the PII of approximately 6,723 USPS employees, as the jury unanimously found. Dkt. 154 at 2. As the Court instructed the jury, "[t]o 'steal' means to take away from one in lawful possession without right with the intention to keep wrongfully," Dkt. 146 at 37,[6] and when construed in the light most favorable to the government, that is what the evidence showed. When Patel made unauthorized copies of PARIS and STARS on March 21, 2017, and Venkata knowingly removed those copies from DHS-OIG headquarters and delivered them to Edwards, Patel and Venkata "t[ook]" property "away from" the government "without right with the

[6] Although Venkata opposed the inclusion of "stealing" in the theft of government property jury instruction, he did not oppose the Court's definition of the term. *See* Dkt. 130 at 6–7.

intention to keep wrongfully." *Morissette*, 342 U.S. at 271 (internal quotation omitted). Moreover, even if Venkata did not intend to personally maintain possession of the DVDs and merely assisted Patel in passing the DVDs to Edwards, there is little doubt that, if the government's view of the evidence is accepted, he aided and abetted Patel and Edwards in stealing the government's property. *See* Dkt. 146 at 39–40. Finally, if there were any doubt about this, there was evidence that Venkata joined the conspiracy as early as May 2016, Dkt. 175 at 34–35 (Tr. 34:19–35:17) (Edwards), and, as a result, he was responsible for the offenses committed his co-conspirators in furtherance, and as a natural consequence, of the conspiracy. Dkt. 146 at 41–42; *see also United States v. Washington*, 106 F.3d 983, 1010–11 (D.C. Cir. 1997) (discussing *Pinkerton* doctrine).

Venkata offers only one response to this understanding of the law and evidence. He asserts that, "[i]n this Circuit, 'stealing' under section 641 requires 'a wrongful taking and carrying away (asportation) of personal property of another with fraudulent intent to deprive the owner of his property without his consent.'" Dkt. 166-1 at 15 (emphasis omitted) (quoting *United States v. Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972)). From this premise, he draws the inference that only "tangible" property can be stolen within the meaning of Section 641. *Id.* at 16. And he then concludes that because the "source code and PII . . . remained precisely where they started—in the possession of the government"—neither Venkata nor his co-conspirators could have stolen (or aided and abetted another in stealing) the property at issue. *Id.*

That argument, however, substantially overreads the D.C. Circuit's decision in *Barlow* and is at odds with other D.C. Circuit precedent. As an initial matter, it bears note that *Barlow* did not define what it means to "steal" government property; rather, it described Section 641 more generally and—acknowledging a certain lack of precision—the court observed that Section

641 "basically" parallels "the common law crime of larceny," which, in turn, "requires [the] wrongful taking and *carrying* away . . . of *personal* property." 470 F.2d at 1251 (emphasis added). This matters for at least two reasons. First, the statutory text and the Supreme Court's decision in *Morissette* make clear that Section 641, more precisely understood, covers more than the common law of larceny, at least as defined in *Barlow*. The statute, for example, says nothing about "carrying" away and, far from applying only to "personal" or tangible property, the statute refers to "any record, voucher, money, or thing of value of the United States or any department or agency thereof," 18 U.S.C. § 641. Similarly, the definition of "[t]o steal" found in *Morissette* and employed in the instructions given in this case, says nothing about "carrying" away and says nothing about "personal" or tangible property. *Morissette*, 342 U.S. at 271.

Second, and even more to the point, D.C. Circuit precedent post-dating *Barlow* by almost a quarter century rejects the notion that Section 641 applies only to tangible property. Although *United States v. Collins*, 56 F.3d 1416 (D.C. Cir. 1995), addressed the sufficiency of a Section 641 conviction premised on a finding of unlawful "conversion" (rather than "stealing"), the court spoke more broadly to the meaning of the statute. As the court observed: "Congress did not limit those things which could be converted to 'tangible property,' but rather any 'thing of value.'" *Id.* at 1419 (quoting 18 U.S.C. § 641). Notably, the phrase "thing of value" applies across the boards to all applications of Section 641, and Venkata fails even to hint at a reason why Congress would have intended to criminalize the "conversion" of intangible property, but not the "stealing" of intangible property.

Nor does this construction of the statute require the Court to take sides in the broader debate about whether and when government information qualifies as a "thing of value of the United States" under 18 U.S.C. § 641, particularly in the context of leakers. *See e.g.*, Note,

Jessica Lutkenhaus, *Prosecuting Leakers the Easy Way: 18 U.S.C. § 641*, 114 Colum. L. Rev. 1167 (2014). As the Supreme Court recognized in *Carpenter v. United States*, 484 U.S. 19, 26 (1987), "[c]onfidential business information has long been recognized as property," and businesses have "a property right in keeping confidential and making exclusive use" of that information. That property interest, even if intangible, is subject to protection under the wire and mail fraud statutes. *Id.* at 28. Here, DHS-OIG went to great lengths to protect the confidentiality of its case management system and computer code and the PII it possessed, *see* Dkt. 174 at 31–35, 37, 40–44, 47–50 (Tr. 31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel), and there is no reason to conclude that the government's interest in protecting that intangible property is any less compelling than the interest of private companies in preventing the theft of their intellectual property. The co-conspirators, moreover, did far more than memorize information, *see United States v. DiGilio*, 538 F.2d 972, 977 (3d Cir. 1976), or repeat something that they learned while employed by the government; rather, they copied entire computer programs and databases—character-for-character—and removed those exact, functioning copies from the DHS-OIG headquarters. Section 641 applies to the theft of "*any* record, voucher, money, or *thing of value* of the United States," 18 U.S.C. § 641 (emphasis added), and it is difficult to fathom a construction of the statute in which entire, proprietary computer programs and databases containing PII about thousands of individuals do not constitute "thing[s] of value."

Nor does the fact that the defendants left the government with its own copies of the property at issue (*i.e.*, the case management system, source code, and PII), make a difference. Dkt. 166-1 at 16; Dkt. 170 at 10. At oral argument, defense counsel suggested that property is "stolen" only when the owner is deprived of its use; otherwise, the government must proceed on a theory of conversion. *See* Aug. 29, 2023 Hrg. Tr. (Rough at 3:18–19). But that

misunderstands the nature of the property right at issue; the relevant bundle of sticks includes both the ability to use one's own property and the right to exclude others. *Cf. Carpenter*, 484 U.S. at 26 (explaining "the business had a right to decide how to use [its confidential information] prior to disclosing it"). To take just one example, a key component of the government's interest in its PII databases included the right to exclude others from making and removing copies of those databases, even though the government maintained its own copies of the databases. The same is true, moreover, of proprietary computer programs, particularly those used for law enforcement purposes.

**2.**

But, even if the term "steal" carries the narrow meaning that Venkata suggestions, the term "conversion" does not. As the Supreme Court explained in *Morissette*, unlike "stealing," "[c]onversion . . . may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful," and "may include misuse or abuse of property," such as "use in an unauthorized manner or to an unauthorized extent." *Morissette*, 342 U.S. at 271–72. Under Section 641, "[t]he cornerstone of conversion is the unauthorized exercise of control over property in such a manner that *serious interference* with ownership rights occurs." *Collins*, 56 F.3d at 1420. Moreover, as explained above, the D.C. Circuit held in *Collins* that, for purposes of Section 641, conversion includes "the misappropriation of intangible property." *Id.* at 1419.

Taking a slightly different tack from above, Venkata argues that the jury lacked sufficient evidence to convict him of conversion because (1) conversion requires a "serious interference with the [victim's] ownership rights," and (2) here, the government offered no evidence that either DHS-OIG or USPS-OIG was ever prevented from accessing or using any computer

program, computer code, or PII as a result of the defendants' actions. Dkt. 166-1 at 16–20. He bases this argument almost entirely on the *Collins* decision, where the D.C. Circuit recognized that Section 641 covers the conversion of intangible property, 56 F.3d at 1417—including "the conversion of computer time and storage," *id.* at 1420—but does so only when the offending "conduct seriously interfere[s] with the rights of the government," *id.* at 1421. In that case, the court concluded that the prosecution "did not produce a shred of evidence," *id.* at 1421, that the defendant's use of his work computer "to create documents relating to his ballroom dance activities," such as "a chapter newsletter" or "a ballroom dance competition calendar," *id.* at 1418, "seriously interfered with the government's ownership rights in its computer," *id.* at 1421. Although the government offered evidence, and the defendant did not contest, that "he typed in data and stored information on the computer regarding his personal activities," the government offered "no evidence . . . that such conduct prevented him or others from performing their official duties on the computer." *Id.*

As an initial matter, the facts of this case are a far cry from those in *Collins*. It is one thing to use a work computer for a limited, personal purpose, resulting in no harm or cost to the government. It is something entirely different to make exact, unauthorized copies of confidential government computer programs, computer code, and databases—including PII; to install those copies on a personal laptop and three personal servers; to use the misappropriated material for business purposes over a period of many months; and to invite computer programmers operating overseas to access this confidential material, including the PII of thousands of individuals. In short, there is no plausible comparison.

Venkata nonetheless purports to find support in *Collins* for the proposition that "to rise to the level of 'serious interference,' the defendant's conduct must have 'deprived [the owner] of

the use or possession of its property.'" Dkt. 166-1 at 16 (quoting *Collins*, 56 F.3d at 1421) (alteration in original). That argument correctly quotes words that appear in *Collins* but takes them out of context. The quoted language appears in the portion of the opinion describing the Eighth Circuit's decision in *United States v. Wilson*, 636 F.2d 225 (8th Cir. 1980). Fairly construed, however, the D.C. Circuit was not setting forth an all-encompassing test for conversion. Rather, it was merely describing why the evidence was insufficient in the *Wilson* case; it was insufficient because the defendant's use of his government secretary to type personal documents did not "interfere[] with the secretary's official duties" in any way, and it did not otherwise "interfere[] with the government's ownership rights." *Collins*, 56 F.3d at 1420–21 (citing *Wilson*, 636 F.2d at 225–28).

Venkata also suggests that conversion requires an "'interference . . . of such a magnitude that the converter must pay the rightful owner the full value of the property converted.'" Dkt. 166-1 at 17 (quoting *Collins*, 56 F.3d at 1420 (citing Restatement (Second) of Torts § 222A)); *see also* Dkt. 170 at 11 & n.2. But this sentence does not mean that conversion is limited to those circumstances in which the defendant deprives the victim of the use or possession of its property. *Cf. id.* at 11 n.2. Rather, the sentence refers to the measure of damages in tort cases, distinguishing between trespass to chattels, where the measure of damages is the diminished value of the chattel, and conversion, where the measure of damages is the full value of the chattel. *See* Restatement (Second) of Torts § 222A, comment c. The measure of damages, however, merely stands as a proxy for what is undisputed here—that conversion applies only if the defendant intentionally interferes with the victim's "dominion or control" over its property in a manner that "seriously interferes with the [victim's] right . . . to control" that property. *See* Restatement (Second) of Torts § 222A.

The examples provided in the Restatement, moreover, make clear that the dividing line between trespass on a chattel and conversion is "almost entirely a matter of degree" and that the test is not, as Venkata suggests, whether the victim remains free to use its property at the same time that it is subject to the defendant's misuse. The Restatement observes, for example, that if "A entrusts an automobile to B, a dealer, for sale," and "[o]n one occasion B drives the car, on his own business, for ten miles," no conversion occurs. Restatement (Second) of Torts § 222A, illustration 21. But if, on the same facts, B "drives the car 2,000 miles," then a conversion occurs. *Id.*, illustration 22. Under both scenarios, A neither possesses nor uses the car, and under both scenarios B misuses the car. What distinguishes the cases is the *extent to which* B exercises unauthorized control over the car in a manner that *seriously interferes* with A's *ownership rights*.

In any event, Venkata's understanding of conversion is at odds with *Morissette*. As relevant here, the Court observed as follows:

> Conversion . . . may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely be commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

342 U.S. at 271–72. *Morissette* says nothing about preventing the owner from using or possessing its property. Indeed, if Venkata were correct that conversion required the owner to be unlawfully deprived of the use or possession of her property, it would—contrary to the teachings

of *Morissette*—be difficult to imagine a "knowing conversion" that would not also constitute "embezzlement, stealing, or purloining."

This, of course, still leaves the question of how to determine whether a defendant's interference with the victim's ownership interest is sufficiently serious to cross the line from trespass on a chattel to conversion—that is, sufficiently serious to require a tortfeasor to pay the victim for the entire value of the chattel. And, although Venkata resists this step, *see* Dkt. 170 at 11 n.2, the Restatement answers the question. It provides as follows:

> (2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
> (a) the extent and duration of the actor's exercise of dominion or control;
>
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c) the actor's good faith;
>
> (d) the extent and duration of the resulting interference with the other's right of control;
>
> (e) the harm done to the chattel;
>
> (f) the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A. "No one factor is always predominant in determining the seriousness of the interference," and the list of factors is not "exclusive." *Id.*, comment d. Moreover, in addition to considering "the conduct of the defendant," the Court must also consider "its consequences" and must, "[i]n each case, . . . ask[] . . . whether the actor has

exercised such dominion and control over the chattel[] and has so seriously interfered with the other's right to control it, that in justice he should be required to buy that chattel." *Id.*[7]

Here, the Court instructed the jury that it could find that Venkata or his co-conspirators "converted" the property identified in the Indictment only if it found beyond a reasonable doubt that "the unauthorized exercise of control over [the] property" occurred in a manner involving "serious interference with [the government's] ownership rights. Dkt. 146 at 37. Consistent with *Collins* and the Restatement, the Court further explained:

> In considering the seriousness of any interference with the government's property right, you may consider the following factors, among any other factors you consider relevant: (a) the extent and duration of the actor's exercise of dominion or control; (b) the actor's intent to assert a right in fact inconsistent with the government's right of control; (c) the actor's good faith; (d) the extent and duration of the resulting interference with the government's right of control; (e) the harm done to the property interest; and (f) the strength of the government's interest in maintaining confidentiality and the expense caused to the government. No one factor is necessarily predominant in determining the seriousness of the interference.

*Id.* at 38. The Court has little doubt that, based on the evidence presented at trial and this instruction, a rational jury could have found beyond a reasonable doubt that Venkata and his co-conspirators converted the government case management systems, computer code, and PII for their own purposes.

---

[7] When proposing jury instructions, Venkata sought to define conversion according to the standard set out in *Collins*, but he opposed the government's proposal that the Court include a definition of conversion from Section 228 of the Restatement (Second) of Torts, notwithstanding the fact that *Collins* relied on the Restatement. *See* Dkt. 130 at 7–8. Section 228 specifically discusses liability for conversion when one's use exceeds one's authorized use, while section 222A speaks more generally to what constitutes conversion. Venkata did not argue that the Restatement was an incorrect statement of the law; rather that it "would be duplicative and confusing to the jury, and [was] unnecessary in any event given that the D.C. Circuit's definition controls." *Id.* at 8.

To start, the "extent and duration" of the co-conspirators' "exercise of dominion or control" over the misappropriated case management systems, computer code, and PII was extensive. They obtained the case management systems and computer code in their entirety, and also obtained PII about thousands of individuals; they updated the materials they had to include the most recent developments in the DHS-OIG system (most notably, adding the eSubpoena module); they used this property extensively over a period of many months; they provided third-parties with access to this highly sensitive material; and they did so for commercial gain. *See, e.g.*, Dkt. 175 at 90–96 (Tr. 90:4–96:25) (Edwards); *id.* at 34–35 (Tr. 34:21–35:11). The evidence also showed that they intended "to assert a right inconsistent with [the government's] right of control." Patel and Venkata were government employees, and there was ample evidence that DHS-OIG went to great lengths to limit access to the computer code and database. Dkt. 174 at 31–35, 37, 40–44, 47–50 (Tr. 31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel) (detailing measures, including only allow IT administrators to access the web and database server, and only allowing developers to access the computer code, as well as information security policy, training, and computer access agreements). And Edwards, Patel, and Venkata personally signed agreements promising not to remove "DHS computer systems or software from government workspaces without express written permission." *Id.* at 42, 44–45, 46–50 (Tr. 42:23–25, 44:23–45:24); Gov't Ex. 1, 2, & 3; *see also* Dkt. 174 at 47–50 (Tr. 46:15–50:10) (Steel); Gov't Ex. 9. The co-conspirators, nonetheless, removed these materials, placed them on a private laptop and private servers, and then allowed programmers working in India to access the programs, computer code, and PII—with no assurances of confidentiality to the U.S. government or the individuals who entrusted their PII to the government. *See, e.g.*, Dkt. 175 at 99 (Tr. 99:1–18) (Edwards). Finally, there was also ample evidence that the co-conspirators,

including Venkata, acted in bad faith; that they interfered with the government's right to control its software and PII over a prolonged period of time; and that they caused DHS-OIG substantial harm and expense. After the scheme was discovered, DHS-OIG had to inform Congress and those affected about the breach of the PII, had to notify the public and those individually affected by the breach, had to pay to provide credit monitoring services at a cost of about $400,000, and had to conduct a security assessment. Dkt. 174 at 60–67 (Tr. 60:12–67:8) (Steel).

For all of these reasons, the jury's verdict was supported by the record, and the Court lacks a sound basis to intrude on the province of the jury. *Cf. United States v. Matzkin*, 14 F.3d 1014, 1021 (4th Cir. 1994) (upholding conversion conviction under Section 641 for disclosure of confidential government contract bid information); *United States v. Barger*, 931 F.2d 359, 368 (6th Cir. 1991) (upholding conversion conviction under Section 641 for taking and sharing government manual with confidential government information); *United States v. Girard*, 601 F.2d 69, 71 (2d. Cir. 1979) (upholding conversion conviction under Section 641 for sale of confidential Drug Enforcement Administration computerized files).

**3.**

Next, Venkata argues that "the Government failed to establish[] that the aggregate 'value' of the copies source code and PII exceeded $1,000." Dkt. 166-1 at 21. Recall that a violation of Section 641 is a misdemeanor if the "value of" the stolen or converted property "does not exceed the sum of $1,000." 18 U.S.C. § 641. The statute then defines "value" as "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." *Id.* According to Venkata, "the Government attempted to meet the $1,000 threshold by pointing to the cost of producing the source code, and of credit monitoring as a result of the data breach," and, on his telling, "neither production costs nor mitigation falls within section 641's definition of 'value,' which aims to

measure the benefit to the thief—not the mitigation cost to the victim." Dkt. 166-1 at 22 (internal quotation omitted). The government responds that it proved the value of the property by reference to its "cost price," which it alleges "was in the millions of dollars." Dkt. 169 at 32. Alternatively, the Government posits that the jury was entitled to infer that the stolen property was worth far in excess of $1,000 from the evidence that there is a market for case management systems (which Venkata thought could be worth millions of dollars), that it cost millions of dollars for the government to develop the EDS and PARIS systems, and that the systems were fully operational. *Id.* at 32–33.

The Court agrees that the government presented sufficient evidence for the jury reasonably to have found that the aggregate value of the stolen goods exceeded $1,000. The government first relies on the "cost price, either wholesale or retail" of the stolen goods. "Cost price" is "the amount of money that was needed to make or get something at an amount that yields no profit." *At Cost Price*, Merriam-Webster, https://www.merriam-webster.com/dictionary/at%20cost%20price; *see also Price*, Black's Law Dictionary (11th ed. 2019) ("[C]ost price": "The price that a seller pays for something to be sold."). The government presented evidence at trial that it spent $2.3 million to develop EDS, plus about $3.6 million improving it over the years. Dkt. 174 at 51–54 (Tr. 51:19–54:7) (Steel); Gov't Ex. 16A at 2 (contract for acquisition of EDS). Special Agent Chad Steel further testified, as an expert, that it cost over $1,000 to develop PARIS. Dkt. 182 at 16–17 (Tr. 16:23–17:13) (Steel). This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that EDS, a copy of which Patel stole in furtherance of the conspiracy after Venkata joined, cost over $1,000.

Venkata objects that the "production cost" is not the same as "cost price," and he asserts that "production cost" is not one of the other value measures listed in the statute. Dkt. 166-1 at

22; Aug. 29, 2023 Hrg. Tr. (Rough at 14:24–15:2). For support, Venkata relies on *United States v. Ligon*, 440 F.3d 1182 (9th Cir. 2006), a case that involved the theft of Native America petroglyphs. In that case, the government attempted to prove value under Section 641 by pointing to the "archaeological value" of the petroglyphs, which, by regulation, is measured "in terms of the costs of the retrieval of the scientific information which would have been obtainable prior to the violation." *Id.* at 1185 (quoting 18 C.F.R § 1312.14(a)). In particular, the regulation requires "an analysis that 'go[es] back in time before the violation occurred and estimate[s] what it would have cost the United States to engage in a full-blown archaeological dig at the site' in order to obtain the archaeological information." *Id.* (quoting *United States v. Quarrell*, 310 F.3d 664, 679 (10th Cir. 2002)) (alterations in original). The Ninth Circuit was unpersuaded that this measure was "encompassed by" the statutory definition of "value," which includes only "'face, par, or market value, or cost price, either wholesale or retail.'" *Id.* (quoting 18 U.S.C. § 641). Venkata asks the Court to extend this reasoning to hold that Section 641's definition of "value" excludes any measure of the cost of services required to develop a product. *See* Dkt. 170 at 15. In his view, the "[c]ost of production is neither the retail nor the wholesale price—both of which measure the *purchase* price." *Id.*

As an initial matter, the Court notes that Venkata's use of the phrase "[c]ost of production" is a bit of a misnomer because a substantial portion of the cost at issue was the price that DHS-OIG agreed to pay to a contractor to develop EDS. Dkt. 174 at 52–53 (Tr. 52:23–53:9) (Steel). But even putting that aside, Venkata's reading of the statute is at odds with the dictionary definition of "cost price," which includes the cost of services needed to make something. *See At Cost Price,* Merriam-Webster (defining cost price as "the amount of money that was needed to make or get something at an amount that yields no profit"). Nor is the Court

persuaded that the additional statutory phrase, "either wholesale or retail, whichever is greater," alters this accepted meaning. To the contrary, if anything, that language broadens the scope of Section 641's felony provision by permitting the jury to apply the greater of the two most common measures of cost price. It would make little sense to allow the government to rely on its out-of-pocket cost when it purchases an electronic case management system off the shelf, but not to do so when it purchases the same system by entering a procurement contract for the services necessary to create the same system. Either way, the government has expended a specific "amount of money"—that is, it has incurred a "cost price"—to obtain a specific product.

In any event, a rational juror could have reasonably concluded that the "market price" was greater than $1,000. Under Venkata's definition, "market value" is "determined by market forces [and] the price at which the minds of a willing buyer and a willing seller would meet." Dkt. 166-1 at 21 (quoting *DiGilio*, 538 F.2d at 979). He further maintains that the government offered no evidence regarding the market value of the property at issue and that, as a result, "any conclusion about the respective market values of the source code and PII would be speculative." *Id.* at 22. He does acknowledge, however, that "[w]hen there is no commercial market for the items, the market value 'may be established by reference to a thieves' market.'" *Id.* (quoting *DiGilio*, 538 F.2d at 979; citing *United States v. Bigelow*, 728 F.2d 412, 414 (9th Cir. 1984) (considering illegal market for sale of IRS credentials)).

Here, a rational jury could have found beyond a reasonable doubt that the "market value" of the stolen property exceeded $1,000 in the aggregate. Although the jury was not entitled speculate, that did not foreclose the use of common sense: It heard testimony that it cost the government $2.3 million to develop EDS and that it invested an additional $3.6 million in the system. Dkt. 174 at 51–54 (Tr. 51:19–54:7) (Steel). It heard testimony that Venkata had

predicted that a commercial case management system would be worth millions of dollars. Dkt. 175 at 35 (Tr. 35:4–9) (Edwards). They heard testimony from Peter Paradis, Deputy Assistant Inspector General for Investigations at USDA-OIG, that Edwards hoped to sell EDS 2.0 to USDA-OIG for about $150,000 for the first year and roughly $40,000 for "out-year operation" and maintenance fees. Dkt. 178 at 46 (Tr. 46:10–16) (Paradis). Under these circumstances, the jury could reasonably have inferred that—had Edwards been required to purchase the stolen programs, code, and PII on the open market or from a "thieves' market"—he (or any competitor) would have happily paid well in excess of $1,000 for EDS, STARS, PARIS, and the PII of thousands of DHS and USPS employees.

**4.**

Finally, Venkata argues that any conversion that did occur "was completed years before [he] ever became involved with Mr. Edwards and Ms. Patel." Dkt. 166-1 at 20. The Court, once again, is unpersuaded. The government offered evidence that Venkata himself committed distinct acts of conversion when copying additional templates and new code onto Edwards' servers, Dkt. 175 at 80, 85 (Tr. 80:14–23, 85:4–24) (Edwards), and aided in stealing government property when he delivered DVDs containing stolen copies of the PARIS and STARS systems to Edwards, *id.* at 106–107 (Tr. 106:1–107:19); Gov't Ex. 17 at 9; Gov't Ex. 84. For the reasons explained above, this evidence was sufficient to sustain Venkata's conviction for theft of government property as a principal, aider and abettor, or co-conspirator.

In response, Venkata argues that "conversion is completed upon the initial interference with the owner's interest," Dkt. 166-1 at 20 (quoting *United States v. Beard*, 713 F. Supp. 285, 291 (S.D. Ind. 1989)), and that, here, the initial interference (if any) occurred when Edwards and Patel "made numerous copies of USPS-OIG and DHS-OIG source code and PII long before Mr.

Venkata was ever alleged to have joined their conspiracy," *id.*; *see also* Dkt. 170 at 13 ("[T]he law is clear that conversion is not a continuing offense."). But the analysis that he relies upon from *United States v. Beard*, 713 F. Supp. 285 (S.D. Ind. 1989), is inapt. In *Beard*, the defendant allegedly "diverted to his own person use approximately $27,000 in funds." *Id.* at 286. To avoid a statute of limitations problem, however, the government did not merely charge the defendant with unlawfully converting the funds, 18 U.S.C. § 641 (first paragraph), but also with unlawfully retaining the same funds with the intent to convert them to his use, *id.* (second paragraph). The district court sensibly rejected this circumvention of the statute of limitations and held that someone who has already converted property to his own use cannot also be guilty of subsequently retaining that same property with the intent to convert it to his own use. *Id.* at 289. As the court explained, the crime of retention with intent to convert "was added to [Section 641] to reach 'a new group of wrongdoers, not to multiply the offense' of the original embezzler or thief." *Id.* (quoting *Milanovich v. United States*, 365 U.S. 551, 554 (1961)).

Nothing in *Beard* suggests that a group of co-conspirators cannot commit multiple instances of conversion, whether of different property or the same or similar property at different times. The fact that Edwards had prior versions of PARIS and STARS, which he was unable to operate, for example, does not absolve Venkata of later stealing copies of PARIS and STARS, which he was then able to help Edwards install and operate on his private servers. The government provided sufficient evidence of theft and conversion that were separate from any thefts that may (or may not) have occurred before Venkata joined the co-conspiracy in May 2016, before Venkata worked extensively to get the systems that Patel stole in late May 2016 to

function, and before Venkata himself removed distinct copies of PARIS and STARS from DHS-OIG's headquarters in March 2017.[8]

**C. Destruction of Records**

Venkata next challenges his conviction under 18 U.S.C. § 1519. Under that statute, the government had to prove that Venkata "knowingly alter[ed], destroy[ed], mutilate[d], conceal[ed], cover[ed] up, falsifie[d], or ma[de] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation" of a "matter within the jurisdiction of any department or agency of the United States." *Id.* Venkata argues that "the evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that [he] knowingly deleted any text messages or emails, or that he had any intent to impede or obstruct the investigation." Dkt. 166-1 at 33.

Venkata's challenge fails because Agent Steel's testimony, along with other evidence, provided a sufficient basis to sustain the jury's verdict. At trial, Steel described the relevant portion of his May 16, 2017 interview of Venkata as follows:

> Q. During this interview, did you ask him for an opportunity to look at his cell phone?
>
> A. Yes, sir, I did.
>
> Q. And that request was made in the context of this voluntary interview?

---

[8] Given this conclusion, the Court need not decide precisely when the crime of conversion was completed. It bears note, however, that the conversion of computer software, code, and PII is not the same as the conversion of $27,000 in funds. As explained above, the line between trespass to a chattel and conversion requires the fact finder to consider a range of factors, including "the extent and duration of the actor's exercise of dominion or control," "the extent and duration of the resulting interference," and "the harm done to the property interest." *See* Dkt. 146 at 38. As a result, although removing the software, code, and PII from DHS-OIG headquarters was likely sufficient to constitute "steal[ing]," it is unlikely that the property was "convert[ed]" until Edwards, with Venkata's assistance, was able to install and operate EDS and PARIS on his own laptop or personal servers.

> A. Yes. As a matter of fact, he offered to show us the information on his cell phone. *He said that he had only had the one communication with Mr. Edwards, the phone call, but that that wasn't—that that was not on the cell phone.* He had said he had deleted the message to distance himself from Mr. Edwards. But he did show me the cell phone[] and showed me the times above and beyond. He also showed me his e-mail account, which was Murali Mohan, and showed me that there were no e-mails in there; and showed his messaging, and that there were no relevant messages in there. . . .

Dkt. 182 at 44 (Tr. 44:7–21) (Steel) (emphasis added).

Government counsel then showed Steel an extraction report from Edwards' cell phone, which included well over two hundred text messages that Edwards and Venkata exchanged between July 15, 2016 and March 29, 2017, Gov't Ex. 19, and established that the messages "relate[d] to the work that Mr. Venkata did for Mr. Edwards" and that they were "[e]xtremely relevant" to Steel's investigation. Dkt. 182 at 45 (Tr. 45:8–13) (Steel). Counsel then asked, "And what did Mr. Venkata do with these text messages," to which Steel responded, "Deleted them, sir." *Id.* (Tr. 45:14–16). When counsel followed up by asking what Venkata told him "about when he deleted these text messages," Steel responded as follows:

> He told me nothing about deleting these text messages. He told me that he deleted the communications with Mr. Edwards following becoming aware of the investigation; and that he had done so because he wanted to distance himself from Mr. Edwards and Ms. Patel.

*Id.* at 45–46 (Tr. 45:24–46:5).

Counsel then turned to Venkata's text messages with Patel and followed a similar script. He established that Venkata and Patel exchanged over one hundred text messages between July 14, 2016 and March 29, 2017, Gov't Ex. 17; that some or all of these messages were "extremely relevant" to Steel's investigation, Dkt. 182 at 46 (Tr. 46:15) (Steel); and that Venkata "[d]eleted them," *id.* (Tr. 46:17). Significantly, when defense counsel questioned the foundation for Steel's conclusion that Venkata had "deleted them," Steel explained that he examined Venkata's cell

phone, that he specifically looked for but did not find communications with Edwards and Patel, but that he found "messages from other folks, both *before* and *after* this period." *Id.* at 46–47 (Tr. 46:22–47:9) (emphasis added).

Steel's testimony regarding Venkata's e-mail was similar. Counsel showed Steel an email sent on March 17, 2017 from Venkata to Edward stating: "Charles, I am working on it. I found user manual, may be useful to you. Attached audit file. Thanks, Murali." Gov't Ex. 25; *see also* Dkt. 182 at 47 (Tr. 47:16–20) (Steel). Steel further testified that the e-mail was relevant to his investigation and that the e-mail was not on Venkata's cell phone, although Steel was subsequently able to find a copy of it on Venkata's home computer. Dkt. 182 at 47–48 (Tr. 47:21–48:4).

Finally, Steel offered similar testimony regarding Venkata's call records. *Id.* at 48–49 (Tr. 48:5–49:9). Counsel showed Steel call records reflecting multiple telephone calls between Venkata and Edwards. Gov't Ex. 36B. He then turned Steel's attention to the final page of the exhibit, which showed calls between Edwards and Venkata on April 20, 2017—after the government investigation had become "overt." Dkt. 182 at 49, 50 (Tr. 49:2–5, 50:8–14) (Steel). Steel, once again, testified that, "[w]hen he looked at Mr. Venkata's cell phone," there was no evidence of these calls. *Id.* at 49 (Tr. 49:6–9).

Recapping Steel's testimony, counsel and the witness then had the following exchange:

> Q. Thank you, Your Honor. Were these calls on the phone when you looked at Mr. Venkata's cell phone?
>
> A. No, sir, they were not.
>
> Q. So just to recap, were the text messages there?
>
> A. No, sir.
>
> Q. Were the—was the e-mail there?

A. No, sir.

Q. Were the phone calls there?

A. No, sir.

*Id.* at 49–50 (Tr. 49:18–50:1) (Steel).

Considered as a whole, this testimony and the accompanying exhibits provided the jury with ample basis to find beyond a reasonable doubt that Venkata knowingly altered or destroyed records with the intent to impede or obstruct an investigation conducted by DHS-OIG regarding Edwards, Patel, and (ultimately) Venkata's misappropriation and misuse of government property. Virtually all of the information relevant to the investigation was no longer on Venkata's cell phone, and Venkata admitted that he "deleted the communications with Mr. Edwards following becoming aware of the investigation" and that he did so "to distance himself from Mr. Edwards and Ms. Patel." *Id.* at 46 (Tr. 46:2–5) (Steel). This testimony, moreover, is corroborated by the call records, which show that Venkata and Edwards spoke multiple times on April 20, 2017, after the government investigation had become public. Gov't Ex. 36B; *see also* Dkt. 182 at 49 (Tr. 49:2–5) (Steel). Given this evidence—and, in particular, Venkata's admission and the absence of any relevant text messages, e-mail, or call records on Venkata's phone—and given Venkata's untruthful responses to questions posed by Steel during the May 16, 2017 interview, a rational jury could reasonably have found that Venkata knowingly removed any incriminating evidence from his cell phone with the intent to impede or obstruct the ongoing investigation.

Venkata offers several reasons to discount this evidence, but his arguments are ones that—had he made them at trial—a rational jury could have decided to accept or reject. With respect to the missing e-mail, Venkata first notes that the investigators did find the e-mail when

they searched Venkata's home, suggesting that perhaps Venkata's phone may have failed "to sync to the email server" and that Venkata did not delete the email from the email server. Dkt. 166-1 at 34. But this hardly demonstrates that the jury's verdict was unreasonable. To the contrary, there was no evidence suggesting that his cell phone failed "to sync to the email server," and the fact that he was less thorough than he might have been in erasing evidence of his crime is no defense. This is particularly so given the fact that the May 16, 2017 interview occurred at the DHS-OIG's offices, Dkt. 182 at 35 (Tr. 35:9–11) (Steel), and the reasonable inference that Venkata erased the incriminating evidence on his cell phone before volunteering that Steel could examine the phone in the hope of ending any investigation of his conduct before the investigators dug any deeper.

Venkata also argues that, understood in context, Steel's testimony that Venkata told him "that he deleted the communications with Mr. Edwards" after "becoming aware of the investigation" was limited to "phone calls between [him] and Mr. Edwards." Dkt. 166-1 at 35 n.8. But that, once again, was a question for jury. Venkata's counsel was free to cross-examine Steel about what he meant but, for strategic or other reasons, declined to do so. In any event, a rational jury could easily have understood Steel (and Venkata) to have referred more broadly to all "communications." Indeed, it would make little sense to delete call records to "distance" one's self from his co-conspirators, but to have left untouched the more incriminating e-mail and text messages. A call record merely shows that they spoke; the e-mail and text messages more definitively connected Venkata with his co-conspirators.

With respect to the text messages, Venkata leans heavily on Steel's testimony that Venkata "told [him] nothing about deleting these text messages." Dkt. 182 at 46 (Tr. 46:1–2) (Steel). That testimony, however, came in response to a question regarding what Venkata said

"about when he deleted these text messages." *Id.* at 45 (Tr. 45:24–25). More importantly, in the very next sentence of his testimony, Steel explains that Venkata "told [him] that he deleted the communications with Mr. Edwards following becoming aware of the investigation." *Id.* at 46 (Tr. 46:2–3). Fairly understood, Steel was simple being precise; Venkata did not separately address the text messages—and, in fact, he said "nothing about deleting . . . text messages." *Id.* at 46 (Tr. 46:1–2). Rather, he spoke more generally about deleting his "communications with Mr. Edwards." *Id.* (Tr. 46:2–3). It is only when that broad statement is considered alongside the evidence that Edwards and Venkata exchanged over two hundred text messages, none of which appeared on Venkata's phone, that the investigators (and the jury) would understand that Venkata was referring to call records, e-mail, *and* text messages.

Venkata further speculates, as he did with the e-mail, that "there are any number of reasons why a text message might not appear on someone's phone at a particular time." Dkt. 166-1 at 35–36. He asserts, for example, that "on an iPhone, the default setting is 30 days." *Id.* at 36. Far more than this would be required to set aside the jury's verdict. Among other difficulties, neither the government nor the defense offered any evidence regarding any such default setting—and, indeed, the Court has no way of knowing whether this assertion is correct (or was correct in 2017). But even more importantly, the argument is at odds with the evidence that was presented to the jury; Steel testified that, when he examined Venkata's cell phone, he found "messages from other folks, both *before* and *after* [the relevant] period." Dkt. 182 at 46–47 (Tr. 46:24–47:2) (Steel) (emphasis added).

Finally, Venkata concedes that "there is some evidence that [he] may have deleted" call records but maintains that "there is no evidence that he did so with the intent of obstructing the investigation," and, indeed, he "took it upon himself to report the calls from Mr. Edwards to his

supervisor . . . to pass along to the [g]overnment agents." Dkt. 166-1 at 36–37. That contention ignores Venkata's admission that he deleted "communications" to distance himself from Edwards and Patel. Dkt. 182 at 46 (Tr. 46:2–5) (Steel). It also ignores Steel's testimony that Venkata claimed (1) that "he . . . told Mr. Edwards that he would have to report any contact, at which point Mr. Edwards immediately ended the conversation," and (2) that this was "the only communication he had with Mr. Edwards." *Id.* at 38 (Tr. 38:3–6). The call records, in contrast, show that Edwards called Venkata multiple times on April 20, 2017, and that at least three of the calls were long enough for substantive discussions, Ex. 36B (112, 91, and 48 seconds). That evidence was more detailed and thus incriminating (and worthy of deleting) than Venkata's report that, "[w]hile looking at [his] phone, [he] noticed [that Edwards had] called [him]." Dkt. 185 at 16 (Tr. 16:10–11) (Horton). Indeed, if anything, the call records (which reflect multiple calls) raise questions about the veracity of Venkata's claim that he only recalled that Edwards had called him (that *very* day) after he reviewed his call records.

"[A] judgment of acquittal" is warranted "only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983). Here, there was more than sufficient evidence for a rational jury to have found beyond a reasonable doubt that Venkata deleted records from his cell phone, after he learned of the ongoing investigation, and that he did so with the intent to divert attention from his own wrongdoing and thus to obstruct or impede the investigation.

### D. Jury Instructions

Venkata next challenges two aspects of the jury instructions: how the jury was charged on the conspiracy charges, and the exclusion of the defense's instruction concerning apparent authority. Neither challenge has merit.

**1.**

Venkata first argues that the Court erroneously instructed the jury that "the co-conspirators could be found guilty of participating in the conspiracy if the jury found that they had either agreed to defraud the government, *or* agreed to steal or convert U.S. property." Dkt. 166-1 at 39 (emphasis added). According to Venkata, this instruction was incorrectly phrased in the disjunctive. That was an error in his view because, as he sees it, "[t]he illegal agreement alleged and put to the jury was that the co-conspirators agreed to defraud the U.S. government *by* stealing or knowingly converting U.S. government property *and* selling it back to federal agencies." *Id.* at 39–40 (emphasis in original).

As an initial matter, even if this was an error, it was harmless. The jury found an agreement to commit *both* objects of the conspiracy. When asked "what specific offense or offenses do you unanimously find to have been the object or objects of the conspiracy," the jury responded that it found "beyond a reasonable doubt" both (1) "that there was an agreement to commit the offense of Theft of Government Property," *and* (2) "that there was an agreement to defraud the United States." Dkt. 154 at 1. The jury therefore found beyond a reasonable doubt *both* predicates that Venkata suggests were necessary to sustain a conspiracy conviction. So, even if the jury was improperly instructed that it could find either an agreement to commit theft or to defraud, it found both, negating any alleged error. *See United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016) ("[I]nstructional error is harmless if it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967))).

In any event, the jury was properly instructed. First, the statute makes clear that a person can violate Section 371 by conspiring "*either* to commit any offense against the United States, *or*

to defraud the United States." 18 U.S.C. § 371 (emphasis added). The Court's instruction tracked this statutory text. Second, the Indictment charged Venkata with multiple objects of the conspiracy. It alleged that Venkata "knowingly and willfully conspire[d]" "a. to commit offenses against the United States, that is: to willfully and knowingly steal, purloin, and convert," *and* "b. to defraud the United States." Dkt. 1 at 4–5 (Indictment ¶ 11(a)–(b)). Third, the jury instructions laid out these two distinct objects of the conspiracy, Dkt. 146 at 33–34, in a way that adequately informed the jury of the "essential nature" of the alleged conspiratorial agreements, *see United States v. Treadwell*, 760 F.2d 327, 337 (D.C. Cir. 1985). The instruction included not only used "the general language of the statute," but "inform[ed] the jury of the 'essential nature' of the conspiratorial agreement[s]—the meeting of minds—that the government was required to prove beyond a reasonable doubt." *Id.*; *see also* Dkt. 146 at 33–34. The Court's instruction to the jury that "in determining whether this agreement was formed either to commit offenses against or defraud the United States, the jury need only find that one of the illegal objects specified . . . was entirely proper, since a single agreement may have more than one object." *Treadwell*, 760 F.2d at 337.

**2.**

Venkata also argues that the Court erroneously declined to include a portion of his requested defense theory of the case. *See* Dkt. 166-1 at 43–48. "A theory-of-defense instruction is in order if there is 'sufficient evidence from which a reasonable jury could find' for the defendant on his theory." *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008) (quoting *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998)). Notably, "[w]hat is required before the theory of the case rule comes into play is a more involved theory involving 'law' or

fact, or both, that is not so obvious to any jury." *Laughlin v. United States*, 474 F.2d 444, 455 (D.C. Cir. 1972).

Venkata argues that the Court was wrong to reject the portion of his proposed theory-of-the-defense instruction that referred to "apparent authority." He claims that because there was evidence in the record about Patel's workplace authority over him and because authorization from a supervisor can affect a defendant's belief in the lawfulness of their conduct, he was entitled to a theory-of-defense instruction that he "'contends that he did not possess the requisite state of mind because he engaged in the conduct related to Counts, One, Two, Eleven, and Twelve[9] based on his reasonable belief that he was acting pursuant to the *apparent authority* of Sonal Patel, regardless of whether or not she had the actual authority to sanction that conduct.'" Dkt. 166-1 at 44 (emphasis added) (quoting Dkt. 141 at 1–2). The Court is unpersuaded.

First, the proposed "apparent authority" instruction risked confusing the jury. As Venkata concedes, the D.C. Circuit "has recognized that . . . 'authorization from one's superiors cannot convert illegal activity into legal.'" Dkt. 166-1 at 44 (quoting *United States v. North*, 910 F.2d 843, 885 (D.C. Cir. 1990)). That concession, moreover, is consistent with how the phrase "apparent authority" is generally used in the law; in agency law, for example, it refers to the "power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from, in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8; *see also Makins v. District of Columbia*, 277 F.3d 544, 549 (D.C. Cir. 2002). But that is not what Venkata sought to convey in his proposed instruction. Rather, he sought to explain to the jury that if he reasonably believed

---

[9] Venkata's proposed instruction referred to Count Twelve although the Court ultimately only submitted Count Thirteen to the jury for the aggravated identity theft counts. *See* Dkt. 141 at 1; Dkt. 146 at 46.

that his conduct was lawful because Patel was his supervisor and he was acting at her request, then the jury could "determine that he did not have the requisite intent to defraud." Dkt. 125 at 10–11 (Def. Proposed Jury Instr.). But that was simply another way of saying that he lacked the requisite state of mind, and using the legally inapt phrase "apparent authority" (rather than state of mind) would have only injected confusion into the instructions.[10]

Second, a "new trial is unwarranted" if the given instructions "substantially covered the same ground that [the defendant] requested in his proposed instruction." *Hurt*, 527 F.3d 1347, 1352. In *Hurt*, the district court refused to give a jury instruction on the defendant's specific theory that he had not violated Section 641 because he acted with a good-faith-but-mistaken belief so he lacked the necessary mens rea for the crime. *Id.* at 1351. The D.C. Circuit upheld the district court's decision because the instruction given by the district court sufficiently stressed the specific intent nature of the crime in a way that "covered the same ground" as the requested instruction. *Id.* at 1352. The same is true here. The jury instructions that the Court gave thoroughly covered Venkata's mens rea argument, albeit without referring (confusingly) to

---

[10] That understanding is also consistent with the Court's pretrial observation that

> I don't think there's any problem in the world with your arguing—making mens rea arguments and saying that Mr. Venkata was told by his boss this was okay; he believed from his boss it was okay; there's no way in the world he has the mens rea necessary to establish the crime. I think that's entirely appropriate. I'm much more skeptical, though, of the notion that there's actually an affirmative defense that I should instruct the jury about, and that I should instruct the jury that if you find that there was reasonable reliance on apparent authority, that that's sufficient.

Dkt. 173 at 86 (Pre-Trial Conference Tr. 86:15–25); *see also id.* at 89 (Tr. 89:4–15). Here, Venkata does not argue that the Court should have provided additional detail or should have pointed to additional factual components in support of his theory that he lacked the requisite mental state to commit the crimes; instead, his argument turns on the Court's decision not to give what he refers to as an "apparent authority" instruction.

an "apparent authority" defense. The final jury instructions on Venkata's theory of the case informed the jury as follows:

> Mr. Venkata *contends that he did not have the required state of mind* for Counts One, Two, and Eleven. With respect to Count Thirteen, Mr. Venkata contends that he did not knowingly possess, use or transfer information containing individuals' personal identifying information. . . . Finally, with respect to Count Sixteen, Mr. Venkata contends that he did not intend to impede or obstruct a federal investigation.

Dkt. 146 at 50 (emphasis added). That instruction, moreover, was given along with the Court's detailed instructions relating to "the required state of mind." The Court instructed the jury that the government was required to prove beyond a reasonable doubt that "Venkata stole or knowingly converted property for his own use or the use of another;" that to "steal" requires that the defendant act with "intention to keep [the property at issue] wrongfully;" and that to act "knowingly," the defendant must act "voluntarily and intentionally and not because of ignorance, mistake, or accident." Dkt. 146 at 29, 37. In addition, and of particular relevance to Venkata's reliance on Patel's supervisory role as it related to his state of mind, the Court instructed the jury that it "should consider *all the circumstances in the evidence* that you think are relevant in determining whether the government has proven beyond a reasonable doubt that the Defendant *acted with the necessary state of mind*." *Id.* at 30 (emphasis added). Venkata did not then, and does not now, argue that any of these instructions misstates "the required state of mind" to violate Section 641 or that the jury failed to understand that it could look to *all* of the evidence, including Patel's status as Venkata's supervisor, to decide whether he had "the required state of mind."

Venkata argues that his "proposed instruction underscored a specific factual theory that, if accepted, would have precluded a guilty verdict on specific counts." Dkt. 170 at 33. In support, he cites *Levine v. United States*, 261 F.2d. 747 (D.C. Cir. 1958). In *Levine*, the court

concluded that the trial judge erred by failing to instruct the jury as to *any* theory of the defendant's case and "only as to the factors the prosecution must establish beyond a reasonable doubt," where there was "an evidentiary theory which if believed defeats the factual theory of the prosecution." *Id.* at 748. Specifically, the trial judge had instructed the jury only that the prosecutor had to prove that the defendant falsely represented himself to be a police officer without any direction that they should acquit if they believed the defendant's theory that he represented himself not as a police officer but as an attorney, that is, an officer of the court. *Id.* Venkata overreads *Levine*. *Levine* established there is some entitlement to a theory-of-the-case instruction; it does not hold that a defendant is entitled to a theory of the case instruction of his choosing or require the court to single out particular evidence favorable to the defense.

Venkata's reliance on the D.C. Circuit's decision in *Salley v. United States*, 353 F.2d 897 (D.C. Cir. 1965), is also misplaced. In *Salley*, the court issued a narrow and specific holding about mistaken identity instructions in narcotics cases involving undercover agents. *Id.* at 899. The court concluded that although "trial judge was not obligated to give the charge in exactly the words requested by defense counsel," he was "obligated to instruct the jury that if there was a reasonable doubt as to the identification of the defendant as the person who made the sale, then the jury should acquit." *Id.* This was because "widespread police practice of utilizing undercover agents . . . creates added danger that the innocent may be convicted;" because an "undercover agent often files for as many as 100 warrants after his tour of duty, which generally lasts for a number of months;" because that practice creates a "possibility of error due to mistake and the fallibility of human memory is obvious;" and because "[o]ften the only chance a defendant has to defend himself without accusing the officer of total fabrication is to raise in the jury's mind a reasonable doubt as to whether the defendant was, in fact, the seller." *Id.* at 898–

99. No similar risk was present here and, in any event, the Court did bring Venkata's state-of-mind defense to the jury's attention.

Third, although a "theory-of-defense instruction is in order if there is 'sufficient evidence from which a reasonable jury could find' for the defendant on his theory," *Hurt*, 527 F.3d at 1351 (quoting *Glover*, 153 F.3d at 754), there must be more than "various wisps of evidence" and "impermissible speculation," *United States v. Crowder*, 543 F.2d 312, 317–18 (D.C. Cir. 1976). Here, there was extensive testimony by Venkata's former colleagues that it was well-understood in their workplace that supervisors could not authorize employees to break the rules or to take valuable, confidential property from DHS-OIG for their own use or the use of another. *See* Dkt. 169 at 60 n.5–9. There was also evidence that Venkata signed an agreement promising not to "remove DHS computer systems or software from Government work spaces *without express written permission*." Gov't Ex. 1. There was evidence that every time he logged onto EDS he had to click "I agree" on the EDS End User Agreement and Usage Warning," which advised: "[u]nauthorized or improper use or access of this system may result in disciplinary action, as well as civil and criminal penalties." Gov't Ex. 9. And Steel testified that Venkata not only denied any "knowledge of DHS information being exfiltrated," but "actually said that it would unethical to take DHS information" and that "he was not allowed or authorized to take DHS development tools from DHS-OIG." Dkt. 182 at 38–39 (Tr. 38:22–39:4).

In contrast, the only evidence to which Venkata directs that Court are generic (and uncontroversial) statements that requests from supervisors are "normal;" that Patel was Venkata's direct and only supervisor; and that they had a professional and social relationship such that he would likely have trusted her more than his colleagues may have. Dkt. 170 at 31–32. When considered in light of the evidence discussed above, the Court is hard pressed to

conclude that any of this constitutes more than a "wisp of evidence," if that, showing that Venkata lacked the requisite state of mind. But the Court nonetheless gave a theory-of-the-defense instruction that left that question to the jury. It would have been a step too far, however, for the Court to suggest to the jury that this evidence could, as a matter of law, support an "apparent authority" defense that differs in any way from a mere denial of "the required state of mind" to steal or convert government property.

Accordingly, the Court is unpersuaded that anything in or omitted from the jury instructions warrants a new trial.

**E. Motion for a New Trial**

Finally, although Venkata moves for a judgment of acquittal or for a new trial, his briefs fail to press any separate argument (other than his challenge to the jury instructions) that might justify granting him a new trial. Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). But, as the D.C. Circuit has explained, the defendant bears the burden in pressing a Rule 33 motion, *Mangieri*, 694 F.2d at 1285, and a new trial "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred," *Wheeler*, 753 F.3d at 208 (internal citations and quotation marks omitted). Because Venkata has not carried this heavy burden, the Court will deny his motion for new trial.

## CONCLUSION

For the foregoing reasons, Venkata's motion for judgment of acquittal and new trial, Dkt. 166, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 3, 2024