IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MURALI YAMAZULA VENKATA,<br>Defendant. | Criminal Action No. 1:20-CR-66<br>**MOTIONS HEARING**<br>Washington, D.C.<br>August 29, 2023<br>Time: 2:35 P.M. |

TRANSCRIPT OF MOTIONS HEARING
HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

---

**A P P E A R A N C E S**

For Plaintiff:
CELIA RUTH CHOY
DOJ-CRM
Public Integrity Section
1301 New York Avenue, NW
Washington, DC 20530

VICTOR R. SALGADO
DOJ-CRM
1301 New York Avenue, NW
10th Floor
Washington, DC 20005

CHRISTINE MICHELLE MACEY
(Via telephone)
DOJ-USAO
601 D Street, NW
Washington, DC 20530

For Defendant:
KATHERINE SAVARESE
Sullivan & Cromwell, LLP
125 Broad Street
Suite 4000
New York, NY 10004

**A P P E A R A N C E S - (CONT'D.)**

For Defendant:
JARED ROSENFELD
Sullivan & Cromwell, LLP
125 Broad Street
Room 2701
New York, NY 10004

KAMIL R. SHIELDS
Sullivan & Cromwell, LLP
1700 New York Avenue, NW
Suite 700
Washington, DC 20006

Court Reporter:
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6714
333 Constitution Avenue, NW
Washington, D.C. 20001
202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case 20-66, United States of America v. Murali Venkata.

Would counsel please state their name at the podium for the record, starting with government counsel.

MR. SALGADO: Good afternoon, Your Honor. Victor Salgado for the government.

MS. CHOY: Good afternoon, Your Honor. Celia Choy for the government.

THE COURT: And do I have another government attorney who is listening in?

MS. CHOY: Christine Macey is listening in, but she's not feeling well, so she won't be participating.

THE COURT: Any objection to that?

MS. SAVARESE: No, Your Honor.

THE COURT: Okay. Thank you.

MR. ROSENFELD: And for the defense, Mr. Venkata, myself, Jared Rosenfeld, Kamil Shields, and Katherine Savarese.

THE COURT: Okay. Good afternoon to all of you. My apologies for keeping you waiting.

We're here today for -- on defendant's motion for judgment on acquittal and a new trial. The defense is in the enviable position that you've already prevailed on one of the significant issues posed by your motion, but there are several other issues that are raised.

Since it's the defendant's motion, why don't we go ahead and start with the defense. Mr. Rosenfeld.

MR. ROSENFELD: Thank you, Your Honor. So --

THE COURT: Is it Rosenthal or Rosenfeld?

MR. ROSENFELD: Rosenfeld. Thank you.

So we appreciate the opportunity to be heard on our motion for judgment of acquittal and a new trial. So as Your Honor has noted, since the Supreme Court rendered its decision in *Dubin*, the 1028A charge has been dropped. So subject to the Court's preference, we'd like to be heard on the first two arguments presented in our briefing.

So that's against the charges for conspiracy to defraud the U.S. in wire fraud, firstly, and also for theft of government property under Section 641. The remainder we'd be happy to just rest on our papers on those issues, Your Honor.

THE COURT: However you want to proceed is fine with me.

MR. ROSENFELD: Okay. Thank you. Ms. Savarese would like to be heard on the conspiracy to defraud and wire fraud charges. I will be arguing the Section 641 charge. And I'd like to proceed to that first.

THE COURT: Okay.

MR. ROSENFELD: So I just would like to focus on the key points of disagreement, as I'm sure your -- I know Your Honor has reviewed the briefing. But just to state the

arguments first at a high level, there's three key issues here, I think. First is we do not believe the government proved its -- proved stealing for purposes of the Section 641 charge to establish stealing, both -- well, the government had to prove that there was a taking away from one in lawful possession without right with the intention to keep wrongfully.

We're of the view that there was no evidence offered that any tangible property of the government was physically taken or carried away, as we believe the government must have shown.

And we also believe there's no evidence offered that the government ever lost possession of its property. And for -- in actuality, the evidence showed that the source code of EDS systems, the STARS and PARIS system and code, as well as the PII, the private identifying information, of government agent employees remained with the government at all times. That's the nut of our argument on the stealing count.

THE COURT: Let me ask you something on that question.

MR. ROSENFELD: Yes.

THE COURT: Twofold. First of all, you said there was no carrying away. But wasn't there, in fact, carrying away by Mr. Venkata of a copy of the source code on a CD or a DVD that was then delivered to Mr. Edwards?

MR. ROSENFELD: So I don't -- I believe Your Honor is

right. There was evidence that Mr. Venkata took two -- I think it was two DVDs onto which some data had been loaded by Ms. Patel, I believe.

I don't read the government's briefs to rely on that fact. The government will correct me if I'm wrong. I think part of the reason why -- or the reason why is because I don't believe that evidence was offered that those DVDs were the government's property. In other words, they were just DVDs. There was no -- not -- so I think that's how I'd address that argument.

THE COURT: So if I were to sneak into the safe of the Coca-Cola Company and write down on my own piece of paper the formula for Coca-Cola and then spirited that away, that would not be a theft?

MR. ROSENFELD: I think that would be conversion, Your Honor. That would not be stealing, which is the word of Section 641 that we're focusing on here.

THE COURT: I guess I'm trying to think this through. I'm not sure it matters at the end of the day, but if I use a -- I don't know if this was the case here; I can't remember -- but I use a government computer to download onto a DVD various electronic impulses which reflect source code or data and I walk off with the information, is that the taking of a thing? I'm taking those electrons that were deposited on my personal DVD by a government computer.

MR. ROSENFELD: Right. Well, that, I think -- so the *Morissette* case discusses gaps, so it says --

THE COURT: Right.

MR. ROSENFELD: -- Congress has drafted a statute intending to avoid gaps between all the many manifold larceny type charges, right?

THE COURT: Right.

MR. ROSENFELD: That's conversion because it's -- I mean, if it is an exportation of physical property that belongs to somebody else, carrying intangible property, which I mean -- I'm not sure if electrons have mass. I didn't take physics in high school, unfortunately.

But let's assume that the software is the intangible property. I see no reason why the government could not charge stealing, carrying with it damages -- the damage -- the good being subject to stealing would be the value of the intangible property, the software.

Here, I think it's different because the actual property taken, the DVDs, I don't -- in my recollection from the briefing, that's not what the government has relied on here, and it was not in evidence that the DVDs were the property of somebody else or the property of the government here.

THE COURT: The DVDs probably weren't worth a thousand dollars anyway; the blank DVDs.

MR. ROSENFELD: Well -- that's right.

Now, as to the point of the intangible government time, that's -- I think that is addressed by the parties under the context of the *Collins* case, which is in -- for the conversion part of the argument.

I think our only other points for stealing were that, firstly, as an evidentiary matter, I think the government has pointed to the acts of Mr. Venkata's alleged co-conspirator, Ms. Patel, here. And as I read the brief, it says that the government could have convicted Mr. Venkata of stealing by virtue of Ms. Patel's theft of the -- of the code or what have you.

Firstly, we think, as an evidentiary matter, as Ms. Savarese will argue, the evidence is not sufficient as to conspiracy. But that's for her to argue.

We'd also say that the same arguments we have against stealing and converting apply equally to Ms. Patel's acts chargeable to Mr. Venkata as they do to the acts of Mr. Venkata himself. So that's just a relatively minor argument, but I think an important one.

The last argument as to stealing, we also think that the government has not proven stealing here because it was never physically -- it was never deprived of anything. There was nothing taken away.

THE COURT: Wasn't it deprived of its exclusive use

of the product or the source code?

MR. ROSENFELD: So --

THE COURT: For example, in the patent world, the thing of greatest value is exclusivity, being able to exclude others from using your property as part of the bundle of rights that constitutes property.

MR. ROSENFELD: That is not how I have read the D.C. Circuit to have construed 641 charges in the past.

I think, actually, this is perhaps best -- this kind of line of argumentation is probably best addressed in the context of the conversion case law rather than stealing. So if we could just move over to that.

THE COURT: All right.

MR. ROSENFELD: So we had -- and I will return to that point.

THE COURT: Okay.

MR. ROSENFELD: Just tee up some of the cases here. So we had argued, of course, under *Collins* -- and I believe the government agrees -- that they have to show an unauthorized exercise of control over property in such a manner that serious interference with ownership rights occurs.

Both parties, I think, agree that the factors of the Restatement (Second) of Torts, 222A, provide a nonexhaustive list of relevant factual considerations that could be considered to evaluate the seriousness of the interference.

Our contention here, which the government does disagree with, is that the -- under D.C. Circuit case law, the government had to show that the interference was serious enough to deprive the owner of the use or possession of the property; and as Your Honor points out, the exclusive use or possession, if that is the standard. We do not think that. They had -- that -- a deprivation of the exclusivity was a sufficient deprivation for purposes of a Section 641 charge to rise to that standard.

And I just point Your Honor to two cases. I don't think the exclusivity point -- it's not addressed in these cases, but I think it's -- I think the exclusivity point were an -- you know, were a -- were sufficient to change the outcome here, it also would have changed the outcome in those other cases.

Let's just look at the *Collins* case. There, you know --

THE COURT: Although in *Collins*, there wasn't a --

MR. ROSENFELD: An interloper, for example; a nongovernment employee using it.

THE COURT: Right. But also there wasn't an independent interest in exclusivity in the same way there is with, you know, a proprietary product.

And so with the *Collins*-like facts, you're a government employee, you're sitting at your computer, you use

your computer to check the sports scores. You're using government property for some personal purpose, and the D.C. Circuit says that's not a problem; you can do that. But that's because the government doesn't have any interest in exclusivity.

There's not -- it's not in the bundle of rights, I wouldn't think, or you wouldn't think of it, typically, as the bundle of rights of saying that -- part of the bundle of rights the government has in its computer is that you won't use it for any other purpose unless, perhaps, I suppose they could create that interest if they were to, when you start work, make you sign a piece of paper saying I'm not going to use my computer ever for personal purposes, in which case maybe they would create that right. But, ordinarily, you wouldn't think of that as the type of thing with -- on the exclusivity.

And the government doesn't have, I don't believe, copyright rights. I don't think that the Copyright Act protects the government. But that doesn't mean that the government doesn't have copyright-like protection in things that are proprietary.

And in the same reason that you might be able to copyright computer code if you were in the private industry, there's no reason why the government couldn't have a similar type of interest. It might be an interest that it couldn't protect through bringing a copyright action. And that it can

protect, instead, by telling people not to take it or not providing access to it.

But there's something about it that feels to me closer to copyright patent, things like that, where there is a -- where part of the bundle of rights is -- and a significant portion of the bundle of rights is exclusivity, in that it's something that others are not going to take and use. It's not made public; by analogy to copyright, not relying on copyright.

MR. ROSENFELD: Well, I take your point that it's -- exclusivity is -- that it's a closer issue than in the *Collins* case with respect to the exclusivity factor. I think our position is that it's still -- nevertheless, doesn't meet the standard set out by the D.C. Circuit, which is a deprivation of the use or possession.

So I think one of the -- I think Your Honor is putting your -- a finger on a facet of the D.C. Circuit's analysis that is set out in a case called *Pearson v. Dodd*, which is a civil case. But there again -- so this is sort of a case cited in *Collins* -- is *Collins*-esque. This was a case where a U.S. Senator's papers were taken by journalists and the journalists copied them and then they returned them.

THE COURT: Right.

MR. ROSENFELD: The D.C. Circuit said, well, that's not conversion. You still -- it said, insofar as the document's value resided in their usefulness as records of the

business of his office, appellee, the Senator, was clearly not substantially deprived of his use of them.

So Your Honor is correct. To the extent that exclusivity is a fundamental component of the use value of, I think, the chattels at issue here, the government could -- could have shown -- met the standard. We do not think that that has been made out here.

THE COURT: I think also, though -- I'm sure there are more modern cases that apply this theory, but I remember that in the Pentagon Papers case that Justice White, in his concurring opinion, suggested that the remedy was for United States to prosecute the *Washington Post* and *The New York Times* for theft under 641 for taking the Pentagon Papers.

And I suspect -- I'd have to go look at it, but I suspect there probably have been over the years with -- leaks and things have been -- some cases where that's been tried. I don't know what's happened in the courts with those types of cases.

MR. ROSENFELD: Yes. Well, I am not -- I did come across that -- there are cases in that line. I did not review their holdings substantially, in part, because I think there is -- there are other cases that are sort of more easier about secrecy generally that point to the value -- the -- sort of the use as -- the particular use as the value upon which the -- I suppose, the government right depends.

And the government has, in fact, pointed them out here. One of them, the *Matzkin* case, this is confidential procurement. If the proposed bid in a procurement contract is disclosed, the government is in a substantially worse position in a contract bidding process or DEA cases involving confidential informants. The value of that information to the government depends on its confidentiality.

THE COURT: But isn't this a fairly good example of that because the government's theory of the case is that the source code was taken for purposes of improving on it and then selling it back to another government agency. And had Mr. Edwards or Ms. Patel or Mr. Venkata gone to OIG and said to them: We've got this great idea. What we'd like to do is we'd like to build onto this source code, and we want to add some additions onto it. We think it actually is a marketable product if we do that. We can sell it to other agencies, and maybe we can sell it to others.

They might well have said: That's a great idea. We love that idea. And we want 50 percent of the profit from that since what you're doing is selling something that's partially ours, and we'll have an interagency agreement, and the Department of Agriculture will pay us something, and we'll pay you something. That's great. We'll team up on this one.

And so they -- in that theory, they are taking a thing of value, where if they had gone to the government and

said, we want to use this, the government would have said, for a price.

MR. ROSENFELD: But we -- our position is -- and Your Honor can disagree with it. Our position is that this is focusing on the wrong chattel. So the correct unit of -- the correct chattel to -- to understand as having been taken is not EDS 2.0, not the potential -- not the right that the government could have exercised to ensure that they would get a cut.

The chattel at issue here in the indictment and at trial was EDS 1.0 and the PII; the taking of which did not impede the government's use one iota, we think. And there is evidence that --

THE COURT: What about the data? I understand that the claim for identity theft has been thrown out, is no longer in the case. But the private information of government employees is something where the government has a strong interest in maintaining the confidentiality of that information. Its value, in some sense, resides, to a huge extent, on it being maintained confidentially.

And when it's made public or released to others, it causes tremendous damage to the government and substantially interferes with an interest of the government.

MR. ROSENFELD: And I take your point. And there are a number of negative adverse consequences set out in the government's brief, and we take that point.

The issue is that if that is the ill to be addressed here, there are other charges that we think could have been brought under -- for example, the Computer Fraud and Abuse Act, I believe, CFAA; a more appropriate charge.

THE COURT: But you can't bring it under the identity theft statute, and perhaps, in some sense, *Dubin* counts against you a little bit in saying, you can't bring a claim for identity theft under these circumstances. But it doesn't mean you couldn't bring just a claim for plain-old theft.

If I were to sneak into the IRS and download everyone's tax returns and -- well, there are several statutes dealing with tax returns. But people's Social Security records, go and take them all, and take them and go sell them on the internet to hackers, it's kind of hard to believe that wouldn't be a theft, even if I didn't use a computer. Let's say I just went and wrote them down by hand; there's not the Computer Abuse Act.

MR. ROSENFELD: And I take the point, Your Honor. It's just that the government has not cited a case of theft where there -- like that, where the government retained access to the assets; the property. We think it had to show more with -- on the exclusivity point if that was the fundamental value, the deprivation of which rendered it a conversion.

That's the -- in a nutshell, our position on conversion and stealing.

THE COURT: Okay.

MR. ROSENFELD: The last issue is on this proof of value point.

THE COURT: Yes.

MR. ROSENFELD: So our -- my understanding -- so the government's brief, I think, primarily argues that testimony from Agent Steel as to the millions that it cost to develop the EDS system and the contract for the development of the EDS system were adequate to establish cost price, which is one of the statutory -- statutorily enumerated measures of value in 641.

THE COURT: Right.

MR. ROSENFELD: So the brief does refer to it as a contract for acquisition and the cost of acquisition, but the testimony in the contract actually discuss the procurement of services. So this is -- and I think the government concedes this. This is really about using the production cost, the cost of producing the software as a measurement of cost value. We think the government is just wrong on this. So production costs, we think, is not cost price for Section 641.

So the statute, in essence, says you can measure the value of an item based on its par or face value; what the item itself says it would be worth on its face. Those are not at issue here.

Or you can look to what others would be willing to

pay for an item, and that includes market value, the value of what the specific good at the time of the offense would garner in the marketplace as it is now or its cost price, i.e., the value of what the specific good was purchased for by the government. Neither of those, we think, is the cost of producing the item.

THE COURT: Even if you were right -- let's say it was just what someone would pay for it in the marketplace, okay? Couldn't the jury reasonably conclude beyond a reasonable doubt that where the government paid X million dollars to create something through a services contract, that it wouldn't have paid X million dollars to do that if it could have just gone out in the marketplace and bought it for $999? I mean, isn't that -- it's not just a reasonable inference; it would be mind-boggling to think otherwise --

MR. ROSENFELD: Right.

THE COURT: -- that the government was spending millions of dollars to build something that was just on the market you could easily just go buy it for less than a thousand dollars.

MR. ROSENFELD: And I take your point, Your Honor. This is market value, not cost price. So we do present arguments in the brief on market value.

So as to that issue, I think we cite cases in our brief saying that it's really -- market value is -- case law

says it's the value to the thief, not to the government. That's the relevant focus.

THE COURT: But, again, that's not a terribly hard inference, particularly where the thief wants to sell it back to the government.

There's such a huge delta between the actual cost of building something like this and the thousand-dollar benchmark. Even if you assume and grant every inference in the defendant's favor, it's just hard to believe that it wasn't worth at least a thousand dollars to the alleged thief or the thief where they're taking something that cost the government millions of dollars to build, they want to sell it back to the government; oh, and by the way, where Mr. Venkata apparently said to Mr. Edwards, if you build this thing, you're going to be a millionaire. That's not helpful testimony on that point.

MR. ROSENFELD: It isn't, of course. But, again -- and this is -- I raised -- this a similar argument as what I had raised earlier. This is EDS 2.0; not what they took; not what they stole.

THE COURT: Right. But, I mean, I sat through the trial, and there were improvements on EDS, and the plan was to build a better product. But it's a little bit like saying the difference between -- I don't know -- buying a pizza and buying a pizza with all the toppings. It's worth more, but it's hard to imagine a world in which it is so much better that you take

something that was less -- a value of less than a thousand dollars, but these additions that were added onto it make it worth something that would make Mr. Edwards a millionaire.

I mean, again, it's a question of whether the jury could have reasonably found beyond a reasonable doubt that was the case.

MR. ROSENFELD: Correct. Now, Ms. Savarese, I believe, will be presenting some argument as to what the thought of the co-conspirators were with respect to the EDS system and the improvements they would have made.

I think we would say, as to the market value, that there is -- the standard requires more than just speculative evidence. So the government needed to adduce concrete evidence of the value of the EDS system in the marketplace to these thieves, the alleged thieves, and this, we think, they have not done.

THE COURT: Okay.

MR. ROSENFELD: Thank you.

THE COURT: Ms. Savarese?

MS. SAVARESE: Thank you, Your Honor. I'll now address the wire fraud issues.

As an initial matter, the government's theory of what this came to defraud here was seems to have evolved a bit over time. At closing, when describing the elements of wire fraud, the government told the jury that the nature of the fraud was

that the EDS program would have been free to any agency in the federal government, but Mr. Venkata and Mr. Edwards "got in the way of USDA-OIG securing the excellent EDS system." And according to the government in closing, "That's the scheme to defraud."

The problem with that theory is it was directly contradicted by the government's own witnesses, Peter Paradis and Agent Steel, who testified that Sonal Patel did, in fact, provide EDS to USDA-OIG free of charge in the spring of 2016.

So in their opposition brief, the government pivoted to a new theory. Now the government argues defendants omitted material facts regarding the pricing and characteristics of the case management system that they were developing and, therefore, they intended to deprive the USDA-OIG of information that went straight to the agency's economic decision-making.

At the time the government submitted their brief, that theory might have held up under the Second Circuit's right-to-control theory of wire fraud; in other words, the theory by which the government could establish a wire fraud by showing that the defendant had schemed to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions. But in May of this year, the Supreme Court flatly rejected that theory.

In *Ciminelli v. United States*, which is 598 U.S. 306, the Court held that the right to valuable economic information

needed to make discretionary economic decisions is not a traditional property interest; and, therefore, a scheme to deprive a victim of such economic information cannot form the basis of a wire fraud conviction.

The facts in *Ciminelli* bear considerable similarities to the instant case. The victim there was a nonprofit organization that helped the State of New York administer the bid process for state-funded development projects, similar to the agency soliciting bids in this case.

According to the prosecution in *Ciminelli*, the defendants rigged the bidding process to ensure that their preferred candidate would meet the criteria for the state-funded project so that their bid would win. Although the defendant's winning candidate did, in fact, meet the criteria for selection, the defendants did not disclose to the nonprofit victim that they had rigged the process to ensure it would be selected.

According to the prosecution in *Ciminelli*, this omission deprived the victim of potentially valuable economic information that it would consider valuable in deciding how to use its assets; in other words, in deciding whether to award the contract.

Here, our situation is quite similar. The government's theory now appears to be that the defendants attempted to win a government contract by developing a product,

EDS 2.0, that would meet the government's stated requirements for an enhanced system, but that the defendants failed to disclose the manner in which that product, EDS 2.0, was developed. Under the Court's holdings in *Ciminelli*, that does not amount to a scheme to defraud.

The case here is also on all fours with *United States v. Regent Office Supply*, 421 F.2d 1174, in which the Second Circuit held that solicitation of a purchase by means of false representations that are not directed to the quality, adequacy, or price of the good to be sold does not constitute a scheme to defraud.

As in *Regent*, the government here has not offered any proof that the defendants expected to get something for nothing or that they intended to get more for the product than it would have been worth to the average customer. To the contrary, the government's own evidence at trial showed that the defendants here were, in fact, attempting to develop a valuable commercial product.

Charles Edwards, the government's witness, testified that he was building a new system, a commercial product. He explained, "I wanted to build a case management system that, regardless of which agency you worked in, will not be written just for that agency. It will be easily adaptable." He said that he recognized the problems with EDS, and he testified that he had his own ideas of what the next generation needed to be.

As Mr. Edwards explained, "I wanted to sell the latest technology"; in other words, not EDS.

In short, there's no evidence that the quality of the product that Mr. Edwards was trying to sell was any different than promised. Yet, in the face of this evidence, the government intends to argue that defendant's omissions related to the price of the product that they were selling.

But the only evidence that the government points to there is not on point. Specifically, Peter Paradis testified that stolen goods are not worth as much as nonstolen goods. And while that may be true, that has no bearing on the value of the new system that Mr. Edwards was building, which was itself not a stolen good.

If Mr. Edwards and Ms. Patel had succeeded in their --

THE COURT: Wasn't it, arguably, a hybrid between the two? It was the original system with the stolen good plus this add-on, or they were add-ons to the original system; so it was both?

MS. SAVARESE: Mr. Edwards' testimony was that there were problems with the EDS; that the EDS code itself was bad and buggy and shouldn't be used; and that he was taking it apart and rebuilding it from the ground up.

THE COURT: Wasn't there also enough evidence for the jury to reasonably conclude beyond a reasonable doubt that he

was planning on building out from the original product; taking the original product, putting some add-ons to it and perhaps fixing some bugs on it?

But it was -- an analogy, you're starting with your Ford chassis, and it may be that you're putting a sportier body on it, and you're putting a faster engine in it, but it's still got the same old chassis.

MS. SAVARESE: Understood, Your Honor. I think that analogy works in the context of a car.

In the context of computer code, my understanding of -- our position is that the evidence that was admitted at trial, Mr. Edwards' own testimony, was that they completely rewrote the code and, in fact, what they were attempting to do was reverse engineering. They wanted to make it look like EDS and have some of the same functionality, but the underlying code itself had to be completely rebuilt from the ground up in order for the new product to have value.

THE COURT: Thank you.

MS. SAVARESE: One other point I just wanted to touch on briefly is that, as for the other elements of wire fraud, we'd submit that the government has not met its burden to prove an interstate wire. I think the Court doesn't need to reach this issue for the reasons that we already explained.

But we'd submit that the government simply hasn't presented any evidence of where Mr. Venkata was at the time of

the relevant wire communication. The government has taken the position that they've presented circumstantial evidence as to his typical practice in the mornings. We know that he was in the District of Columbia several hours before and 90 minutes after -- sorry -- that he was in Virginia several hours before and in the District of Columbia 90 minutes after the phone call took place.

But the government hasn't offered any evidence whatsoever of where he might have been when that call took place.

THE COURT: Well, hasn't the government presented evidence that he went to work that day because he met Mr. Edwards there and went outside and handed him the disk, and that that was the reason that Ms. Patel called him and asked him to give the disk -- Mr. Patel or Mr. Edwards; I can't remember who it was -- but that he was asked because he was the one who was in the office and who could do it?

And there was evidence that he got to the office pretty early in the morning. He would get there by -- he'd take the 6:30 bus. So he'd be there early in the morning. It's true, it's possible that this was an unusual day, but there was no evidence to the contrary, no reason to doubt that he followed his usual practice, and that he was at the office.

MS. SAVARESE: Respectfully, Your Honor, our position is that the evidence was offered -- the testimony that you're

referring to is that -- of a co-worker was that he and Mr. Venkata would ordinarily commute to the office together.

THE COURT: Right.

MS. SAVARESE: The testimony was not about the specific day in question.

And given that there was no testimony that this is, in fact, what Mr. Venkata did every single day, it was just his ordinary practice, we think that it's a little bit of a -- too wide of a gap of circumstantial evidence.

THE COURT: But most people get to work at the start of the workday. I mean, so it's consistent with the fact that he was an employee and this was his workplace, and the testimony was that maybe he would be there even considerably earlier than the telephone call took place. What time was the call?

MS. SAVARESE: The call was around 10:00 a.m.

THE COURT: About 10:00 a.m. We know he was at work that day. We know he was there shortly after the call or an hour and a half after the call to deliver the DVDs.

We know that his usual practice or typical practice was to arrive quite early. And there was no evidence that he took a -- he went to the doctor that morning or anything else that might contradict the evidence that he was at work and that he typically got there early.

MS. SAVARESE: It's our position that it's not

Mr. Venkata's burden to --

THE COURT: It's not -- I completely get that. It's not his burden. Obviously, the government bears the burden beyond a reasonable doubt.

But where the government establishes a usual pattern of behavior, and there's no evidence to the contrary, that would, typically, be enough to establish to meet its burden. I'm not saying that there was an obligation to offer any contradictory evidence, but if there's evidence that something usually happens in a particular way and there's no evidence to the contrary, there's no reason to think that it didn't happen that way.

MS. SAVARESE: So I think the facts in *Izydore* -- the case we cited in our brief -- speak to that a little bit. Because there, the government put on a witness who testified that they left a voicemail message, I believe, on a -- back when you had to use the box inside of your house to listen to your voicemail messages, they left the message for the defendant, and the defendant called them back afterwards.

And the government was seeking to offer this as evidence as to where the defendant was when they called this person who had left the voicemail back, and the Court held that the government had not offered any evidence as to where the person was; they were inviting the jury to speculate that they had gone home, listened to the message and, therefore, were in

the state where they were located.

But the government said -- sorry. The Court found that that was not enough.

THE COURT: Although this -- it strikes me as this is a case in which maybe you're the one who is asking more for the Court to speculate than the government and that the government has shown that he was at his office at 10:30.

It's offered evidence that he usually, in the usual practice, went in quite early, and you're saying, but you never know. I mean, it is possible that his child was in an accident that morning, had to run the kid to the hospital before he went to work that day; or it's possible that he had some unusual errand he had to run.

But that all seems to be more in the nature of speculation than we know he was at the office in the morning. We know that he usually arrived early in the day, and that he wasn't somebody who had a work schedule that started at 10:30, for example. And sort of the natural course or natural assumption would be that he was there.

And you're saying, but you never know; it's possible that he wasn't there. It seems to me you're the one asking for the speculation in that regard.

MS. SAVARESE: Point taken, Your Honor. I think I may have misstated the record. I believe that the government's only evidence was where Mr. Venkata was 90 minutes after the

call occurred. I don't believe that they offered any evidence as to where he was in the morning, meaning they didn't offer any evidence that he had, in fact, arrived at the office before the call was made.

They just offered evidence that he was there in person 90 minutes after the call occurred to hand over the DVDs.

THE COURT: I understood that. But he was there by 10:30 -- I'm sorry. What time was the DVD handed over?

MS. SAVARESE: 11:30; it was an hour and a half.

THE COURT: So the DVD was handed over at 11:30. So we know he was there at 11:30.

MS. SAVARESE: Yes.

THE COURT: And then the question is whether there's any reason to doubt that he was there an hour and a half earlier.

And the evidence is that he usually went to work first thing in the morning, and there was no reason to think he was on an unusual work schedule that would require someone -- or allow someone to come in to work later. It's a reasonable inference for the Court -- for a jury to say, well, we infer that he was there because he usually got to work in the morning, and we know he was there at work that day.

MS. SAVARESE: Certainly, Your Honor. Our position is just that the government did not, in fact, offer any direct

evidence of where he was on that particular morning. And the unique geographic circumstances of where we are with the District, Virginia, and Maryland all being so close to each other, it's -- we would submit that it's not at all unreasonable to imagine that he could have very well been in Maryland at the time of the call if his commute was not as it sometimes was.

THE COURT: Was the call just reported or recorded or what was the -- I've forgotten how we know about the content of the call.

MS. SAVARESE: I believe that the -- there was a phone record of when the call occurred and where Mr. Edwards was, and then we had Mr. Edwards' testimony of what -- of the content of the call. And Mr. Edwards did not testify that Mr. Venkata gave any indication of where he was at the time they spoke.

THE COURT: Okay. Anything else?

MS. SAVARESE: No. If no further questions, we'd respectfully request a judgment of acquittal on the wire fraud charges on that basis.

THE COURT: Okay. Thank you.

MS. SAVARESE: Thank you, Your Honor.

THE COURT: I'll let you all reply, but I'll hear from the government now.

MS. CHOY: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. CHOY: With your permission, I will address the defendant's arguments regarding Count 2, the Section 641 count, and Mr. Salgado will address the defendant's contentions regarding the wire fraud and scheme to defraud counts.

THE COURT: Okay.

MS. CHOY: The evidence at trial showed that Mr. Venkata and his co-conspirators made unauthorized copies of proprietary government software and databases, that they removed those copies from government premises. They installed them on private servers at Mr. Edwards' home for the purpose of exploiting them for commercial purposes and to compete with the government, and they provided access to that government property to outside foreign computer developers.

That evidence is more than sufficient to uphold the conviction of Mr. Venkata on Count 2 either as a principal, an aider and abettor, or vicariously as a conspirator under Pinkerton.

THE COURT: Is the government's theory that the property was stolen or converted?

MS. CHOY: Our contention is that both of those means of violating 641 were proven beyond a reasonable doubt a trial. The Supreme Court in *Morissette* explained the relationship between those two means of violating the statute and that stealing is a subset of conversion, which is defined by the

initial unlawful taking and the intent to keep permanently.

There's no support for the defendant's contention that stealing requires a physical carrying away of tangible property. That's a limitation that does not appear in the statute, and the Supreme Court in *Morissette* explained that stealing had no fixed meaning at common law. It's not the same thing as larceny.

Although, Your Honor, you don't need to resolve the meaning of stealing, of course, because if you find that the evidence was sufficient of conversion, you can uphold the conviction on Count 2.

So I'll turn --

THE COURT: So what was converted?

MS. CHOY: The government's proprietary software, which was the EDS system and its source code, and the PARIS system and its source code, as well as the proprietary databases that belong to DHS-OIG and USPS-OIG. And the jury returned a special verdict form finding that all of those forms of property had been converted.

So I'll turn now to the defendant's arguments regarding conversion. The defendant has argued that the serious interference requirement for conversion involves a bright-line legal rule that the owner of the property must be deprived of the use or possession of the property, but there's no support for that argument.

Conversion -- the serious interference aspect of conversion requires a fact-intensive analysis of all of the facts and circumstances, including the extent and duration of the defendant's interference with the property, the nature of the owner's interest in the property -- as Your Honor was alluding to, the owner might have a particular interest in exclusivity of access to that property -- as well as the negative consequences that flow from the interference with that property.

In this case, the evidence at trial showed that the government took -- went to great lengths to preserve its exclusive control over this property by restricting access to it, by having everyone who had access to it sign these computer access agreements, undergo trainings, et cetera.

The evidence also showed that there were very substantial negative consequences to the government when the exclusivity of its control of this property was breached. And that included operational consequences. There was testimony that witnesses became -- and whistleblowers became more hesitant to share information, that DHS-OIG lost the trust of the law enforcement partners.

THE COURT: Was that because of the PII being taken, or was it because of the software, or both?

MS. CHOY: It was -- I'm not sure the testimony was specific as to which part of that it was. It was the whole

breach of -- the data breach that DHS-OIG was forced to report to Congress, that its systems had been breached, that its data had been breached. These were systems that included case information about criminal investigations.

And so it makes sense, if you have whistleblowers, that they might be hesitant to come forward if they believe that the agency can't protect the integrity of its information and their identity. So there was testimony of that in the record.

There was also testimony that the government spent almost half a million dollars in remediation costs. So all of that is relevant to the serious interference inquiry.

The government -- the defendant has argued that *United States v. Collins* creates sort of a bright-line legal rule that the owner has to be deprived of the use or possession of the property, but we disagree about the meaning of that case.

THE COURT: I think I remember pretrial that we dealt with *Collins* is my recollection. I don't know if it came into the jury instructions or where it came in, but I do remember looking at that pretrial.

MS. CHOY: Right, Your Honor. We read *Collins* to say -- we look to the Restatement of Torts to flesh out the meaning of serious interference, and the Restatement of Torts makes clear that it's a multifactor analysis, that no factor is

predominant, that a material breach of user authorization agreement could constitute serious interference. And that's exactly what happened here.

If Your Honor has no more questions about the serious interference issue, I'll briefly address the value of the property issue.

THE COURT: Okay.

MS. CHOY: The evidence at trial showed that the government engaged an outside contractor to develop EDS to the government's specifications at a cost of approximately $2.3 million. That evidence demonstrates that the cost price to the government was $2.3 million; the cost that it took the government to acquire that property.

The defendant has characterized that expenditure as development costs. I don't think that distinction makes sense in the context of the government procurement of property. The government frequently engages outside contractors to develop property, objects, things that -- to the government's specifications. Those are custom-built for the government so they're not, sort of, available on the open market.

Nonetheless, the cost that the government pays to that developer is the cost price of that property. If the government engages Lockheed Martin to build a fighter jet for a certain amount of money, you could characterize that as the cost of development of the fighter jet. Nonetheless, that's a

cost price to the government

THE COURT: There are different types of government contracts, but some are cost-plus. So sometimes the way the government contracts work is that the government reimburses the contractor for the cost of the labor plus some add-on to it. So that is one form of -- one of the significant forms of government contracting.

MS. CHOY: Fair enough, Your Honor.

Nonetheless, the inference here is clear that if the government had acquired this property for $2.3 million, it was certainly worth more than a thousand dollars.

THE COURT: Do you agree with what I was suggesting as well, that even if it's a market price analysis instead of the cost to the government, that the jury could reasonably conclude beyond a reasonable doubt that, certainly, it cost the government $2.3 million to build; if the government could have bought it in the marketplace, it would have paid more than a thousand dollars for it?

MS. CHOY: Yes, we do, Your Honor.

THE COURT: Okay. This question may be for you or maybe for Mr. Salgado. What is your view with respect to what Mr. Edwards' plan was as to what he was building?

And Ms. Savarese said to me, I think, a few minutes ago that the defense's view is -- of the evidence is that he was building something from scratch, and he was using the

EDS 1, perhaps, as a model or as something to provide some guidance. But the plan was not to take any of the original source code and plug it into a new product, but to build the product from scratch because the original source code was glitchy.

What is the government's position as to what the evidence shows on that?

MS. CHOY: The evidence certainly showed that Mr. Edwards planned to set up a working version of these systems to show the Indian developers. And I think the jury could infer from that, that the developers were incorporating ideas and aspects of the system when they went about their work.

I would agree I don't think there was evidence that it was -- that they were copying and pasting source code. Nonetheless, they were incorporating what they were seeing in the model that Mr. Edwards provided to them into what they were developing.

THE COURT: All right. Thanks. Okay.

MS. CHOY: Thank you, Your Honor.

THE COURT: Mr. Salgado?

MR. SALGADO: Thank you, Judge. It's good to be back.

THE COURT: Good to see you. Maybe I could ask you to start with that same question as it relates to the fraud

theory. And that if it was a new product that was being built, how does that affect the fraud theory?

MR. SALGADO: Judge, the conspirators' designs vis-a-vis this new product was fully laid out in trial exhibit -- Government Exhibit 11A. That's the meeting that Mr. Edwards and Ms. Patel had with Mr. Paradis at the Matchbox restaurant in May of 2016.

And in it you can hear both Ms. Patel and Mr. Edwards pitching this new product to Mr. Paradis. What they were really planning on doing -- by this time, of course, they had already met with Mr. Venkata on Memorial Day or before that -- they were simply planning on using EDS as the foundation -- foundational package that they would tweak, right?

THE COURT: That's my question, if you can refine that. You think the evidence showed that they were actually using the actual EDS source code as the foundation, or were they using the schematic of EDS? You know, using EDS as a model, but then writing the source code from scratch?

So, in other words, were they taking the source code, or were they saying the first module needs to do X, and EDS did X, and this is how it did it; write source code that does that.

MR. SALGADO: Correct. As to the actual EDS, the various modules that it had, I don't think the evidence got into that level of detail. However -- and importantly -- regarding eSubpoena, which was a critical module for EDS, which

was built by this defendant --

THE COURT: I remember.

MR. SALGADO: -- that was pretty much promised to Mr. Paradis as a whole. You're going to get the same thing, essentially.

Because Mr. Paradis had told him -- right? -- everybody at OIG is raving about this new module that you have. That's something that I really want. And Ms. Patel tells Mr. Paradis, Mr. Venkata can give the concept to Mr. Edwards, which will then be transferred over to Mr. Paradis.

THE COURT: You used the word concept there. At another point you used the word module. That's my question is, is it the government's position or the evidence showed or would permit a jury to conclude beyond a reasonable doubt that the plan was to just take that module, that is, that portion of the source code, pull it out and plug it in? Or was it that it was going to use the concept that Mr. Edwards had come up with, that is, let's have an idea of having a special module for subpoenas, and this is, in general terms, how it would work?

MR. SALGADO: So the -- I believe there was testimony that no federal agency in the government had that type of finality. That came only from Mr. Venkata. Of course, came from him, but it was owned by the U.S. Government -- right? -- by DHS-OIG.

Our position would be that, whether it's the concept

or the actual module, I don't think that's a distinction without a difference. However --

THE COURT: I do think there is a difference there. I mean, I think -- I mean, we can talk about this.

I guess, I would be surprised if it was a theft or if it was a fraud for Mr. Venkata to have left the government and then said, there ought to be software products out there that have a special module that lets you issue a subpoena by just entering some data and information in it and pushing a button and the subpoena issues.

That's just a sufficient level of generalization or an idea that I would be surprised if it would be a problem for Mr. Venkata or anyone to say, let's do that and, in fact, anyone who is listening to today's proceedings might say to themselves, that's a great idea, eSubpoena. We ought to do that.

I don't think that any of us today have disclosed a government secret by having the conversation about -- or a proprietary -- anything that's proprietary by saying that there's such a thing as eSubpoena, and it's a module in which you can push a button, and it just issues the subpoena.

There's a difference to my mind as to whether you're actually taking the source code and saying let's actually just plug it -- Mr. Venkata spent a lot of hours on the government clock sitting at his computer typing that source code, and that

belongs to the government. That's very different from saying, Mr. Venkata had this really clever idea that there ought to be a special module that does subpoenas.

MR. SALGADO: Understood, Your Honor. I appreciate the nuance that the Court is injecting into the difference between the concept and the module.

THE COURT: Right.

MR. SALGADO: I'm looking at Mr. Edwards' testimony on direct. There was ample discussion about the eSubpoena module. There's testimony about how this defendant first showed him the eSubpoena module at Ms. Patel's residence, and then, of course, he -- this defendant -- sent the eSubpoena requirements.

There was an email; I can't remember the exhibit. We will gladly send it to the Court, if necessary. And then that -- subsequently, that subpoena module was uploaded onto the servers; that was made available to the Indian coders. What I'm trying to find out to close the loop is whether Mr. Edwards, when meeting with Mr. Paradis, represented to him that eSubpoena, the module, as it existed, was part of the product as it is.

If you give me one second, Your Honor, to take a quick look.

THE COURT: Okay. That's fine.

MR. SALGADO: At least on the direct, Your Honor,

there is ample discussion of Mr. Venkata uploading the eSubpoena module onto Mr. Edwards' private server. That, by itself, of course, is theft.

THE COURT: So I think on the theft point, I get the point in that. Even if you're stealing it as a model, you're still stealing it. So I get that.

But if -- on the fraud theory, the fraud theory is you're selling back to the government something that was government property. If it was just a government concept that was then re-executed, I guess it's less clear to me that that's government property you're selling back to the government.

MR. SALGADO: Again, Judge, if I can spend five minutes during the defendant's reply to look at this.

THE COURT: That's fine. If you want to submit something further to the Court next week, that's fine too.

MR. SALGADO: I will note this, however; that Mr. Edwards had no knowledge of the eSubpoena module, much less how to tweak it, how to upload it onto a server. He testified that Mr. Venkata was the tech brains of the operation.

And what we see throughout the record with the text messages -- that's Government Exhibit 19 -- and in the servers themselves -- right? -- that Mr. Venkata helped build in Mr. Edwards' residence is the eSubpoena module. Mr. Edwards had no way of knowing it existed because he had left the government before Mr. Venkata had developed it.

So I think the inference is powerful there. That, to the extent that the eSubpoena module made its way to the Indian developers for purposes of repackaging or remaking this new product, that it came from Mr. Venkata.

And it's fraud, Your Honor, because, again, it's a scheme crime. It doesn't have to materialize under Ousten [phonetic]. So as long as Mr. Venkata is taking steps to incorporate the eSubpoena module into this finalized product that Edwards has promised Mr. Paradis, we think that the scheme has consummated, has materialized at that point.

THE COURT: What about *Ciminelli*, the --

MR. SALGADO: You know, Judge, I was mystified by that because I heard counsel start her colloquy with the Court that we had changed our theory of fraud, and that was a clear allusion to the right-to-control theory that was overturned in *Ciminelli*.

However, that's not what we said in our papers. They are the ones who cited *United States v. Binday*, which was a Second Circuit right-to-control case, on pages 3 and 6 in their opening brief. And we simply said -- of course, at the time *Ciminelli* had not come down. *Ciminelli* was in the oven still.

THE COURT: Right.

MR. SALGADO: We simply said -- after laying out our affirmative theory of fraud, we simply said on page 12, I believe, or 14 -- 12, reasonably said -- oh, and also, by the

way, this case that they cite, *Binday*, if you read it closely, it would actually -- its core holding would actually apply here and support the government's theory of fraud.

THE COURT: So what is the government's theory of fraud?

MR. SALGADO: That in developing this -- first of all, it starts, Your Honor, with the fact that, obviously, this property, this code, belonged to the U.S. Government. The jury heard evidence about how, to the extent that the DHS-OIG wanted to share that product, it had to enter into a memorandum of understanding with a fellow -- a sister agency.

And in which case, it would be made available free of charge to that sister agency. Obviously, they both fall under the U.S. Government. So that's step number one.

Step number two is that, in offering this alternative commercial package to Mr. Paradis -- who, obviously, was working with the government, right? That's something that we have to keep in mind. He was not an unwitting purchaser in the open market. He was working with the government. They offered this next generation EDS, this EDS 2.0; they refer to it interchangeably.

And what the evidence shows, Your Honor, is that even though Mr. Edwards and Ms. Patel were telling Mr. Paradis that Mr. Edwards had long been working in this different commercial package, that was not true. EDS -- DHS-OIG's EDS was the

starting point. They had stolen it. They couldn't upload it. They needed this defendant to re-upload it and to steal it again and re-upload it on the laptop and then on two servers. Of course, later on they supplemented it with the USPS-OIG modules and the data.

But that product, that didn't exist yet when they talked to Mr. Paradis, contemplated the use of stolen property, proprietary software, and the PII, and the data.

THE COURT: Well, I guess I'm still trying to understand. There's one way to understand what you're saying. There was just a piece of information that was withheld. The piece of information that was withheld was that they had obtained --

MR. SALGADO: That's where I was getting at. I'm sorry for --

THE COURT: Okay.

MR. SALGADO: -- taking so long to get to the punchline.

The fact that they didn't disclose that information and that they omitted material information, that they may have representations to the customer, to the U.S. Government through Mr. Paradis, that is the fraud.

Now, the defendant's focus on this --

THE COURT: Isn't that *Ciminelli;* under the right-to-control theory a defendant is guilty of fraud if he

schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions. And the Supreme Court said that doesn't hold, doesn't fly.

MR. SALGADO: Well, no. That's not our position, Your Honor. Our position is that the product that they were selling was less valuable than it otherwise would have been. That's the --

THE COURT: So they lied about the value of the product.

MR. SALGADO: Correct. Mr. Paradis told the jury that, in his experience in the open market, any products sold with stolen property have less than market value pricing. That's number one. Also, this concept of the unbargained for risk.

The jury heard that DHS-OIG, when they discovered the data breach, they had to spend all this money in mitigating steps, and they had to lock down the proprietary software. They had a consultant to do a front-to-end assessment as to the integrity of the software.

THE COURT: You're talking about damage to OIG, and I think on the fraud theory, you need to be talking about the Department of Agriculture, right?

MR. SALGADO: Well, that risk would be transferred on to USDA-OIG.

THE COURT: So the fraud, then, was not disclosing to

the Department of Agriculture that --

MR. SALGADO: It was stolen and that it would carry a significant mitigation cost.

THE COURT: Because they may have been shared with programmers in India?

MR. SALGADO: Correct. Correct.

THE COURT: But there's no reason to think -- any program could have been written by programmers in India; probably a lot of programs are.

MR. SALGADO: Except as Agent Steel explained, any time outside parties have access to a platform, that compromises the integrity of that platform. He talked about how coders went at great lengths to protect the integrity of the code. I believe the term he used was TFS. Only coders can check out parts of the code.

THE COURT: But is there any reason to think that Mr. Edwards indicated to Department of Agriculture that the coding was done solely in the United States and that there were not any Indian or other foreign coders involved in writing the code?

MR. SALGADO: Mr. Paradis testified, I believe, that he did not find out that there were coders in India involved until later on in the investigation.

THE COURT: Right. But the question is whether Mr. Edwards misled him in any way with respect to who was

writing the code or what was being written.

MR. SALGADO: That's part of the government's theory, that by not disclosing the involvement of Indian coders in developing this new product that -- once again, was going to be sold to the USDA-OIG for purposes of housing sensitive information, PII, and the coders could have --

THE COURT: This does strike me as a very different theory from the one that I heard from the government at trial. If the government's theory is that the fraud was misleading the Department of Agriculture by not disclosing to the Department of Agriculture that there were Indian programmers who were writing the code -- I tried this case a long time ago, but I don't recall anything about that in the trial.

MR. SALGADO: It was twofold. The fact that they didn't disclose that it was built following the theft of proprietary code and using that proprietary code in the development of the platform and, of course, use of the sensitive law enforcement databases and the PII, and also that there were Indian coders involved, I believe I did mention that in the closing, but, again, I'd have to --

THE COURT: That strikes me as one of those things where the government can ask and probably all the time does ask when they're buying computer software --

MR. SALGADO: Right.

THE COURT: -- and they say, for cybersecurity

purposes, we want to know where this code was written or who prepared the code. And they just never got to that point in the transaction.

MR. SALGADO: And had this scheme not been taken down, it would have gotten to that point.

THE COURT: But then someone at the Department of Agriculture would say we want you to certify this is all written in the United States. If somebody falsely certified, that would be a fraud. But no one ever asked the question.

MR. SALGADO: Without focusing on the Indian coders, Your Honor, I believe the government's theory of fraud resting on the theft fulfills --

THE COURT: That's more consistent with what I remember from trial.

MR. SALGADO: It's akin to -- I believe Your Honor used the analogy one piece at a time -- right? -- the Cadillac, Johnny Cash.

THE COURT: I remember that now, yes.

MR. SALGADO: Right. It's selling a Cadillac with stolen parts, you know, that could be traceable somehow, without disclosing that. Such that, if and when that Cadillac hits the road and gets pulled over by a cop, that it's going to be seized or impounded because of the stolen parts.

That's sort of the risk that I'm talking about here.

THE COURT: I've got a question about that. If this

was advertised as EDS 2, doesn't that sort of suggest that it was based on EDS 1?

MR. SALGADO: Sure.

THE COURT: But you say that's the fraud, is that it was based on EDS 1. If they're saying this is EDS 2, why isn't that disclosing the fact that it is, in fact, based on an improvement to EDS 1?

MR. SALGADO: Respectfully, had they said EDS 2 using stolen EDS 1, maybe we wouldn't be standing here -- right? -- on a fraud count. But they stole it; that's the reality. And without the theft, the --

THE COURT: But that's just a separate count. I guess what I'm trying to figure out in my own mind is whether the fact that it was stolen and used at least as a model for creating the new product constitutes a material misrepresentation and omission under the Supreme Court standards.

MR. SALGADO: We have numerous other half-truths on page 11, Your Honor, of our brief, if I could pull it up. Well, they all go along the same lines.

THE COURT: Okay.

MR. SALGADO: This affirmative effort to mislead Paradis that he was buying an enhanced product that was free of any encumbrances; and that was, of course, not the case. They stole the software. They stole eSubpoena. They stole the

databases, the sensitive --

THE COURT: Is the encumbrance that somebody at the OIG would at some point in time say, hey, wait a second, this is ours. I mean, wait a second; you're using our product. I'm still trying to figure out what it is --

MR. SALGADO: In all likelihood, yes, Your Honor. But as we noted in the brief, it's a scheme crime. It doesn't have to be --

THE COURT: No. I understand.

MR. SALGADO: -- brought to its natural conclusion for it to violate the statute.

And Mr. Paradis, Agent Paradis, went at it on both sides of the ledger, right? I know that the price would have been lower had I known that it was built with stolen product. That's just common sense, and the jury interpreted --

THE COURT: Although, I find that a little hard to get my head around that. One would hope that the Department of Agriculture, OIG, wouldn't say, oh, stolen product, we only pay half price for buying stolen goods. I don't quite understand exactly how I get my head around that.

MR. SALGADO: Understood. But, again, this goes to the crime being a scheme crime, right? It doesn't have to get to that point. It's what they intended to do.

And they intended to steal property from the U.S. Government to profit from it. That's, nuts and bolts, the

nature of the fraud. And there was risk involved that was unbargained for because they did not disclose that it was used -- it was built, used, and stolen property.

As Mr. Paradis said, you know, almost -- it's an axiom -- right? -- that stolen goods are worth less in the open market. In this case the victim happened to be the U.S. Government and, thankfully, it didn't get to that point.

But I don't think that changes the analytical framework with which the jury approached the elements as applied to the facts.

THE COURT: Okay. Anything else?

MR. SALGADO: That's it, Your Honor. Just to clarify, our theory is not a right-to-control theory. We did not raise that. They raised it. We simply responded to it. We even have a transition phrase in there on page 12.

Even under their theory or citation to *Binday*, they're wrong; they're misreading it. But that's not our central affirmative theory of fraud.

If Your Honor doesn't have any questions on the jury instructions or the obstruction counts or the interstate wire, for that matter, I'll sit down, happily, and take a look at the Edwards testimony.

THE COURT: That sounds fine. Thanks. Why don't we take a ten-minute break. And then I'll come back and give you maybe another 15 minutes, and we'll finish up.

(Recess taken.)

THE COURT: Mr. Salgado?

MR. SALGADO: Just very briefly, Your Honor. This is a transcript of a recording of a conversation between Pete Paradis and Charles Edwards on October 12, 2016, and the exhibit -- the trial exhibit is Defense Exhibit 26A. There is discussion of his demo that Mr. Edwards is going to show to Paradis; again, this is October of 2016.

And the entire conversation is relevant, but more importantly, for purposes of this Court, this is Mr. Edwards. This is regarding the demo. "It's going to build the hotline. It's going to do the complete investigation, and it's going to do the eSubpoena just like DHS-OIG has." And this is on page 2 of 26A.

Mr. Paradis was asked about this exhibit. He explained his understanding of what Mr. Edwards was telling him. And, again, Your Honor, Mr. Edwards had no way of knowing -- or, rather, no access to eSubpoena but for Defendant Venkata. And, once again, he did not disclose that Mr. Venkata had given eSubpoena, the very platform that he developed using United States Government money, to Mr. Edwards for the purpose of giving it to Mr. Paradis.

That failure to disclose, Your Honor, is material and, in the government's view, it's fraud.

THE COURT: Okay. Thank you. Ms. Savarese?

MS. SAVARESE: Your Honor, just to continue where Mr. Salgado left off, in that same exhibit on the same page, in fact, Mr. Edwards also explained to Mr. Paradis that the new version is "not like DHS because DHS code is so, you know, cobbled together. You would get lots of issues. It's not that version."

So we've heard a couple of different theories of the scheme to defraud from the government, some for the first time today, including that the failure to disclose the involvement of programmers in India was the fraud. As Your Honor noted, that theory was not advanced at trial, and as Ms. Choy noted in her argument, the government contracts with third parties all the time, such as Lockheed Martin. So the fact that there were contractors in India doesn't appear to be material.

To clarify the point that I made earlier, it's completely true that the government never used the phrase right-to-control in any of its arguments. But the government did say in their brief -- and I quote -- "that the defendants intended to deprive USDA-OIG of information that went straight to the agency's economic decision-making."

And I submit that that is the heart of *Ciminelli*. That there's no right to this information necessary to make discretionary economic decisions.

THE COURT: At some level, isn't that the essence of all fraud? It can't be that that's a problem under *Ciminelli*

because at least all frauds, by omission, that is the point, is that you're omitting some important fact that could affect the decision-making.

MS. SAVARESE: Certainly. Of course. And it does have to be an important fact; such as, for example, the functionality of the product.

But for the reasons that we've discussed today, there were no misrepresentations made as to --

THE COURT: What if I'm selling something that's not entirely mine?

MS. SAVARESE: If you were selling stolen property, certainly, that might be a problem. But here, for the reasons that we've discussed and consistent with the evidence presented at trial, there was no -- they were not selling stolen property.

Ms. Choy told you that the code was not copied and pasted. There was -- this was a new -- a new product. I'd like to read a couple --

THE COURT: I think what she said is, I guess, that they didn't have any evidence one way or the other as to whether it was copied or pasted or whether that was the plan.

MS. SAVARESE: Okay. I'd like to just read a couple to flesh out what the plan was --

THE COURT: Okay.

MS. SAVARESE: -- a couple more pieces of evidence

that the government, in fact, pointed to in their briefs. I read the first one at the outset to complete the portion that Mr. Salgado read.

But, similarly, in Defendant Exhibit 28A -- and as you may recall, there were certain transcripts that were offered by the defense and certain that were offered by the government. On page 4 Mr. Edwards told Mr. Paradis, "It took me a long time because I completely rewrote investigations, hotline, admin, and subpoena."

And then at 24, he says, "So we went through and broke it apart, and each template we built back the way it's supposed to load." And I would submit that that is all evidence of the fact that what the -- what Mr. Edwards intended, what the defendants intended was to build the new product and new product that would be commercially viable, which the current EDS system was not because it wasn't a very good system.

And that was what they represented to Mr. Paradis, that they were selling him a new and improved product, and that was true. And that -- to the extent -- the manner in which that product was developed was considered unsavory, that that's not a cognizable interest under *Ciminelli*.

THE COURT: I suppose it does come back to this conceptual question about whether the jury could have found beyond a reasonable doubt that the product was, at least in

portion -- that was being sold was at least, in part, stolen. I'll have to go back and look at the trial record a little bit more carefully on that issue, I think.

MS. SAVARESE: I appreciate that, Your Honor. We would submit that, based on our review of the record, that there was no evidence that it was stolen property. It was new property. That was the idea.

THE COURT: Okay. Thank you. Mr. Rosenfeld, anything else?

MR. ROSENFELD: Yes, Your Honor. Thank you. Just very briefly.

So the government did point to a number of negative consequences that happened as a result of the copying of the EDS system and so forth.

I think the bottom line for conversion, that all is maybe true and likely is true. The point, though, is that, to show a substantial interference, it's like -- I think, bottom line, it has to be so severe that the government needs a new one. I need a new one. So this is in 222A, which is -- of the Restatement, which the government points to as an authority, which we agree is an authority.

It says in the very first item: "So seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."

It strikes the defense that nowhere in the brief or at trial is there evidence that, in fact, the government is no longer using EDS system. I think -- in fact, the evidence is that, yes, the government took -- there was testimony that the government took steps to make it more secure.

But the government used it while the EDS system was copied on Mr. Edwards' private servers and, as far as we know, continues to use it today. That's the only point that I have on the conversion and the stealing items.

I did -- and this is, I think, a relatively smaller point. Just on the cost price issue --

THE COURT: Yes.

MR. ROSENFELD: -- I want to make sure that this comes across clearly. I think -- it's not that -- the government has, helpfully, cited two dictionary definitions of cost price. We have -- and this is not in our brief, but I did go back just to help the Court and try and find a dictionary definition of our own that we think is also good authority.

So I'd point the Court to the 1914 definition of the *Bouvier's Law Dictionary*, which says that the cost of an article -- the cost price is -- the cost of an article purchased for exportation is the price paid with incidental charges paid at the place of exportation; cost price is that actually paid for the goods.

But I think the dictionary definitions are not really

necessary here because the argument is, really, a textual one. So it makes no sense for a production cost to be a definition -- to be a definition embraced by the words cost price because of the next two words in the statute, which is retail or wholesale, whichever is greater.

I do not understand how there could be a retail or wholesale calculation of the cost of production. It's either -- in other words, cost price has to be the commercial price in a marketplace, I think, at the time of sale because otherwise those two words don't really make any sense.

THE COURT: So if the Department of Defense hires Lockheed Martin and says, here are a thousand bolts and a thousand pieces of steel and 7,000 feet of wire, and so forth, we'd like an F-16. And Lockheed Martin builds them an F-16, and then someone steals that F-16.

Is that not -- is the price of that not the value of an F-16 on the market and what we're selling F-16s to allies in other parts of the world? I assume it's not the price of the chunks of steel and -- it's probably not steel, but whatever the chunks of metal are that are used to make an F-16.

MR. ROSENFELD: Correct. But it wouldn't be the cost of -- one would not look to all the invoices of the Lockheed Martin employees in putting the steel together. One would look at, bottom line, what's the price of the F-16; how much did you buy it for.

THE COURT: Right. But if you paid Lockheed Martin on a cost-plus contract and said, we will pay you whatever it costs you to build it, and Lockheed Martin submits all their invoices to the Department of Defense -- which is the way these contracts work -- and they say we had 400 employees working on this, here is the list of all the employees, here's what their hourly wages were, we had overhead from this facility, we had other costs, and here's what all our costs are, and you agreed to pay us 10 percent in addition to our costs, is that not the cost of the airplane?

MR. ROSENFELD: It is by one measure, but not the measure recognized as the correct method of calculation for purposes of Section 641 because there's no wholesale or retail value. I mean, it's -- you have to choose one or the other.

So it would be -- one would look -- I expect the government would say, well, this is how much we paid for the F-16, and that's not -- that's not what they have done here.

THE COURT: Okay.

MR. ROSENFELD: Thank you, Your Honor.

THE COURT: Thank you.

All right. Well, so if there's anything else that you-all want to submit, I'll just direct that you do so by a week from tomorrow. But if anything has come up in the argument where you feel there's additional evidence you want to point me to or anything else you want me to consider -- and I

know the government, I don't think, ever had a chance to really respond on the papers to the *Ciminelli* argument which was raised for the first time, I think, today, which is understandable because the case had not been decided at the time of the briefing.

Today is the 29th. So I'll direct that anything else -- well, I'll give you until Wednesday because Monday is a holiday. So I'll give you until the 6th of September to submit anything else you want to submit.

All right. Well, thank you all. This was very helpful.

(The hearing adjourned at 4:30 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 1st day of September, 2023.

/s/ Tamara M. Sefranek__________
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**$**

**$999** [1] - 18:13

**/**

**/s** [1] - 63:9

**1**

**1** [5] - 38:1, 51:2, 51:5, 51:7, 51:9
**1.0** [1] - 15:10
**10** [1] - 61:9
**10004** [2] - 1:25, 2:4
**1028A** [1] - 4:9
**10:00** [2] - 27:16, 27:17
**10:30** [3] - 29:7, 29:17, 30:9
**10th** [1] - 1:17
**11** [1] - 51:19
**1174** [1] - 23:7
**11:30** [3] - 30:10, 30:11, 30:12
**11A** [1] - 39:5
**12** [4] - 44:24, 44:25, 53:15, 54:5
**125** [2] - 1:24, 2:3
**1301** [2] - 1:14, 1:17
**14** [1] - 44:25
**15** [1] - 53:25
**1700** [1] - 2:6
**19** [1] - 43:21
**1914** [1] - 59:19
**1:20-CR-66** [1] - 1:3
**1st** [1] - 63:7

**2**

**2** [7] - 32:3, 32:16, 33:11, 51:1, 51:5, 51:8, 54:13
**2.0** [5] - 15:7, 19:18, 23:1, 23:3, 45:20
**2.3** [4] - 36:11, 36:12, 37:10, 37:16
**20-66** [1] - 3:2
**20001** [2] - 2:23, 63:11
**20005** [1] - 1:18
**20006** [1] - 2:7
**2016** [4] - 21:9, 39:7, 54:5, 54:8
**202-354-3246** [1] - 2:24
**2023** [2] - 1:6, 63:7
**20530** [2] - 1:14, 1:21
**222A** [2] - 9:23, 58:19
**24** [1] - 57:10
**26A** [2] - 54:6, 54:14
**2701** [1] - 2:3
**28A** [1] - 57:4
**29** [1] - 1:6
**29th** [1] - 62:6
**2:35** [1] - 1:6

**3**

**3** [1] - 44:19
**306** [1] - 21:24
**333** [2] - 2:23, 63:11

**4**

**4** [1] - 57:7
**400** [1] - 61:5
**4000** [1] - 1:24
**421** [1] - 23:7
**4:30** [1] - 62:12

**5**

**50** [1] - 14:19
**598** [1] - 21:24

**6**

**6** [1] - 44:19
**601** [1] - 1:21
**641** [12] - 4:14, 4:20, 5:3, 6:17, 9:8, 10:8, 13:13, 17:11, 17:20, 32:3, 32:22, 61:13
**6714** [2] - 2:22, 63:10
**6:30** [1] - 26:20
**6th** [1] - 62:8

**7**

**7,000** [1] - 60:13
**700** [1] - 2:6

**9**

**90** [4] - 26:4, 26:6, 29:25, 30:6

**A**

**a.m** [2] - 27:16, 27:17
**abettor** [1] - 32:17
**ability** [1] - 63:6
**able** [2] - 9:4, 11:21
**Abuse** [2] - 16:3, 16:17
**access** [9] - 12:2, 16:20, 32:13, 34:7, 34:12, 34:13, 34:14, 48:11, 54:18
**accident** [1] - 29:10
**according** [3] - 21:4, 22:10, 22:18
**accurate** [1] - 63:4
**acquire** [1] - 36:13
**acquired** [1] - 37:10
**acquisition** [2] - 17:14
**acquittal** [3] - 3:22, 4:7, 31:19
**Act** [3] - 11:17, 16:3, 16:17
**Action** [1] - 1:2
**action** [1] - 11:25
**actor** [1] - 58:24
**acts** [3] - 8:8, 8:17, 8:18
**actual** [5] - 7:18, 19:6, 39:16, 39:22, 41:1
**actuality** [1] - 5:13
**adaptable** [1] - 23:23
**add** [5] - 14:14, 24:18, 25:2, 37:5
**add-on** [2] - 24:18, 37:5
**add-ons** [2] - 24:18, 25:2
**added** [1] - 20:2
**addition** [1] - 61:9
**additional** [1] - 61:24
**additions** [2] - 14:15, 20:2
**address** [5] - 6:9, 20:21, 32:2, 32:4, 36:5
**addressed** [4] - 8:3, 9:10, 10:11, 16:1
**adduce** [1] - 20:13
**adequacy** [1] - 23:10
**adequate** [1] - 17:9
**adjourned** [1] - 62:12
**admin** [1] - 57:9
**administer** [1] - 22:7
**admitted** [1] - 25:11
**advanced** [1] - 55:11
**adverse** [1] - 15:24
**advertised** [1] - 51:1
**affect** [2] - 39:2, 56:2
**afternoon** [5] - 3:6, 3:8, 3:19, 31:25, 32:1
**afterwards** [1] - 28:19
**agencies** [1] - 14:16
**agency** [9] - 14:11, 21:1, 22:9, 23:22, 23:23, 35:7, 40:21, 45:11, 45:13
**agency's** [2] - 21:15, 55:20
**Agent** [4] - 17:7, 21:8, 48:10, 52:12
**agent** [1] - 5:16
**ago** [2] - 37:24, 49:12
**agree** [4] - 9:22, 37:12, 38:14, 58:21
**agreed** [1] - 61:8
**agreement** [2] - 14:21, 36:2
**agreements** [1] - 34:14
**agrees** [1] - 9:19
**Agriculture** [8] - 14:22, 47:22, 48:1, 48:17, 49:10, 49:11, 50:7, 52:18
**ahead** [1] - 4:2
**aider** [1] - 32:17
**airplane** [1] - 61:10
**akin** [1] - 50:15
**alleged** [3] - 8:8, 19:10, 20:15
**allies** [1] - 60:17
**allow** [1] - 30:20
**alluding** [1] - 34:6
**allusion** [1] - 44:15
**almost** [2] - 35:11, 53:4
**alternative** [1] - 45:15
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**amount** [2] - 23:5, 36:24
**ample** [2] - 42:9, 43:1
**analogy** [4] - 12:8, 25:4, 25:9, 50:16
**analysis** [4] - 12:17, 34:2, 35:25, 37:13
**analytical** [1] - 53:8
**anyway** [1] - 7:25
**apart** [2] - 24:23, 57:11
**apologies** [1] - 3:20
**appear** [2] - 33:4, 55:14
**appellee** [1] - 13:1
**applied** [1] - 53:10
**apply** [3] - 8:17, 13:9, 45:2
**appreciate** [3] - 4:6, 42:4, 58:4
**approached** [1] - 53:9
**appropriate** [1] - 16:4
**arguably** [1] - 24:16
**argue** [3] - 8:14, 8:15, 24:6
**argued** [3] - 9:18, 33:21, 35:13
**argues** [2] - 17:6, 21:11
**arguing** [1] - 4:20
**argument** [12] - 5:17, 6:10, 8:5, 8:19, 8:21, 19:17, 20:8, 33:25, 55:12, 60:1, 61:24, 62:2
**argumentation** [1] - 9:10
**arguments** [7] - 4:11, 5:1, 8:16, 18:23, 32:3, 33:20, 55:17
**arrive** [1] - 27:21
**arrived** [2] - 29:16, 30:3
**article** [2] - 59:21
**aspect** [1] - 34:1
**aspects** [1] - 38:12
**assessment** [1] - 47:18
**assets** [2] - 16:21, 22:21
**assume** [3] - 7:13, 19:8, 60:18
**assumption** [1] - 29:19
**attempted** [1] - 22:25
**attempting** [2] - 23:17, 25:13
**attorney** [1] - 3:10
**August** [1] - 1:6
**authority** [3] - 58:20, 58:21, 59:18
**authorization** [1] - 36:1
**available** [3] - 36:20, 42:17, 45:12
**Avenue** [5] - 1:14, 1:17, 2:6, 2:23, 63:11
**average** [1] - 23:15
**avoid** [1] - 7:5
**award** [1] - 22:21
**axiom** [1] - 53:5

**B**

**bad** [1] - 24:21
**based** [5] - 17:22, 51:2, 51:5, 51:6, 58:5
**basis** [2] - 22:4, 31:20
**bear** [1] - 22:5
**bearing** [1] - 24:11
**bears** [1] - 28:3
**became** [2] - 34:19
**BEFORE** [1] - 1:9
**behavior** [1] - 28:6
**belong** [1] - 33:17
**belonged** [1] - 45:8
**belongs** [2] - 7:9, 42:1
**benchmark** [1] - 19:7

**best** [3] - 9:9, 9:10, 63:6
**better** [2] - 19:22, 19:25
**between** [7] - 7:5, 19:6, 19:23, 24:16, 32:24, 42:6, 54:4
**beyond** [8] - 18:9, 20:5, 24:25, 28:4, 32:22, 37:15, 40:14, 57:25
**bid** [3] - 14:3, 22:8, 22:13
**bidding** [2] - 14:5, 22:11
**bids** [1] - 22:9
**Binday** [3] - 44:18, 45:1, 53:16
**bit** [6] - 16:7, 19:22, 20:23, 27:8, 28:14, 58:2
**blank** [1] - 7:25
**body** [1] - 25:5
**boggling** [1] - 18:15
**bolts** [2] - 52:25, 60:12
**bottom** [3] - 58:15, 58:17, 60:24
**bought** [2] - 18:13, 37:17
**Bouvier's** [1] - 59:20
**box** [1] - 28:17
**brains** [1] - 43:19
**breach** [4] - 35:1, 36:1, 47:16
**breached** [3] - 34:17, 35:2, 35:3
**break** [1] - 53:24
**brief** [15] - 8:9, 15:25, 17:6, 17:13, 18:23, 18:25, 21:10, 21:16, 28:14, 44:20, 51:19, 52:7, 55:18, 59:1, 59:16
**briefing** [4] - 4:11, 4:25, 7:20, 62:5
**briefly** [4] - 25:20, 36:5, 54:3, 58:11
**briefs** [2] - 6:4, 57:1
**bright** [2] - 33:23, 35:14
**bright-line** [2] - 33:23, 35:14
**bring** [3] - 16:5, 16:7, 16:9
**bringing** [1] - 11:25
**Broad** [2] - 1:24, 2:3
**broke** [1] - 57:11
**brought** [2] - 16:3, 52:10
**buggy** [1] - 24:22
**bugs** [1] - 25:3
**build** [13] - 14:14, 18:18, 19:12, 19:14, 19:22, 23:21, 36:23, 37:16, 38:3, 43:22, 54:11, 57:14, 61:3
**building** [6] - 19:7, 23:20, 24:12, 25:1, 37:22, 37:25
**builds** [1] - 60:14
**built** [7] - 36:19, 39:1, 40:1, 49:15, 52:14, 53:3, 57:11
**bundle** [6] - 9:5, 11:6, 11:8, 12:5, 12:6
**burden** [5] - 25:21, 28:1, 28:3, 28:7
**bus** [1] - 26:20
**business** [1] - 13:1
**button** [2] - 41:9, 41:21
**buy** [2] - 18:19, 60:25
**buying** [5] - 19:23, 49:23, 51:23, 52:19

## C

**Cadillac** [3] - 50:16, 50:19, 50:21
**calculation** [2] - 60:7, 61:12
**candidate** [2] - 22:12, 22:14
**cannot** [1] - 22:3
**car** [1] - 25:9
**carefully** [1] - 58:3
**carried** [1] - 5:9
**carry** [1] - 48:2
**carrying** [5] - 5:22, 7:10, 7:15, 33:3
**Case** [1] - 3:2
**case** [36] - 6:20, 7:2, 8:4, 9:11, 10:2, 10:16, 11:13, 12:11, 12:17, 12:18, 12:19, 13:10, 14:2, 14:9, 15:15, 16:19, 18:25, 20:6, 21:13, 22:6, 22:9, 23:6, 23:21, 28:14, 29:5, 34:10, 35:3, 35:17, 44:19, 45:1, 45:12, 49:12, 51:24, 53:6, 62:4
**cases** [11] - 9:17, 10:10, 10:12, 10:15, 13:9, 13:16, 13:18, 13:20, 13:22, 14:5, 18:24
**Cash** [1] - 50:17
**causes** [1] - 15:21
**CD** [1] - 5:23
**CELIA** [1] - 1:12
**Celia** [1] - 3:8
**central** [1] - 53:18
**certain** [3] - 36:24, 57:5, 57:6
**certainly** [6] - 30:24, 37:11, 37:15, 38:8, 56:4, 56:12
**CERTIFICATE** [1] - 63:1
**certified** [1] - 50:8
**certify** [2] - 50:7, 63:3
**cetera** [1] - 34:14
**CFAA** [1] - 16:4
**chance** [1] - 62:1
**change** [1] - 10:13
**changed** [2] - 10:14, 44:14
**changes** [1] - 53:8
**characteristics** [1] - 21:12
**characterize** [1] - 36:24
**characterized** [1] - 36:14
**charge** [8] - 4:9, 4:20, 5:3, 7:14, 10:8, 16:4, 21:9, 45:13
**chargeable** [1] - 8:18
**charges** [7] - 4:12, 4:20, 7:6, 9:8, 16:2, 31:20, 59:23
**Charles** [2] - 23:19, 54:5
**chassis** [2] - 25:5, 25:7
**chattel** [4] - 15:5, 15:6, 15:9, 58:25
**chattels** [1] - 13:5
**check** [2] - 11:1, 48:15
**child** [1] - 29:10
**choose** [1] - 61:14
**choy** [2] - 55:11, 56:16
**CHOY** [15] - 1:12, 3:8, 3:12, 31:25, 32:2, 32:7, 32:21, 33:14, 34:24, 35:22, 36:8, 37:8, 37:19, 38:8, 38:20
**Choy** [1] - 3:8
**CHRISTINE** [1] - 1:19
**Christine** [1] - 3:12
**chunks** [2] - 60:19, 60:20
**Ciminelli** [14] - 21:24, 22:5, 22:10, 22:18, 23:4, 44:11, 44:16, 44:21, 46:24, 55:21, 55:25, 57:22, 62:2
**Circuit** [7] - 9:8, 10:2, 11:3, 12:13, 12:23, 23:8, 44:19
**Circuit's** [2] - 12:16, 21:17
**circumstances** [3] - 16:8, 31:2, 34:3
**circumstantial** [2] - 26:2, 27:9
**citation** [1] - 53:16
**cite** [2] - 18:24, 45:1
**cited** [5] - 12:19, 16:19, 28:14, 44:18, 59:15
**civil** [1] - 12:18
**claim** [3] - 15:14, 16:7, 16:9
**clarify** [2] - 53:13, 55:15
**clear** [4] - 35:25, 37:9, 43:10, 44:14
**clearly** [2] - 13:1, 59:14
**clever** [1] - 42:2
**clock** [1] - 41:25
**close** [2] - 31:3, 42:18
**closely** [1] - 45:1
**closer** [2] - 12:4, 12:10
**closing** [3] - 20:24, 21:4, 49:20
**co** [4] - 8:8, 20:9, 27:1, 32:8
**co-conspirator** [1] - 8:8
**co-conspirators** [2] - 20:9, 32:8
**co-worker** [1] - 27:1
**cobbled** [1] - 55:5
**Coca** [2] - 6:12, 6:13
**Coca-Cola** [2] - 6:12, 6:13
**code** [37] - 5:13, 5:14, 5:23, 6:22, 8:11, 9:1, 11:22, 14:10, 14:14, 24:21, 25:10, 25:13, 25:16, 33:15, 33:16, 38:3, 38:4, 38:15, 39:16, 39:18, 39:19, 39:21, 40:16, 41:23, 41:25, 45:8, 48:14, 48:15, 48:20, 49:1, 49:12, 49:16, 50:1, 50:2, 55:4, 56:16
**coders** [9] - 42:17, 48:13, 48:14, 48:19, 48:22, 49:3, 49:6, 49:19, 50:10
**coding** [1] - 48:18
**cognizable** [1] - 57:22
**Cola** [2] - 6:12, 6:13
**Collins** [11] - 8:4, 9:18, 10:16, 10:18, 10:24, 12:10, 12:19, 35:14, 35:19, 35:22
**Collins-esque** [1] - 12:19
**Collins-like** [1] - 10:24
**colloquy** [1] - 44:13
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 26:4, 26:6
**commercial** [6] - 23:17, 23:20, 32:12, 45:16, 45:24, 60:8
**commercially** [1] - 57:15
**common** [2] - 33:6, 52:15
**communication** [1] - 26:1
**commute** [2] - 27:2, 31:6
**Company** [1] - 6:12
**compete** [1] - 32:12
**complete** [3] - 54:12, 57:2, 63:5
**completely** [5] - 25:12, 25:16, 28:2, 55:16, 57:8
**component** [1] - 13:4
**compromises** [1] - 48:12
**computer** [13] - 6:21, 6:25, 10:25, 11:1, 11:9, 11:12, 11:22, 16:15, 25:10, 32:14, 34:13, 41:25, 49:23
**Computer** [2] - 16:3, 16:17
**concedes** [1] - 17:16
**concept** [7] - 40:9, 40:11, 40:17, 40:25, 42:6, 43:9, 47:13
**conceptual** [1] - 57:24
**conclude** [4] - 18:9, 24:25, 37:15, 40:14
**conclusion** [1] - 52:10
**concrete** [1] - 20:13
**concurring** [1] - 13:11
**confidential** [2] - 14:2, 14:6
**confidentiality** [2] - 14:7, 15:17
**confidentially** [1] - 15:19
**Congress** [2] - 7:4, 35:2
**consequences** [5] -

15:24, 34:8, 34:16, 34:18, 58:13
**consider** [2] - 22:20, 61:25
**considerable** [1] - 22:5
**considerably** [1] - 27:13
**considerations** [1] - 9:24
**considered** [2] - 9:25, 57:21
**consistent** [3] - 27:11, 50:13, 56:13
**conspiracy** [3] - 4:12, 4:19, 8:15
**conspirator** [2] - 8:8, 32:17
**conspirators** [2] - 20:9, 32:8
**conspirators'** [1] - 39:3
**constitute** [2] - 23:10, 36:2
**constitutes** [3] - 9:6, 51:15, 63:4
**Constitution** [2] - 2:23, 63:11
**construed** [1] - 9:8
**consultant** [1] - 47:18
**consummated** [1] - 44:10
**CONT'D** [1] - 2:1
**contemplated** [1] - 46:7
**content** [2] - 31:9, 31:14
**contention** [3] - 10:1, 32:21, 33:2
**contentions** [1] - 32:4
**context** [5] - 8:4, 9:11, 25:9, 25:10, 36:16
**continue** [1] - 55:1
**continues** [1] - 59:8
**contract** [9] - 14:3, 14:5, 17:8, 17:14, 17:15, 18:11, 22:22, 22:25, 61:2
**contracting** [1] - 37:7
**contractor** [2] - 36:9, 37:5
**contractors** [2] - 36:17, 55:14
**contracts** [4] - 37:3, 37:4, 55:12, 61:5
**contradict** [1] - 27:23
**contradicted** [1] - 21:7
**contradictory** [1] - 28:9
**contrary** [4] - 23:15, 26:22, 28:6, 28:11
**control** [10] - 9:20, 21:18, 34:12, 34:17, 44:15, 44:19, 46:25, 53:13, 55:17, 58:23
**conversation** [3] - 41:18, 54:4, 54:9
**conversion** [15] - 6:15, 7:8, 8:5, 9:11, 12:24, 16:23, 16:25, 32:25, 33:10, 33:21, 33:22, 34:1, 34:2, 58:15, 59:9
**converted** [3] - 32:20, 33:13, 33:19
**converting** [1] - 8:17
**convicted** [1] - 8:10
**conviction** [3] - 22:4, 32:16, 33:11
**cop** [1] - 50:22
**copied** [4] - 12:21, 56:16, 56:21, 59:7
**copies** [2] - 32:8, 32:10
**copy** [1] - 5:23
**copying** [2] - 38:15, 58:13
**copyright** [7] - 11:17, 11:19, 11:22, 11:25, 12:4, 12:8
**Copyright** [1] - 11:17
**copyright-like** [1] - 11:19
**core** [1] - 45:2
**correct** [11] - 6:5, 13:3, 15:5, 15:6, 20:7, 39:22, 47:10, 48:6, 60:21, 61:12
**cost** [37] - 17:7, 17:9, 17:14, 17:17, 17:18, 17:20, 18:3, 18:5, 18:22, 19:6, 19:11, 36:10, 36:11, 36:12, 36:21, 36:22, 36:25, 37:1, 37:3, 37:5, 37:14, 37:15, 48:3, 59:11, 59:16, 59:20, 59:21, 59:23, 60:2, 60:3, 60:7, 60:8, 60:21, 61:2, 61:10
**cost-plus** [2] - 37:3, 61:2
**costs** [7] - 17:20, 35:11, 36:15, 61:3, 61:8, 61:9
**counsel** [3] - 3:4, 3:5, 44:13
**Count** [3] - 32:3, 32:16, 33:11
**count** [4] - 5:17, 32:3, 51:10, 51:12
**counts** [3] - 16:6, 32:5, 53:20
**couple** [4] - 55:7, 56:18, 56:22, 56:25
**course** [13] - 9:18, 19:16, 29:18, 33:9, 39:10, 40:22, 42:12, 43:3, 44:20, 46:4, 49:17, 51:24, 56:4
**Court** [22] - 2:21, 2:22, 4:8, 21:23, 21:25, 25:22, 28:22, 29:2, 29:6, 30:21, 32:23, 33:5, 42:5, 42:15, 43:15, 44:13, 47:3, 51:16, 54:10, 59:17, 59:19, 63:10
**COURT** [114] - 1:1, 3:10, 3:14, 3:16, 3:19, 4:4, 4:16, 4:22, 5:18, 5:21, 6:11, 6:18, 7:3, 7:7, 7:24, 8:25, 9:3, 9:13, 9:16, 10:18, 10:21, 12:22, 13:8, 14:8, 15:13, 16:5, 17:1, 17:4, 17:12, 18:7, 18:17, 19:3, 19:20, 20:17, 20:19, 24:16, 24:24, 25:18, 26:11, 27:3, 27:10, 27:17, 28:2, 29:4, 30:8, 30:11, 30:14, 31:8, 31:17, 31:21, 31:23, 32:1, 32:6, 32:19, 33:13, 34:22, 35:18, 36:7, 37:2, 37:12, 37:20, 38:19, 38:21, 38:24, 39:14, 40:2, 40:11, 41:3, 42:7, 42:24, 43:4, 43:14, 44:11, 44:22, 45:4, 46:9, 46:16, 46:24, 47:8, 47:20, 47:25, 48:4, 48:7, 48:16, 48:24, 49:7, 49:21, 49:25, 50:6, 50:13, 50:18, 50:25, 51:4, 51:12, 51:21, 52:2, 52:9, 52:16, 53:11, 53:23, 54:2, 54:25, 55:24, 56:9, 56:19, 56:24, 57:23, 58:8, 59:12, 60:11, 61:1, 61:18, 61:20, 63:1
**Court's** [2] - 4:10, 23:4
**Courthouse** [1] - 2:22
**COURTROOM** [1] - 3:2
**courts** [1] - 13:17
**CRC** [2] - 2:21, 63:9
**create** [3] - 11:10, 11:14, 18:11
**creates** [1] - 35:14
**creating** [1] - 51:15
**crime** [4] - 44:6, 52:7, 52:22
**criminal** [2] - 3:2, 35:4
**Criminal** [1] - 1:2
**criteria** [2] - 22:12, 22:14
**critical** [1] - 39:25
**CRM** [2] - 1:13, 1:16
**Cromwell** [3] - 1:23, 2:2, 2:5
**CRR** [2] - 2:21, 63:9
**current** [1] - 57:16
**custom** [1] - 36:19
**custom-built** [1] - 36:19
**customer** [2] - 23:15, 46:21
**cut** [1] - 15:8
**cybersecurity** [1] - 49:25

## D

**D.C** [9] - 1:5, 2:23, 9:8, 10:2, 11:3, 12:13, 12:16, 12:23, 63:11
**damage** [3] - 7:15, 15:21, 47:20
**damages** [1] - 7:15
**data** [9] - 6:2, 6:23, 15:13, 35:1, 35:2, 41:9, 46:5, 46:8, 47:16
**databases** [4] - 32:9, 33:17, 49:18, 52:1
**Dated** [1] - 63:7
**DC** [4] - 1:14, 1:18, 1:21, 2:7
**DEA** [1] - 14:5
**dealing** [1] - 16:12
**dealt** [1] - 35:18
**decided** [1] - 62:4
**deciding** [2] - 22:20, 22:21
**decision** [4] - 4:8, 21:15, 55:20, 56:3
**decision-making** [3] - 21:15, 55:20, 56:3
**decisions** [4] - 21:22, 22:1, 47:2, 55:23
**Defendant** [5] - 1:7, 1:23, 2:2, 54:18, 57:4
**defendant** [12] - 21:20, 28:19, 28:21, 33:21, 35:13, 36:14, 40:1, 42:10, 42:12, 46:2, 46:25
**defendant's** [12] - 3:21, 4:1, 19:8, 22:14, 24:6, 32:3, 32:4, 33:2, 33:20, 34:4, 43:13, 46:23
**defendants** [9] - 21:11, 22:11, 22:15, 22:24, 23:2, 23:13, 23:16, 55:18, 57:14
**Defense** [3] - 54:6, 60:11, 61:4
**defense** [5] - 3:17, 3:22, 4:2, 57:6, 59:1
**defense's** [1] - 37:24
**defined** [1] - 32:25
**definition** [4] - 59:18, 59:19, 60:3
**definitions** [2] - 59:15, 59:25
**defraud** [8] - 4:13, 4:19, 20:23, 21:5, 23:5, 23:11, 32:5, 55:8
**deliver** [1] - 27:19
**delivered** [1] - 5:24
**delta** [1] - 19:6
**demo** [2] - 54:7, 54:11
**demonstrates** [1] - 36:11
**Department** [10] - 14:22, 47:22, 48:1, 48:17, 49:10, 50:6, 52:17, 60:11, 61:4
**deposited** [1] - 6:24
**deprivation** [4] - 10:7, 10:8, 12:13, 16:23
**deprive** [6] - 10:4, 21:14, 21:20, 22:3, 47:1, 55:19
**deprived** [6] - 8:23, 8:25, 13:2, 22:19, 33:24, 35:15
**DEPUTY** [1] - 3:2
**describing** [1] - 20:24
**designs** [1] - 39:3
**detail** [1] - 39:24
**develop** [4] - 17:7, 23:17, 36:9, 36:17
**developed** [4] - 23:4, 43:25, 54:20, 57:21
**developer** [1] - 36:22
**developers** [4] - 32:14, 38:10, 38:11, 44:3
**developing** [5] -

21:13, 22:25, 38:18, 45:6, 49:4
**development** [5] - 17:8, 22:8, 36:15, 36:25, 49:17
**DHS** [10] - 33:17, 34:20, 35:1, 40:24, 45:9, 45:25, 47:15, 54:13, 55:4
**DHS-OIG** [7] - 33:17, 34:20, 35:1, 40:24, 45:9, 47:15, 54:13
**DHS-OIG's** [1] - 45:25
**Dictionary** [1] - 59:20
**dictionary** [3] - 59:15, 59:17, 59:25
**difference** [5] - 19:23, 41:2, 41:3, 41:22, 42:5
**different** [7] - 7:18, 24:4, 37:2, 42:1, 45:24, 49:7, 55:7
**direct** [5] - 30:25, 42:9, 42:25, 61:22, 62:6
**directed** [1] - 23:9
**directly** [1] - 21:6
**disagree** [3] - 10:2, 15:4, 35:16
**disagreement** [1] - 4:24
**disclose** [8] - 22:15, 23:3, 46:19, 49:15, 53:2, 54:19, 54:23, 55:9
**disclosed** [2] - 14:4, 41:17
**disclosing** [5] - 47:25, 49:3, 49:10, 50:21, 51:6
**discovered** [1] - 47:15
**discretionary** [4] - 21:22, 22:1, 47:2, 55:23
**discuss** [1] - 17:15
**discussed** [2] - 56:7, 56:13
**discusses** [1] - 7:2
**discussion** [3] - 42:9, 43:1, 54:7
**disk** [2] - 26:13, 26:15
**distinction** [2] - 36:15, 41:1
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [3] - 26:4, 26:6, 31:3
**doctor** [1] - 27:22
**document's** [1] - 12:25
**Dodd** [1] - 12:17
**DOJ** [3] - 1:13, 1:16, 1:20
**DOJ-CRM** [2] - 1:13, 1:16
**DOJ-USAO** [1] - 1:20
**dollar** [1] - 19:7
**dollars** [11] - 7:25, 18:11, 18:12, 18:18, 18:20, 19:10, 19:12, 20:2, 35:11, 37:11, 37:18
**done** [3] - 20:16, 48:18, 61:17
**doubt** [10] - 18:10, 20:5, 24:25, 26:22, 28:4, 30:15, 32:22, 37:15, 40:14, 57:25
**down** [6] - 6:12, 16:16, 44:21, 47:17, 50:5, 53:21
**download** [2] - 6:21, 16:10
**drafted** [1] - 7:4
**dropped** [1] - 4:9
**Dubin** [2] - 4:9, 16:6
**duration** [1] - 34:3
**during** [1] - 43:13
**DVD** [5] - 5:23, 6:22, 6:25, 30:9, 30:11
**DVDs** [9] - 6:2, 6:7, 6:8, 7:19, 7:21, 7:24, 7:25, 27:19, 30:7

## E

**early** [6] - 26:19, 26:20, 27:21, 27:24, 29:9, 29:16
**easier** [1] - 13:22
**easily** [2] - 18:19, 23:23
**economic** [11] - 21:15, 21:21, 21:22, 21:25, 22:1, 22:3, 22:19, 47:1, 47:2, 55:20, 55:23
**EDS** [44] - 5:14, 15:7, 15:10, 17:8, 19:18, 19:21, 20:9, 20:14, 21:1, 21:3, 21:9, 23:1, 23:3, 23:24, 24:2, 24:21, 25:14, 33:15, 36:9, 38:1, 39:12, 39:16, 39:17, 39:20, 39:22, 39:25, 45:20, 45:25, 51:1, 51:2, 51:5, 51:7, 51:8, 51:9, 57:16, 58:14, 59:3, 59:6
**Edwards** [38] - 5:24, 14:12, 19:14, 20:3, 21:2, 23:19, 24:1, 24:4, 24:12, 24:14, 26:13, 26:15, 31:12, 31:14, 38:9, 38:17, 39:6, 39:8, 40:9, 40:17, 42:19, 43:17, 43:23, 44:9, 45:23, 45:24, 48:17, 48:25, 53:22, 54:5, 54:7, 54:10, 54:16, 54:17, 54:21, 55:3, 57:7, 57:13
**Edwards'** [9] - 24:20, 25:12, 31:13, 32:11, 37:22, 42:8, 43:2, 43:23, 59:7
**effort** [1] - 51:22
**either** [2] - 32:16, 60:8
**electronic** [1] - 6:22
**electrons** [2] - 6:24, 7:11
**elements** [3] - 20:24, 25:20, 53:9
**email** [1] - 42:14
**embraced** [1] - 60:3
**employee** [3] - 10:20, 10:25, 27:12
**employees** [5] - 5:16, 15:16, 60:23, 61:5, 61:6
**encumbrance** [1] - 52:2
**encumbrances** [1] - 51:24
**end** [2] - 6:19, 47:18
**enforcement** [2] - 34:21, 49:18
**engaged** [1] - 36:9
**engages** [2] - 36:17, 36:23
**engine** [1] - 25:6
**engineering** [1] - 25:14
**enhanced** [2] - 23:2, 51:23
**ensure** [3] - 15:8, 22:11, 22:16
**enter** [1] - 45:10
**entering** [1] - 41:9
**entire** [1] - 54:9
**entirely** [1] - 56:10
**enumerated** [1] - 17:10
**enviable** [1] - 3:23
**equally** [1] - 8:17
**errand** [1] - 29:13
**esque** [1] - 12:19
**essence** [2] - 17:21, 55:24
**essentially** [1] - 40:5
**establish** [4] - 5:4, 17:9, 21:19, 28:7
**establishes** [1] - 28:5
**eSubpoena** [16] - 39:25, 41:15, 41:20, 42:9, 42:11, 42:12, 42:20, 43:2, 43:17, 43:23, 44:2, 44:8, 51:25, 54:13, 54:18, 54:20
**et** [1] - 34:14
**evaluate** [1] - 9:25
**evidence** [63] - 5:7, 5:11, 5:13, 6:1, 6:7, 7:21, 8:14, 15:12, 20:13, 23:16, 24:3, 24:5, 24:8, 24:24, 25:11, 25:25, 26:2, 26:8, 26:12, 26:18, 26:22, 26:25, 27:9, 27:21, 27:23, 28:6, 28:9, 28:10, 28:21, 28:23, 29:8, 29:25, 30:1, 30:3, 30:5, 30:17, 31:1, 32:7, 32:15, 33:10, 34:10, 34:15, 36:8, 36:11, 37:24, 38:7, 38:8, 38:14, 39:15, 39:23, 40:13, 45:9, 45:22, 56:13, 56:20, 56:25, 57:13, 58:6, 59:2, 59:3, 61:24
**evidentiary** [2] - 8:7, 8:13
**evolved** [1] - 20:23
**exactly** [2] - 36:3, 52:20
**example** [6] - 9:3, 10:19, 14:8, 16:3, 29:18, 56:5
**excellent** [1] - 21:3
**except** [1] - 48:10
**exclude** [1] - 9:4
**exclusive** [3] - 8:25, 10:5, 34:12
**exclusivity** [14] - 9:4, 10:7, 10:11, 10:12, 10:22, 11:5, 11:15, 12:6, 12:10, 12:11, 13:4, 16:22, 34:7, 34:17
**executed** [1] - 43:10
**exercise** [1] - 9:20
**exercised** [1] - 15:8
**exhibit** [6] - 39:5, 42:14, 54:6, 54:15, 55:2
**Exhibit** [4] - 39:5, 43:21, 54:6, 57:4
**exist** [1] - 46:6
**existed** [2] - 42:20, 43:24
**expect** [1] - 61:15
**expected** [1] - 23:13
**expenditure** [1] - 36:14
**experience** [1] - 47:11
**explained** [8] - 23:21, 24:1, 25:23, 32:23, 33:5, 48:10, 54:16, 55:3
**exploiting** [1] - 32:12
**exportation** [3] - 7:9, 59:22, 59:23
**extent** [6] - 13:3, 15:19, 34:3, 44:2, 45:9, 57:20

## F

**F-16** [7] - 60:14, 60:15, 60:17, 60:20, 60:24, 61:17
**F-16s** [1] - 60:17
**F.2d** [1] - 23:7
**face** [3] - 17:22, 17:23, 24:5
**facet** [1] - 12:16
**facility** [1] - 61:7
**fact** [27] - 5:22, 6:5, 14:1, 21:8, 22:14, 23:17, 25:13, 27:7, 27:11, 30:3, 30:25, 34:2, 41:13, 45:7, 46:19, 49:14, 51:6, 51:14, 55:3, 55:13, 56:2, 56:5, 57:1, 57:13, 59:2, 59:3
**fact-intensive** [1] - 34:2
**factor** [2] - 12:11, 35:25
**factors** [1] - 9:22
**facts** [6] - 10:24, 21:12, 22:5, 28:13, 34:3, 53:10
**factual** [1] - 9:24
**failed** [1] - 23:2
**failure** [2] - 54:23, 55:9
**fair** [1] - 37:8
**fairly** [1] - 14:8
**fall** [1] - 45:13
**false** [1] - 23:9
**falsely** [1] - 50:8
**far** [1] - 59:7
**faster** [1] - 25:6

**favor** [1] - 19:9
**federal** [2] - 21:2, 40:21
**feet** [1] - 60:13
**fellow** [1] - 45:11
**few** [1] - 37:23
**fighter** [2] - 36:23, 36:25
**figure** [2] - 51:13, 52:5
**finality** [1] - 40:22
**finalized** [1] - 44:8
**fine** [5] - 4:16, 42:24, 43:14, 43:15, 53:23
**finger** [1] - 12:16
**finish** [1] - 53:25
**first** [13] - 4:10, 4:21, 5:1, 5:2, 5:21, 30:18, 39:20, 42:10, 45:6, 55:8, 57:2, 58:22, 62:3
**firstly** [3] - 4:13, 8:7, 8:13
**five** [1] - 43:12
**fixed** [1] - 33:6
**fixing** [1] - 25:3
**flatly** [1] - 21:23
**flesh** [2] - 35:23, 56:23
**Floor** [1] - 1:17
**flow** [1] - 34:8
**fly** [1] - 47:3
**focus** [3] - 4:23, 19:2, 46:23
**focusing** [3] - 6:17, 15:5, 50:10
**followed** [1] - 26:23
**following** [1] - 49:15
**FOR** [1] - 1:1
**forced** [1] - 35:1
**Ford** [1] - 25:5
**foregoing** [1] - 63:4
**foreign** [2] - 32:14, 48:19
**forgotten** [1] - 31:9
**form** [3] - 22:3, 33:18, 37:6
**forms** [2] - 33:18, 37:6
**formula** [1] - 6:13
**forth** [2] - 58:14, 60:13
**forward** [1] - 35:6
**foundation** [2] - 39:12, 39:16
**foundational** [1] - 39:13
**fours** [1] - 23:6
**framework** [1] - 53:9
**Fraud** [1] - 16:3
**fraud** [35] - 4:13, 4:19, 20:21, 20:24, 20:25, 21:18, 21:19, 22:4, 25:20, 31:19, 32:5, 38:25, 39:2, 41:6, 43:7, 44:5, 44:14, 44:24, 45:3, 45:5, 46:22, 46:25, 47:21, 47:25, 49:9, 50:9, 50:11, 51:4, 51:10, 53:1, 53:18, 54:24, 55:10, 55:25
**frauds** [1] - 56:1
**free** [4] - 21:1, 21:9, 45:12, 51:23
**frequently** [1] - 36:17
**front** [1] - 47:18
**front-to-end** [1] - 47:18
**fulfills** [1] - 50:12
**full** [2] - 58:24, 63:5
**fully** [1] - 39:4
**functionality** [2] - 25:15, 56:6
**fundamental** [2] - 13:4, 16:22
**funded** [2] - 22:8, 22:13

**G**

**gap** [1] - 27:9
**gaps** [2] - 7:2, 7:5
**garner** [1] - 18:2
**general** [1] - 40:19
**generalization** [1] - 41:11
**generally** [1] - 13:23
**generation** [2] - 23:25, 45:20
**geographic** [1] - 31:2
**given** [2] - 27:6, 54:20
**gladly** [1] - 42:15
**glitchy** [1] - 38:5
**goods** [5] - 24:10, 52:19, 53:5, 59:24
**government** [140] - 3:5, 3:7, 3:9, 3:10, 4:14, 5:2, 5:4, 5:8, 5:9, 5:12, 5:15, 5:16, 6:5, 6:21, 6:25, 7:14, 7:20, 7:22, 8:2, 8:7, 8:10, 8:22, 9:19, 10:1, 10:3, 10:25, 11:2, 11:4, 11:9, 11:16, 11:18, 11:19, 11:23, 13:5, 13:25, 14:1, 14:4, 14:7, 14:11, 14:25, 15:1, 15:7, 15:15, 15:16, 15:21, 15:22, 16:19, 16:20, 17:16, 17:19, 18:5, 18:10, 18:17, 19:1, 19:5, 19:11, 19:12, 20:13, 20:25, 21:2, 21:4, 21:10, 21:11, 21:16, 21:19, 22:25, 23:12, 24:6, 24:8, 25:21, 25:24, 26:1, 26:8, 26:11, 28:3, 28:5, 28:15, 28:20, 28:23, 29:2, 29:6, 30:25, 31:24, 32:9, 32:10, 32:13, 34:11, 34:16, 35:10, 35:13, 36:9, 36:12, 36:13, 36:16, 36:17, 36:19, 36:21, 36:23, 37:1, 37:2, 37:4, 37:7, 37:10, 37:14, 37:16, 40:21, 41:6, 41:18, 41:24, 42:1, 43:8, 43:9, 43:11, 43:25, 45:17, 45:19, 49:8, 49:22, 55:8, 55:12, 55:16, 55:17, 57:1, 57:7, 58:12, 58:18, 58:20, 59:2, 59:4, 59:5, 59:6, 59:15, 61:16, 62:1
**Government** [9] - 39:5, 40:23, 43:21, 45:8, 45:14, 46:21, 52:25, 53:7, 54:21
**government's** [25] - 6:4, 6:8, 14:9, 15:11, 15:25, 17:6, 20:22, 21:7, 22:24, 23:1, 23:16, 23:19, 29:24, 32:19, 33:14, 36:10, 36:18, 38:6, 40:13, 45:3, 45:4, 49:2, 49:9, 50:11, 54:24
**grant** [1] - 19:8
**great** [6] - 14:13, 14:18, 14:23, 34:11, 41:15, 48:13
**greater** [1] - 60:5
**greatest** [1] - 9:4
**ground** [2] - 24:23, 25:16
**guess** [6] - 6:18, 41:5, 43:10, 46:9, 51:13, 56:19
**guidance** [1] - 38:2
**guilty** [1] - 46:25

**H**

**hackers** [1] - 16:14
**half** [6] - 27:19, 30:10, 30:15, 35:11, 51:18, 52:19
**half-truths** [1] - 51:18
**hand** [2] - 16:16, 30:6
**handed** [3] - 26:13, 30:9, 30:11
**happily** [1] - 53:21
**happy** [1] - 4:15
**hard** [5] - 16:14, 19:3, 19:9, 19:24, 52:16
**head** [2] - 52:17, 52:20
**hear** [2] - 31:23, 39:8
**heard** [8] - 4:6, 4:10, 4:19, 44:13, 45:9, 47:15, 49:8, 55:7
**HEARING** [2] - 1:4, 1:8
**hearing** [1] - 62:12
**heart** [1] - 55:21
**held** [4] - 21:17, 21:25, 23:8, 28:22
**HELD** [1] - 1:9
**help** [1] - 59:17
**helped** [2] - 22:7, 43:22
**helpful** [2] - 19:15, 62:11
**helpfully** [1] - 59:15
**hereby** [1] - 63:3
**hesitant** [2] - 34:20, 35:6
**high** [2] - 5:1, 7:12
**himself** [1] - 8:19
**hires** [1] - 60:11
**hits** [1] - 50:22
**hold** [1] - 47:3
**holding** [1] - 45:2
**holdings** [2] - 13:21, 23:4
**holiday** [1] - 62:8
**home** [2] - 28:25, 32:11
**Honor** [51] - 3:6, 3:8, 3:15, 4:3, 4:8, 4:15, 4:25, 5:25, 6:16, 10:5, 10:10, 12:15, 13:3, 15:4, 16:18, 18:21, 20:20, 25:8, 26:24, 29:23, 30:24, 31:22, 31:25, 33:8, 34:5, 35:22, 36:4, 37:8, 37:19, 38:20, 42:4, 42:22, 42:25, 44:5, 45:7, 45:22, 47:5, 50:11, 50:15, 51:19, 52:6, 53:12, 53:19, 54:3, 54:17, 54:23, 55:1, 55:10, 58:4, 58:10, 61:19
**HONORABLE** [1] - 1:9
**hope** [1] - 52:17
**hospital** [1] - 29:11
**hotline** [2] - 54:11, 57:9
**hour** [3] - 27:19, 30:10, 30:15
**hourly** [1] - 61:7
**hours** [3] - 26:4, 26:5, 41:24
**house** [1] - 28:17
**housing** [1] - 49:5
**huge** [2] - 15:18, 19:6
**hybrid** [1] - 24:16

**I**

**i.e** [1] - 18:3
**idea** [8] - 14:13, 14:18, 14:19, 40:18, 41:12, 41:15, 42:2, 58:7
**ideas** [2] - 23:25, 38:12
**identifying** [1] - 5:15
**identity** [4] - 15:14, 16:5, 16:8, 35:8
**ill** [1] - 16:1
**imagine** [2] - 19:25, 31:5
**impede** [1] - 15:11
**important** [3] - 8:20, 56:2, 56:5
**importantly** [2] - 39:24, 54:10
**impounded** [1] - 50:23
**improved** [1] - 57:19
**improvement** [1] - 51:7
**improvements** [2] - 19:21, 20:10
**improving** [1] - 14:10
**impulses** [1] - 6:22
**IN** [1] - 1:1
**incidental** [1] - 59:22
**included** [2] - 34:18, 35:3
**includes** [1] - 18:1
**including** [2] - 34:3, 55:9
**incorporate** [1] - 44:8
**incorporating** [2] - 38:11, 38:16
**independent** [1] - 10:22
**India** [5] - 48:5, 48:8, 48:22, 55:10, 55:14
**Indian** [8] - 38:10, 42:17, 44:2, 48:19, 49:3, 49:11, 49:19, 50:10
**indicated** [1] - 48:17
**indication** [1] - 31:15
**indictment** [1] - 15:9

**industry** [1] - 11:22
**infer** [2] - 30:21, 38:11
**inference** [6] - 18:14, 19:4, 19:8, 30:21, 37:9, 44:1
**informants** [1] - 14:6
**information** [22] - 5:15, 6:23, 14:6, 15:15, 15:18, 21:14, 21:21, 21:25, 22:3, 22:20, 34:20, 35:4, 35:7, 41:9, 46:11, 46:12, 46:19, 46:20, 47:2, 49:6, 55:19, 55:22
**initial** [2] - 20:22, 33:1
**injecting** [1] - 42:5
**inquiry** [1] - 35:12
**inside** [1] - 28:17
**insofar** [1] - 12:24
**installed** [1] - 32:10
**instant** [1] - 22:6
**instead** [2] - 12:1, 37:13
**instructions** [2] - 35:20, 53:20
**intangible** [4] - 7:10, 7:13, 7:16, 8:2
**Integrity** [1] - 1:13
**integrity** [4] - 35:7, 47:19, 48:12, 48:13
**intended** [7] - 21:14, 23:14, 52:23, 52:24, 55:19, 57:14
**intending** [1] - 7:5
**intends** [1] - 24:6
**intensive** [1] - 34:2
**intent** [1] - 33:1
**intention** [1] - 5:6
**interagency** [1] - 14:21
**interchangeably** [1] - 45:21
**interest** [11] - 10:22, 11:4, 11:11, 11:24, 15:17, 15:22, 22:2, 34:5, 34:6, 57:22
**interference** [12] - 9:21, 9:25, 10:3, 33:22, 34:1, 34:4, 34:8, 35:12, 35:24, 36:2, 36:5, 58:17
**interferes** [2] - 15:22, 58:23
**interloper** [1] - 10:19
**internet** [1] - 16:14
**interpreted** [1] - 52:15
**interstate** [2] - 25:22, 53:20
**investigation** [2] - 48:23, 54:12
**investigations** [2] - 35:4, 57:8
**inviting** [1] - 28:24
**invoices** [2] - 60:22, 61:4
**involved** [4] - 48:19, 48:22, 49:19, 53:1
**involvement** [2] - 49:3, 55:9
**involves** [1] - 33:22
**involving** [1] - 14:5
**iota** [1] - 15:11
**IRS** [1] - 16:10
**issue** [13] - 12:10, 13:5, 15:9, 16:1, 17:2, 17:24, 18:24, 25:23, 36:5, 36:6, 41:8, 58:3, 59:11
**issues** [8] - 3:24, 3:25, 4:15, 5:1, 20:21, 41:10, 41:21, 55:5
**item** [5] - 17:22, 18:1, 18:6, 58:22
**items** [1] - 59:9
**itself** [5] - 17:23, 24:12, 24:21, 25:16, 43:3
**Izydore** [1] - 28:13

## J

**JARED** [1] - 2:2
**Jared** [1] - 3:18
**jet** [2] - 36:23, 36:25
**Johnny** [1] - 50:17
**journalists** [2] - 12:20, 12:21
**JUDGE** [2] - 1:9, 1:9
**Judge** [3] - 38:22, 43:12, 44:12
**judge** [1] - 39:3
**judgment** [3] - 3:22, 4:7, 31:19
**jury** [18] - 18:9, 20:4, 20:25, 24:25, 28:24, 30:21, 33:17, 35:20, 37:14, 38:10, 40:14, 45:8, 47:10, 47:15, 52:15, 53:9, 53:19, 57:24
**Justice** [1] - 13:10
**justly** [1] - 58:24

## K

**KAMIL** [1] - 2:5
**Kamil** [1] - 3:18
**KATHERINE** [1] - 1:23
**Katherine** [1] - 3:18
**keep** [3] - 5:6, 33:1, 45:18
**keeping** [1] - 3:20
**key** [2] - 4:24, 5:1
**kid** [1] - 29:11
**kind** [2] - 9:9, 16:14
**knowing** [2] - 43:24, 54:18
**knowledge** [1] - 43:17
**known** [1] - 52:14

## L

**labor** [1] - 37:5
**laid** [1] - 39:4
**laptop** [1] - 46:3
**larceny** [2] - 7:5, 33:7
**last** [2] - 8:21, 17:2
**latest** [1] - 24:1
**law** [6] - 9:11, 10:2, 18:25, 33:6, 34:21, 49:18
**Law** [1] - 59:20
**lawful** [1] - 5:5
**laying** [1] - 44:23
**leaks** [1] - 13:15
**least** [6] - 19:9, 42:25, 51:14, 56:1, 57:25, 58:1
**ledger** [1] - 52:13
**left** [6] - 28:16, 28:18, 28:22, 41:6, 43:24, 55:2
**legal** [2] - 33:23, 35:14
**lengths** [2] - 34:11, 48:13
**less** [8] - 18:19, 20:1, 43:10, 43:17, 47:6, 47:12, 53:5
**level** [4] - 5:1, 39:24, 41:11, 55:24
**lied** [1] - 47:8
**likelihood** [1] - 52:6
**likely** [1] - 58:16
**limitation** [1] - 33:4
**line** [7] - 9:10, 13:20, 33:23, 35:14, 58:15, 58:18, 60:24
**lines** [1] - 51:20
**list** [2] - 9:24, 61:6
**listen** [1] - 28:17
**listened** [1] - 28:25
**listening** [3] - 3:11, 3:12, 41:14
**LLP** [3] - 1:23, 2:2, 2:5
**load** [1] - 57:12
**loaded** [1] - 6:2
**located** [1] - 29:1
**lock** [1] - 47:17
**Lockheed** [7] - 36:23, 55:13, 60:12, 60:14, 60:22, 61:1, 61:3
**look** [12] - 10:16, 13:14, 17:25, 25:14, 35:23, 42:23, 43:13, 53:21, 58:2, 60:22, 60:23, 61:15
**looking** [2] - 35:21, 42:8
**loop** [1] - 42:18
**lost** [2] - 5:12, 34:20
**love** [1] - 14:19
**lower** [1] - 52:14

## M

**Macey** [1] - 3:12
**MACEY** [1] - 1:19
**maintained** [1] - 15:19
**maintaining** [1] - 15:17
**management** [2] - 21:13, 23:21
**manifold** [1] - 7:5
**manner** [3] - 9:20, 23:3, 57:20
**market** [13] - 18:1, 18:19, 18:22, 18:23, 18:25, 20:11, 36:20, 37:13, 45:19, 47:11, 47:12, 53:6, 60:17
**marketable** [1] - 14:15
**marketplace** [6] - 18:3, 18:8, 18:13, 20:14, 37:17, 60:9
**Martin** [7] - 36:23, 55:13, 60:12, 60:14, 60:23, 61:1, 61:3
**Maryland** [2] - 31:3, 31:6
**mass** [1] - 7:11
**Matchbox** [1] - 39:6
**material** [6] - 21:12, 36:1, 46:20, 51:15, 54:23, 55:14
**materialize** [1] - 44:6
**materialized** [1] - 44:10
**matter** [4] - 8:7, 8:13, 20:22, 53:21
**matters** [1] - 6:19
**Matzkin** [1] - 14:2
**mean** [13] - 7:9, 7:10, 11:18, 16:8, 18:14, 19:20, 20:4, 27:11, 29:10, 41:4, 52:4, 61:14
**meaning** [5] - 30:2, 33:6, 33:9, 35:16, 35:24
**means** [3] - 23:8, 32:21, 32:24
**measure** [3] - 17:21, 61:11, 61:12
**measurement** [1] - 17:18
**measures** [1] - 17:10
**meet** [5] - 12:12, 22:12, 22:14, 23:1, 28:7
**meeting** [2] - 39:5, 42:19
**memorandum** [1] - 45:10
**Memorial** [1] - 39:11
**mention** [1] - 49:19
**message** [3] - 28:16, 28:18, 28:25
**messages** [2] - 28:18, 43:21
**met** [4] - 13:6, 25:21, 26:12, 39:11
**metal** [1] - 60:20
**method** [1] - 61:12
**MICHELLE** [1] - 1:19
**might** [10] - 11:21, 11:24, 14:18, 21:17, 26:9, 27:23, 34:6, 35:6, 41:14, 56:12
**million** [7] - 18:10, 18:12, 35:11, 36:11, 36:12, 37:10, 37:16
**millionaire** [2] - 19:15, 20:3
**millions** [3] - 17:7, 18:18, 19:11
**mind** [4] - 18:15, 41:22, 45:18, 51:13
**mind-boggling** [1] - 18:15
**mine** [1] - 56:10
**minor** [1] - 8:19
**minute** [1] - 53:24
**minutes** [7] - 26:4, 26:6, 29:25, 30:6, 37:23, 43:13, 53:25
**mislead** [1] - 51:22
**misleading** [1] - 49:9
**misled** [1] - 48:25
**misreading** [1] - 53:17
**misrepresentation** [1] - 51:16
**misrepresentations** [1] - 56:8
**misstated** [1] - 29:24
**mitigating** [1] - 47:16
**mitigation** [1] - 48:3
**model** [5] - 38:1, 38:17, 39:18, 43:5, 51:14

**modern** [1] - 13:9
**module** [20] - 39:20, 39:25, 40:7, 40:12, 40:15, 40:18, 41:1, 41:8, 41:20, 42:3, 42:6, 42:10, 42:11, 42:16, 42:20, 43:2, 43:17, 43:23, 44:2, 44:8
**modules** [2] - 39:23, 46:5
**Monday** [1] - 62:7
**money** [3] - 36:24, 47:16, 54:21
**Morissette** [3] - 7:2, 32:23, 33:5
**morning** [9] - 26:19, 26:20, 27:22, 29:11, 29:15, 30:2, 30:18, 30:23, 31:1
**mornings** [1] - 26:3
**MOSS** [1] - 1:9
**most** [1] - 27:10
**motion** [4] - 3:21, 3:24, 4:1, 4:7
**MOTIONS** [2] - 1:4, 1:8
**move** [1] - 9:12
**MR** [75] - 3:6, 3:17, 4:3, 4:5, 4:18, 4:23, 5:20, 5:25, 6:15, 7:1, 7:4, 7:8, 8:1, 9:2, 9:7, 9:14, 9:17, 10:19, 12:9, 12:23, 13:19, 15:3, 15:23, 16:18, 17:2, 17:5, 17:13, 18:16, 18:21, 19:16, 20:7, 20:18, 38:22, 39:3, 39:22, 40:3, 40:20, 42:4, 42:8, 42:25, 43:12, 43:16, 44:12, 44:23, 45:6, 46:14, 46:17, 47:4, 47:10, 47:23, 48:2, 48:6, 48:10, 48:21, 49:2, 49:14, 49:24, 50:4, 50:10, 50:15, 50:19, 51:3, 51:8, 51:18, 51:22, 52:6, 52:10, 52:21, 53:12, 54:3, 58:10, 59:13, 60:21, 61:11, 61:19
**MS** [37] - 3:8, 3:12, 3:15, 20:20, 24:20, 25:8, 25:19, 26:24, 27:4, 27:16, 27:25, 28:13, 29:23, 30:10, 30:13, 30:24, 31:11, 31:18, 31:22, 31:25, 32:2, 32:7, 32:21, 33:14, 34:24, 35:22, 36:8, 37:8, 37:19, 38:8, 38:20, 55:1, 56:4, 56:11, 56:22, 56:25, 58:4
**multifactor** [1] - 35:25
**MURALI** [1] - 1:5
**Murali** [1] - 3:3
**must** [2] - 5:9, 33:23
**mystified** [1] - 44:12

## N

**N.W** [1] - 63:11
**name** [1] - 3:4
**natural** [3] - 29:18, 52:10
**nature** [4] - 20:25, 29:14, 34:4, 53:1
**necessary** [5] - 21:21, 42:15, 47:2, 55:22, 60:1
**need** [4] - 25:22, 33:8, 47:21, 58:19
**needed** [4] - 20:13, 22:1, 23:25, 46:2
**needs** [2] - 39:20, 58:18
**negative** [4] - 15:24, 34:8, 34:16, 58:12
**never** [6] - 8:23, 29:9, 29:20, 50:2, 55:16
**nevertheless** [1] - 12:12
**New** [7] - 1:14, 1:17, 1:25, 2:4, 2:6, 13:12, 22:7
**new** [23] - 3:22, 4:7, 21:11, 23:20, 24:12, 25:17, 38:3, 39:1, 39:4, 39:9, 40:7, 44:3, 49:4, 51:15, 55:3, 56:17, 57:14, 57:15, 57:19, 58:6, 58:18, 58:19
**next** [4] - 23:25, 43:15, 45:20, 60:4
**nonetheless** [4] - 36:21, 36:25, 37:9, 38:16
**nonexhaustive** [1] - 9:23
**nongovernment** [1] - 10:20
**nonprofit** [2] - 22:6, 22:15
**nonstolen** [1] - 24:10
**note** [1] - 43:16
**noted** [4] - 4:8, 52:7, 55:10, 55:11
**notes** [1] - 63:5
**nothing** [2] - 8:24, 23:13
**nowhere** [1] - 59:1
**nuance** [1] - 42:5
**number** [5] - 15:24, 45:14, 45:15, 47:13, 58:12
**numerous** [1] - 51:18
**nut** [1] - 5:17
**nuts** [1] - 52:25
**nutshell** [1] - 16:24
**NW** [5] - 1:14, 1:17, 1:21, 2:6, 2:23
**NY** [2] - 1:25, 2:4

## O

**objection** [1] - 3:14
**objects** [1] - 36:18
**obligation** [1] - 28:8
**obstruction** [1] - 53:20
**obtained** [1] - 46:13
**obviously** [4] - 28:3, 45:7, 45:13, 45:16
**occurred** [3] - 30:1, 30:6, 31:12
**occurs** [1] - 9:21
**October** [2] - 54:5, 54:8
**OF** [4] - 1:1, 1:2, 1:8, 63:1
**offense** [1] - 18:2
**offer** [4] - 28:8, 28:20, 30:2, 30:25
**offered** [13] - 5:7, 5:11, 6:7, 23:12, 26:8, 26:25, 28:23, 29:8, 30:1, 30:5, 45:19, 57:6
**offering** [1] - 45:15
**Office** [1] - 23:7
**office** [8] - 13:1, 26:17, 26:18, 26:23, 27:2, 29:7, 29:15, 30:3
**OFFICIAL** [1] - 63:1
**Official** [2] - 2:22, 63:10
**OIG** [20] - 14:12, 21:3, 21:9, 21:14, 33:17, 34:20, 35:1, 40:7, 40:24, 45:9, 46:4, 47:15, 47:20, 47:24, 49:5, 52:3, 52:18, 54:13, 55:19
**OIG's** [1] - 45:25
**old** [2] - 16:9, 25:7
**omission** [3] - 22:19, 51:16, 56:1
**omissions** [1] - 24:6
**omitted** [2] - 21:11, 46:20
**omitting** [1] - 56:2
**once** [2] - 49:4, 54:19
**one** [33] - 3:23, 5:5, 8:20, 12:15, 14:2, 14:23, 15:11, 17:9, 25:19, 26:17, 29:5, 29:21, 37:6, 42:22, 45:14, 46:10, 47:13, 49:8, 49:21, 50:9, 50:16, 52:17, 56:20, 57:2, 58:19, 60:1, 60:22, 60:23, 61:11, 61:14, 61:15
**ones** [1] - 44:18
**ons** [2] - 24:18, 25:2
**open** [4] - 36:20, 45:19, 47:11, 53:5
**opening** [1] - 44:20
**operation** [1] - 43:19
**operational** [1] - 34:18
**opinion** [1] - 13:11
**opportunity** [1] - 4:6
**opposition** [1] - 21:10
**order** [1] - 25:17
**ordinarily** [2] - 11:14, 27:2
**ordinary** [1] - 27:8
**organization** [1] - 22:7
**original** [6] - 24:17, 24:18, 25:1, 25:2, 38:2, 38:4
**otherwise** [3] - 18:15, 47:6, 60:10
**ought** [3] - 41:7, 41:15, 42:2
**Ousten** [1] - 44:6
**outcome** [2] - 10:13, 10:14
**outset** [1] - 57:2
**outside** [5] - 26:13, 32:14, 36:9, 36:17, 48:11
**oven** [1] - 44:21
**overhead** [1] - 61:7
**overturned** [1] - 44:15
**own** [7] - 6:12, 21:7, 23:16, 23:25, 25:12, 51:13, 59:18
**owned** [1] - 40:23
**owner** [4] - 10:4, 33:23, 34:6, 35:15
**owner's** [1] - 34:5
**ownership** [1] - 9:21

## P

**P.M** [1] - 1:6
**p.m** [1] - 62:12
**package** [3] - 39:13, 45:16, 45:25
**page** [6] - 44:24, 51:19, 53:15, 54:13, 55:2, 57:7
**pages** [1] - 44:19
**paid** [8] - 18:10, 18:12, 37:17, 59:22, 59:23, 59:24, 61:1, 61:16
**paper** [2] - 6:12, 11:12
**papers** [4] - 4:15, 12:20, 44:17, 62:2
**Papers** [2] - 13:10, 13:13
**par** [1] - 17:22
**Paradis** [27] - 21:7, 24:9, 39:6, 39:9, 40:4, 40:6, 40:9, 40:10, 42:19, 44:9, 45:16, 45:23, 46:7, 46:22, 47:10, 48:21, 51:23, 52:12, 53:4, 54:5, 54:8, 54:15, 54:22, 55:3, 57:7, 57:18
**PARIS** [2] - 5:14, 33:15
**part** [10] - 6:6, 8:5, 9:5, 11:8, 12:5, 13:21, 34:25, 42:20, 49:2, 58:1
**partially** [1] - 14:20
**participating** [1] - 3:13
**particular** [4] - 13:24, 28:10, 31:1, 34:6
**particularly** [1] - 19:4
**parties** [4] - 8:3, 9:22, 48:11, 55:12
**partners** [1] - 34:21
**parts** [4] - 48:15, 50:20, 50:23, 60:18
**past** [1] - 9:8
**pasted** [2] - 56:17, 56:21
**pasting** [1] - 38:15
**Patel** [11] - 6:3, 8:9, 14:12, 21:8, 24:14, 26:14, 26:15, 39:6, 39:8, 40:8, 45:23
**Patel's** [3] - 8:11, 8:17, 42:11
**patent** [2] - 9:3, 12:4
**pattern** [1] - 28:5
**pay** [8] - 14:22, 18:1, 18:8, 52:18, 58:24,

61:2, 61:9
**pays** [1] - 36:21
**Pearson** [1] - 12:17
**Pentagon** [2] - 13:10, 13:13
**people** [2] - 12:1, 27:10
**people's** [1] - 16:12
**percent** [2] - 14:19, 61:9
**perhaps** [5] - 9:9, 11:10, 16:6, 25:2, 38:1
**permanently** [1] - 33:1
**permission** [1] - 32:2
**permit** [1] - 40:14
**person** [3] - 28:22, 28:24, 30:6
**personal** [3] - 6:25, 11:2, 11:13
**Pete** [1] - 54:4
**Peter** [2] - 21:7, 24:9
**phone** [2] - 26:6, 31:12
**phonetic]** [1] - 44:7
**phrase** [2] - 53:15, 55:16
**physical** [2] - 7:9, 33:3
**physically** [2] - 5:8, 8:23
**physics** [1] - 7:11
**piece** [5] - 6:12, 11:12, 46:11, 46:12, 50:16
**pieces** [2] - 56:25, 60:13
**PII** [6] - 5:15, 15:10, 34:22, 46:8, 49:6, 49:18
**Pinkerton** [1] - 32:18
**pitching** [1] - 39:9
**pivoted** [1] - 21:10
**pizza** [2] - 19:23, 19:24
**place** [4] - 26:7, 26:10, 27:14, 59:23
**plain** [1] - 16:9
**plain-old** [1] - 16:9
**Plaintiff** [2] - 1:3, 1:12
**plan** [6] - 19:21, 37:22, 38:2, 40:15, 56:21, 56:23
**planned** [1] - 38:9
**planning** [3] - 25:1, 39:10, 39:12
**platform** [4] - 48:11, 48:12, 49:17, 54:20
**plug** [3] - 38:3, 40:16, 41:24
**plus** [4] - 24:17, 37:3, 37:5, 61:2
**podium** [1] - 3:4
**point** [35] - 8:2, 9:15, 10:10, 10:11, 10:12, 12:9, 13:23, 15:23, 15:25, 16:18, 16:22, 17:3, 18:21, 19:15, 24:9, 25:19, 29:23, 40:12, 43:4, 43:5, 44:10, 46:1, 50:2, 50:5, 52:3, 52:23, 53:7, 55:15, 56:1, 58:12, 58:16, 59:8, 59:11, 59:19, 61:25
**pointed** [3] - 8:8, 14:1, 57:1
**points** [5] - 4:24, 8:6, 10:5, 24:8, 58:20
**portion** [4] - 12:6, 40:15, 57:2, 58:1
**posed** [1] - 3:24
**position** [16] - 3:23, 12:12, 14:4, 15:3, 15:4, 16:24, 25:11, 26:2, 26:24, 27:25, 30:24, 38:6, 40:13, 40:25, 47:4, 47:5
**possession** [7] - 5:6, 5:12, 10:4, 10:5, 12:14, 33:24, 35:15
**possible** [4] - 26:21, 29:10, 29:12, 29:20
**Post** [1] - 13:12
**potential** [1] - 15:7
**potentially** [3] - 21:21, 22:19, 47:1
**powerful** [1] - 44:1
**practice** [6] - 26:3, 26:23, 27:8, 27:20, 29:9
**predominant** [1] - 36:1
**preference** [1] - 4:10
**preferred** [1] - 22:12
**premises** [1] - 32:10
**prepared** [1] - 50:2
**present** [1] - 18:22
**presented** [5] - 4:11, 25:25, 26:2, 26:11, 56:13
**presenting** [1] - 20:8
**preserve** [1] - 34:11
**pretrial** [2] - 35:18, 35:21
**pretty** [2] - 26:19, 40:3
**prevailed** [1] - 3:23
**price** [24] - 15:2, 17:9, 17:20, 18:3, 18:22, 23:10, 24:7, 36:11, 36:22, 37:1, 37:13, 52:13, 52:19, 59:11, 59:16, 59:21, 59:22, 59:23, 60:4, 60:8, 60:9, 60:16, 60:18, 60:24
**pricing** [2] - 21:12, 47:12
**primarily** [1] - 17:6
**principal** [1] - 32:16
**private** [6] - 5:15, 11:22, 15:15, 32:11, 43:2, 59:7
**problem** [5] - 11:3, 21:6, 41:12, 55:25, 56:12
**problems** [2] - 23:24, 24:21
**proceed** [2] - 4:16, 4:21
**proceedings** [2] - 41:14, 63:6
**process** [4] - 14:5, 22:8, 22:11, 22:16
**procurement** [4] - 14:3, 17:15, 36:16
**producing** [2] - 17:18, 18:6
**product** [39] - 9:1, 10:23, 14:16, 19:22, 22:25, 23:3, 23:14, 23:18, 23:20, 24:4, 24:7, 25:1, 25:2, 25:17, 38:3, 38:4, 39:1, 39:4, 39:9, 42:21, 44:4, 44:8, 45:10, 46:6, 47:5, 47:9, 49:4, 51:15, 51:23, 52:4, 52:14, 52:18, 56:6, 56:17, 57:15, 57:19, 57:21, 57:25
**production** [4] - 17:17, 17:19, 60:2, 60:7
**products** [2] - 41:7, 47:11
**profit** [2] - 14:19, 52:25
**program** [2] - 21:1, 48:8
**programmers** [4] - 48:5, 48:8, 49:11, 55:10
**programs** [1] - 48:9
**project** [1] - 22:13
**projects** [1] - 22:8
**promised** [3] - 24:5, 40:3, 44:9
**proof** [2] - 17:2, 23:13
**property** [48] - 4:14, 5:8, 5:12, 6:8, 7:9, 7:10, 7:14, 7:17, 7:19, 7:22, 9:5, 9:6, 9:20, 10:4, 11:2, 16:21, 22:2, 32:14, 32:20, 33:4, 33:19, 33:23, 33:24, 34:4, 34:5, 34:7, 34:9, 34:12, 34:17, 35:16, 36:6, 36:13, 36:16, 36:18, 36:22, 37:10, 43:9, 43:11, 45:8, 46:7, 47:12, 52:24, 53:3, 56:11, 56:15, 58:6, 58:7
**proposed** [1] - 14:3
**proprietary** [11] - 10:23, 11:20, 32:9, 33:14, 33:16, 41:19, 46:8, 47:17, 49:16
**prosecute** [1] - 13:12
**prosecution** [2] - 22:10, 22:18
**protect** [4] - 11:25, 12:1, 35:7, 48:13
**protection** [1] - 11:19
**protects** [1] - 11:18
**prove** [2] - 5:5, 25:21
**proved** [2] - 5:2, 5:3
**proven** [2] - 8:22, 32:22
**provide** [3] - 9:23, 21:9, 38:1
**provided** [2] - 32:13, 38:17
**providing** [1] - 12:2
**Public** [1] - 1:13
**public** [2] - 12:8, 15:20
**pull** [2] - 40:16, 51:19
**pulled** [1] - 50:22
**punchline** [1] - 46:18
**purchase** [1] - 23:8
**purchased** [2] - 18:4, 59:22
**purchaser** [1] - 45:18
**purpose** [4] - 11:2, 11:10, 32:11, 54:21
**purposes** [10] - 5:3, 10:8, 11:13, 14:10, 32:12, 44:3, 49:5, 50:1, 54:10, 61:13
**push** [1] - 41:21
**pushing** [1] - 41:9
**put** [1] - 28:15
**putting** [5] - 12:16, 25:2, 25:5, 25:6, 60:23

**Q**

**quality** [2] - 23:9, 24:3
**questions** [3] - 31:18, 36:4, 53:19
**quick** [1] - 42:23
**quite** [4] - 22:23, 27:21, 29:9, 52:19
**quote** [1] - 55:18

**R**

**raise** [1] - 53:14
**raised** [5] - 3:25, 19:17, 19:18, 53:14, 62:3
**RANDOLPH** [1] - 1:9
**rather** [2] - 9:11, 54:18
**raving** [1] - 40:7
**re** [3] - 43:10, 46:2, 46:3
**re-executed** [1] - 43:10
**re-upload** [2] - 46:2, 46:3
**reach** [1] - 25:22
**read** [9] - 6:4, 8:9, 9:7, 35:22, 45:1, 56:18, 56:22, 57:2, 57:3
**reality** [1] - 51:10
**really** [9] - 17:17, 18:25, 39:10, 40:8, 42:2, 59:25, 60:1, 60:10, 62:1
**reason** [12] - 6:6, 7:14, 11:21, 11:23, 26:14, 26:22, 28:11, 30:15, 30:18, 48:7, 48:16
**reasonable** [10] - 18:10, 18:14, 20:5, 24:25, 28:4, 30:20, 32:22, 37:15, 40:14, 57:25
**reasonably** [5] - 18:9, 20:5, 24:25, 37:14, 44:25
**reasons** [3] - 25:23, 56:7, 56:12
**rebuilding** [1] - 24:23
**rebuilt** [1] - 25:16
**recess** [1] - 54:1
**recognized** [2] - 23:24, 61:12
**recollection** [2] - 7:19, 35:19
**record** [7] - 3:5, 29:24, 31:12, 35:9, 43:20, 58:2, 58:5
**recorded** [1] - 31:8
**recording** [1] - 54:4

**records** [2] - 12:25, 16:13
**refer** [2] - 17:13, 45:20
**referring** [1] - 27:1
**refine** [1] - 39:14
**reflect** [1] - 6:22
**regard** [1] - 29:22
**regarding** [6] - 21:12, 32:3, 32:5, 33:21, 39:25, 54:11
**regardless** [1] - 23:22
**regent** [1] - 23:7
**Regent** [1] - 23:12
**reimburses** [1] - 37:4
**rejected** [1] - 21:23
**related** [1] - 24:6
**relates** [1] - 38:25
**relationship** [1] - 32:23
**relatively** [2] - 8:19, 59:10
**released** [1] - 15:20
**relevant** [5] - 9:24, 19:2, 26:1, 35:12, 54:9
**relied** [1] - 7:20
**rely** [1] - 6:4
**relying** [1] - 12:8
**remainder** [1] - 4:14
**remained** [1] - 5:16
**remaking** [1] - 44:3
**remediation** [1] - 35:11
**remedy** [1] - 13:11
**remember** [9] - 6:21, 13:9, 26:16, 35:18, 35:20, 40:2, 42:14, 50:14, 50:18
**removed** [1] - 32:10
**rendered** [2] - 4:8, 16:23
**repackaging** [1] - 44:3
**reply** [2] - 31:23, 43:13
**report** [1] - 35:1
**reported** [1] - 31:8
**Reporter** [3] - 2:21, 2:22, 63:10
**REPORTER** [1] - 63:1
**representations** [2] - 23:9, 46:21
**represented** [2] - 42:19, 57:18
**request** [1] - 31:19
**require** [1] - 30:19
**required** [1] - 58:24
**requirement** [1] - 33:22
**requirements** [2] - 23:1, 42:13
**requires** [3] - 20:12, 33:3, 34:2
**resided** [1] - 12:25
**residence** [2] - 42:11, 43:23
**resides** [1] - 15:18
**resolve** [1] - 33:8
**respect** [4] - 12:11, 20:9, 37:21, 48:25
**respectfully** [3] - 26:24, 31:19, 51:8
**respond** [1] - 62:2
**responded** [1] - 53:14
**rest** [1] - 4:15
**Restatement** [4] - 9:23, 35:23, 35:24, 58:20
**restaurant** [1] - 39:7
**resting** [1] - 50:11
**restricting** [1] - 34:12
**result** [1] - 58:13
**retail** [3] - 60:5, 60:6, 61:13
**retained** [1] - 16:20
**return** [1] - 9:14
**returned** [2] - 12:21, 33:18
**returns** [2] - 16:11, 16:12
**reverse** [1] - 25:14
**review** [2] - 13:20, 58:5
**reviewed** [1] - 4:25
**rewrote** [2] - 25:13, 57:8
**rigged** [2] - 22:11, 22:16
**right-to-control** [6] - 21:18, 44:15, 44:19, 46:25, 53:13, 55:17
**rights** [8] - 9:5, 9:21, 11:6, 11:8, 11:17, 12:5, 12:6
**rise** [1] - 10:8
**risk** [4] - 47:14, 47:23, 50:24, 53:1
**RMR** [2] - 2:21, 63:9
**road** [1] - 50:22
**Room** [3] - 2:3, 2:22, 63:10
**Rosenfeld** [4] - 3:18, 4:2, 4:4, 58:8
**ROSENFELD** [37] - 2:2, 3:17, 4:3, 4:5, 4:18, 4:23, 5:20, 5:25, 6:15, 7:1, 7:4, 7:8, 8:1, 9:2, 9:7, 9:14, 9:17, 10:19, 12:9, 12:23, 13:19, 15:3, 15:23, 16:18, 17:2, 17:5, 17:13, 18:16, 18:21, 19:16, 20:7, 20:18, 58:10, 59:13, 60:21, 61:11, 61:19
**rosenfeld** [1] - 4:5
**Rosenthal** [1] - 4:4
**rule** [2] - 33:23, 35:15
**run** [2] - 29:11, 29:13
**RUTH** [1] - 1:12

## S

**safe** [1] - 6:11
**sale** [1] - 60:9
**Salgado** [7] - 3:7, 32:4, 37:21, 38:21, 54:2, 55:2, 57:3
**SALGADO** [40] - 1:16, 3:6, 38:22, 39:3, 39:22, 40:3, 40:20, 42:4, 42:8, 42:25, 43:12, 43:16, 44:12, 44:23, 45:6, 46:14, 46:17, 47:4, 47:10, 47:23, 48:2, 48:6, 48:10, 48:21, 49:2, 49:14, 49:24, 50:4, 50:10, 50:15, 50:19, 51:3, 51:8, 51:18, 51:22, 52:6, 52:10, 52:21, 53:12, 54:3
**sat** [1] - 19:20
**Savarese** [7] - 3:18, 4:18, 8:14, 20:7, 20:19, 37:23, 54:25
**SAVARESE** [24] - 1:23, 3:15, 20:20, 24:20, 25:8, 25:19, 26:24, 27:4, 27:16, 27:25, 28:13, 29:23, 30:10, 30:13, 30:24, 31:11, 31:18, 31:22, 55:1, 56:4, 56:11, 56:22, 56:25, 58:4
**schedule** [2] - 29:17, 30:19
**schematic** [1] - 39:17
**scheme** [11] - 21:4, 22:2, 23:5, 23:11, 32:5, 44:6, 44:9, 50:4, 52:7, 52:22, 55:8
**schemed** [1] - 21:20
**schemes** [1] - 47:1
**school** [1] - 7:12
**scores** [1] - 11:1
**scratch** [3] - 37:25, 38:4, 39:18
**second** [3] - 42:22, 52:3, 52:4
**Second** [4] - 9:23, 21:17, 23:8, 44:19
**secrecy** [1] - 13:23
**secret** [1] - 41:18
**Section** [9] - 1:13, 4:14, 4:20, 5:3, 6:17, 10:8, 17:20, 32:3, 61:13
**secure** [1] - 59:5
**securing** [1] - 21:3
**Security** [1] - 16:12
**see** [3] - 7:14, 38:24, 43:20
**seeing** [1] - 38:16
**seeking** [1] - 28:20
**Sefranek** [3] - 2:21, 63:9, 63:9
**SEFRANEK** [1] - 63:3
**seized** [1] - 50:23
**selected** [1] - 22:17
**selection** [1] - 22:15
**sell** [7] - 14:16, 14:17, 16:13, 19:4, 19:12, 24:1, 24:4
**selling** [12] - 14:11, 14:20, 24:7, 43:8, 43:11, 47:6, 50:19, 56:9, 56:11, 56:14, 57:19, 60:17
**Senator** [1] - 13:1
**Senator's** [1] - 12:20
**send** [1] - 42:15
**sense** [7] - 15:18, 16:6, 35:5, 36:15, 52:15, 60:2, 60:10
**sensitive** [3] - 49:5, 49:18, 52:1
**sent** [1] - 42:12
**separate** [1] - 51:12
**September** [2] - 62:8, 63:7
**serious** [8] - 9:20, 10:3, 33:22, 34:1, 35:12, 35:24, 36:2, 36:4
**seriously** [1] - 58:22
**seriousness** [1] - 9:25
**server** [2] - 43:2, 43:18
**servers** [5] - 32:11, 42:17, 43:21, 46:3, 59:7
**services** [2] - 17:16, 18:11
**set** [4] - 12:13, 12:17, 15:24, 38:9
**several** [4] - 3:24, 16:11, 26:4, 26:5
**severe** [1] - 58:18
**share** [2] - 34:20, 45:10
**shared** [1] - 48:4
**Shields** [1] - 3:18
**SHIELDS** [1] - 2:5
**short** [1] - 24:3
**shortly** [1] - 27:18
**show** [6] - 9:19, 10:3, 16:21, 38:10, 54:7, 58:17
**showed** [10] - 5:13, 23:16, 32:7, 34:10, 34:15, 36:8, 38:8, 39:15, 40:13, 42:11
**showing** [1] - 21:20
**shown** [3] - 5:10, 13:6, 29:7
**shows** [2] - 38:7, 45:22
**sides** [1] - 52:13
**sign** [2] - 11:12, 34:13
**significant** [4] - 3:24, 12:5, 37:6, 48:3
**similar** [4] - 11:23, 19:17, 22:8, 22:23
**similarities** [1] - 22:5
**similarly** [1] - 57:4
**simply** [6] - 25:24, 39:12, 44:20, 44:23, 44:24, 53:14
**single** [1] - 27:7
**sister** [2] - 45:11, 45:13
**sit** [1] - 53:21
**sitting** [2] - 10:25, 41:25
**situation** [1] - 22:23
**smaller** [1] - 59:10
**sneak** [2] - 6:11, 16:10
**Social** [1] - 16:12
**software** [12] - 7:13, 7:17, 17:18, 32:9, 33:14, 34:23, 41:7, 46:8, 47:17, 47:19, 49:23, 51:25
**sold** [4] - 23:10, 47:11, 49:5, 58:1
**solely** [1] - 48:18
**solicitation** [1] - 23:8
**soliciting** [1] - 22:9
**someone** [5] - 18:8, 30:19, 30:20, 50:6, 60:15
**sometimes** [2] - 31:7, 37:3
**Sonal** [1] - 21:8
**sorry** [4] - 26:5, 29:2, 30:9, 46:15
**sort** [8] - 12:18, 13:22, 13:23, 29:18, 35:14,

36:20, 50:24, 51:1
**sounds** [1] - 53:23
**source** [18] - 5:13, 5:23, 6:22, 9:1, 14:10, 14:14, 33:15, 33:16, 38:3, 38:4, 38:15, 39:16, 39:18, 39:19, 39:21, 40:16, 41:23, 41:25
**special** [4] - 33:18, 40:18, 41:8, 42:3
**specific** [4] - 18:2, 18:4, 27:5, 34:25
**specifically** [1] - 24:9
**specifications** [2] - 36:10, 36:19
**speculate** [2] - 28:24, 29:6
**speculation** [2] - 29:15, 29:22
**speculative** [1] - 20:12
**spend** [2] - 43:12, 47:16
**spending** [1] - 18:17
**spent** [2] - 35:10, 41:24
**spirited** [1] - 6:13
**sportier** [1] - 25:5
**sports** [1] - 11:1
**spring** [1] - 21:9
**standard** [5] - 10:6, 10:9, 12:13, 13:6, 20:12
**standards** [1] - 51:17
**standing** [1] - 51:9
**STARS** [1] - 5:14
**start** [5] - 4:2, 11:11, 27:10, 38:25, 44:13
**started** [1] - 29:17
**starting** [3] - 3:5, 25:4, 46:1
**starts** [1] - 45:7
**state** [5] - 3:4, 4:25, 22:8, 22:13, 29:1
**State** [1] - 22:7
**state-funded** [2] - 22:8, 22:13
**STATES** [3] - 1:1, 1:2, 1:9
**States** [10] - 2:22, 3:3, 13:12, 21:24, 23:7, 35:14, 44:18, 48:18, 50:8, 54:21
**statute** [7] - 7:4, 16:6, 17:21, 32:24, 33:5, 52:11, 60:4
**statutes** [1] - 16:11
**statutorily** [1] - 17:10
**statutory** [1] - 17:10
**steal** [2] - 46:2, 52:24
**stealing** [20] - 5:3, 5:4, 5:17, 6:16, 7:15, 7:16, 8:6, 8:10, 8:17, 8:21, 8:22, 9:11, 16:25, 32:25, 33:3, 33:6, 33:9, 43:5, 43:6, 59:9
**steals** [1] - 60:15
**Steel** [3] - 17:7, 21:8, 48:10
**steel** [4] - 60:13, 60:19, 60:23
**stenographic** [1] - 63:5
**step** [2] - 45:14, 45:15
**steps** [3] - 44:7, 47:17, 59:5
**still** [7] - 12:12, 12:24, 25:6, 43:6, 44:21, 46:9, 52:5
**stole** [5] - 19:19, 51:10, 51:25
**stolen** [21] - 24:10, 24:13, 24:17, 32:20, 46:1, 46:7, 47:12, 48:2, 50:20, 50:23, 51:9, 51:14, 52:14, 52:18, 52:19, 53:3, 53:5, 56:11, 56:14, 58:1, 58:6
**straight** [2] - 21:15, 55:19
**Street** [3] - 1:21, 1:24, 2:3
**strike** [1] - 49:7
**strikes** [3] - 29:4, 49:21, 59:1
**strong** [1] - 15:16
**subject** [2] - 4:9, 7:16
**submit** [10] - 25:21, 25:24, 31:4, 43:14, 55:21, 57:12, 58:5, 61:22, 62:8, 62:9
**submits** [1] - 61:3
**submitted** [1] - 21:16
**subpoena** [5] - 41:8, 41:10, 41:21, 42:16, 57:9
**subpoenas** [2] - 40:19, 42:3
**subsequently** [1] - 42:16
**subset** [1] - 32:25
**substantial** [2] - 34:16, 58:17
**substantially** [4] - 13:2, 13:21, 14:4, 15:21
**succeeded** [1] - 24:14
**sufficient** [6] - 8:14, 10:7, 10:13, 32:15, 33:10, 41:11
**suggest** [1] - 51:1
**suggested** [1] - 13:11
**suggesting** [1] - 37:12
**Suite** [2] - 1:24, 2:6
**Sullivan** [3] - 1:23, 2:2, 2:5
**supplemented** [1] - 46:4
**Supply** [1] - 23:7
**support** [3] - 33:2, 33:25, 45:3
**suppose** [3] - 11:10, 13:25, 57:23
**supposed** [1] - 57:12
**Supreme** [6] - 4:8, 21:23, 32:23, 33:5, 47:3, 51:16
**surprised** [2] - 41:5, 41:12
**suspect** [2] - 13:14, 13:15
**system** [21] - 5:14, 17:8, 17:9, 20:10, 20:14, 21:3, 21:13, 23:2, 23:20, 23:21, 24:12, 24:17, 24:18, 33:15, 33:16, 38:12, 57:16, 57:17, 58:14, 59:3, 59:6
**systems** [4] - 5:14, 35:2, 35:3, 38:10

**T**

**TAMARA** [1] - 63:3
**Tamara** [3] - 2:21, 63:9, 63:9
**tangible** [2] - 5:8, 33:3
**tax** [2] - 16:11, 16:12
**team** [1] - 14:23
**tech** [1] - 43:19
**technology** [1] - 24:2
**tee** [1] - 9:17
**telephone** [2] - 1:20, 27:14
**template** [1] - 57:11
**ten** [1] - 53:24
**ten-minute** [1] - 53:24
**term** [1] - 48:14
**terms** [1] - 40:19
**terribly** [1] - 19:3
**testified** [7] - 21:8, 23:19, 23:24, 24:9, 28:15, 43:18, 48:21
**testify** [1] - 31:14
**testimony** [19] - 17:6, 17:15, 19:15, 24:20, 25:12, 26:25, 27:4, 27:6, 27:13, 31:13, 34:18, 34:24, 35:8, 35:10, 40:20, 42:8, 42:10, 53:22, 59:4
**text** [1] - 43:20
**textual** [1] - 60:1
**TFS** [1] - 48:14
**thankfully** [1] - 53:7
**THE** [116] - 1:1, 1:1, 1:9, 3:2, 3:10, 3:14, 3:16, 3:19, 4:4, 4:16, 4:22, 5:18, 5:21, 6:11, 6:18, 7:3, 7:7, 7:24, 8:25, 9:3, 9:13, 9:16, 10:18, 10:21, 12:22, 13:8, 14:8, 15:13, 16:5, 17:1, 17:4, 17:12, 18:7, 18:17, 19:3, 19:20, 20:17, 20:19, 24:16, 24:24, 25:18, 26:11, 27:3, 27:10, 27:17, 28:2, 29:4, 30:8, 30:11, 30:14, 31:8, 31:17, 31:21, 31:23, 32:1, 32:6, 32:19, 33:13, 34:22, 35:18, 36:7, 37:2, 37:12, 37:20, 38:19, 38:21, 38:24, 39:14, 40:2, 40:11, 41:3, 42:7, 42:24, 43:4, 43:14, 44:11, 44:22, 45:4, 46:9, 46:16, 46:24, 47:8, 47:20, 47:25, 48:4, 48:7, 48:16, 48:24, 49:7, 49:21, 49:25, 50:6, 50:13, 50:18, 50:25, 51:4, 51:12, 51:21, 52:2, 52:9, 52:16, 53:11, 53:23, 54:2, 54:25, 55:24, 56:9, 56:19, 56:24, 57:23, 58:8, 59:12, 60:11, 61:1, 61:18, 61:20
**theft** [16] - 4:13, 6:14, 8:11, 13:13, 15:14, 16:6, 16:8, 16:9, 16:15, 16:19, 41:5, 43:3, 43:4, 49:15, 50:12, 51:11
**themselves** [2] - 41:15, 43:22
**theories** [1] - 55:7
**theory** [32] - 13:9, 14:9, 14:24, 20:22, 21:6, 21:11, 21:17, 21:18, 21:19, 21:23, 22:24, 32:19, 39:1, 39:2, 43:7, 44:14, 44:15, 44:24, 45:3, 45:4, 46:25, 47:21, 49:2, 49:8, 49:9, 50:11, 53:13, 53:16, 53:18, 55:11
**therefore** [3] - 21:14, 22:2, 28:25
**they've** [1] - 26:2
**thief** [4] - 19:1, 19:4, 19:10
**thieves** [2] - 20:15
**third** [1] - 55:12
**thousand** [9] - 7:25, 18:19, 19:7, 19:10, 20:1, 37:11, 37:18, 60:12, 60:13
**thousand-dollar** [1] - 19:7
**three** [1] - 5:1
**throughout** [1] - 43:20
**thrown** [1] - 15:14
**today** [7] - 3:21, 41:17, 55:9, 56:7, 59:8, 62:3, 62:6
**today's** [1] - 41:14
**together** [3] - 27:2, 55:5, 60:23
**tomorrow** [1] - 61:23
**took** [11] - 6:1, 19:18, 26:7, 26:9, 27:14, 27:22, 34:11, 36:12, 57:7, 59:4, 59:5
**toppings** [1] - 19:24
**Torts** [3] - 9:23, 35:23, 35:24
**touch** [1] - 25:19
**traceable** [1] - 50:20
**traditional** [1] - 22:2
**trainings** [1] - 34:14
**transaction** [1] - 50:3
**TRANSCRIPT** [1] - 1:8
**transcript** [3] - 54:4, 63:4, 63:6
**transcripts** [1] - 57:5
**transferred** [2] - 40:10, 47:23
**transition** [1] - 53:15
**tremendous** [1] - 15:21
**trial** [19] - 3:22, 4:7, 15:10, 19:21, 23:16, 25:12, 32:7, 32:22, 34:10, 36:8, 39:4, 49:8, 49:13, 50:14, 54:6, 55:11, 56:14, 58:2, 59:2
**tried** [2] - 13:16, 49:12
**true** [9] - 24:11, 26:21, 45:25, 55:16, 57:20,

58:16, 63:4, 63:5
**trust** [1] - 34:20
**truths** [1] - 51:18
**try** [1] - 59:17
**trying** [6] - 6:18, 24:4, 42:18, 46:9, 51:13, 52:5
**turn** [2] - 33:12, 33:20
**tweak** [2] - 39:13, 43:18
**two** [11] - 4:10, 6:1, 6:2, 10:10, 24:17, 32:24, 45:15, 46:3, 59:15, 60:4, 60:10
**twofold** [2] - 5:21, 49:14
**type** [4] - 7:6, 11:15, 11:24, 40:21
**types** [2] - 13:17, 37:2
**typical** [2] - 26:3, 27:20
**typically** [3] - 11:7, 27:24, 28:7
**typing** [1] - 41:25

## U

**U.S** [9] - 4:13, 12:20, 21:24, 40:23, 45:8, 45:14, 46:21, 52:24, 53:6
**unauthorized** [2] - 9:19, 32:8
**unbargained** [2] - 47:13, 53:2
**under** [18] - 4:14, 8:3, 9:18, 10:2, 13:13, 16:3, 16:5, 16:8, 21:17, 23:4, 32:17, 44:6, 45:13, 46:24, 51:16, 53:16, 55:25, 57:22
**undergo** [1] - 34:14
**underlying** [1] - 25:15
**understandable** [1] - 62:4
**understood** [4] - 25:8, 30:8, 42:4, 52:21
**unfortunately** [1] - 7:12
**unique** [1] - 31:2
**unit** [1] - 15:5
**United** [10] - 2:22, 3:2, 13:11, 21:24, 23:6, 35:14, 44:18, 48:18, 50:8, 54:21
**UNITED** [3] - 1:1, 1:2, 1:9
**unlawful** [1] - 33:1
**unless** [1] - 11:10
**unreasonable** [1] - 31:5
**unsavory** [1] - 57:21
**unusual** [3] - 26:21, 29:12, 30:19
**unwitting** [1] - 45:18
**up** [10] - 9:17, 14:23, 21:17, 24:23, 25:16, 38:9, 40:17, 51:19, 53:25, 61:23
**uphold** [2] - 32:15, 33:10
**upload** [4] - 43:18, 46:1, 46:2, 46:3
**uploaded** [1] - 42:16
**uploading** [1] - 43:1
**USAO** [1] - 1:20
**USDA** [6] - 21:3, 21:9, 21:14, 47:24, 49:5, 55:19
**USDA-OIG** [6] - 21:3, 21:9, 21:14, 47:24, 49:5, 55:19
**usefulness** [1] - 12:25
**user** [1] - 36:1
**USPS** [2] - 33:17, 46:4
**USPS-OIG** [2] - 33:17, 46:4
**usual** [4] - 26:23, 27:20, 28:5, 29:8

## V

**valuable** [7] - 21:21, 21:25, 22:19, 22:20, 23:17, 47:1, 47:6
**value** [33] - 7:16, 9:4, 12:25, 13:4, 13:23, 13:24, 14:6, 14:25, 15:18, 16:23, 17:3, 17:10, 17:18, 17:22, 18:1, 18:4, 18:22, 18:23, 18:25, 19:1, 20:1, 20:11, 20:14, 24:11, 25:17, 36:5, 47:8, 47:12, 58:24, 60:16, 61:14
**various** [2] - 6:22, 39:23
**Venkata** [32] - 3:3, 3:17, 5:23, 6:1, 8:10, 8:18, 14:12, 19:13, 21:2, 25:25, 27:2, 27:7, 29:25, 31:15, 32:8, 32:16, 39:11, 40:9, 40:22, 41:6, 41:13, 41:24, 42:2, 43:1, 43:19, 43:22, 43:25, 44:4, 44:7, 54:19
**VENKATA** [1] - 1:5
**Venkata's** [2] - 8:8, 28:1
**verdict** [1] - 33:18
**version** [3] - 38:9, 55:4, 55:6
**Via** [1] - 1:20
**viable** [1] - 57:15
**vicariously** [1] - 32:17
**victim** [7] - 21:20, 22:3, 22:6, 22:16, 22:19, 47:1, 53:6
**VICTOR** [1] - 1:16
**Victor** [1] - 3:6
**view** [4] - 5:7, 37:21, 37:24, 54:24
**violate** [1] - 52:11
**violating** [2] - 32:22, 32:24
**Virginia** [2] - 26:5, 31:3
**virtue** [1] - 8:11
**vis** [2] - 39:4
**vis-a-vis** [1] - 39:4
**voicemail** [3] - 28:16, 28:18, 28:22
**vs** [1] - 1:4

## W

**wages** [1] - 61:7
**wait** [2] - 52:3, 52:4
**waiting** [1] - 3:20
**walk** [1] - 6:23
**wants** [1] - 19:4
**Washington** [8] - 1:5, 1:14, 1:18, 1:21, 2:7, 2:23, 13:12, 63:11
**Wednesday** [1] - 62:7
**week** [2] - 43:15, 61:23
**whatsoever** [1] - 26:9
**whichever** [1] - 60:5
**whistleblowers** [2] - 34:19, 35:5
**White** [1] - 13:10
**whole** [2] - 34:25, 40:4
**wholesale** [3] - 60:5, 60:7, 61:13
**wide** [1] - 27:9
**willing** [1] - 17:25
**win** [2] - 22:13, 22:25
**winning** [1] - 22:14
**wire** [14] - 4:13, 4:19, 20:21, 20:24, 21:18, 21:19, 22:4, 25:20, 25:22, 26:1, 31:19, 32:5, 53:20, 60:13
**withheld** [2] - 46:11, 46:12
**witness** [2] - 23:19, 28:15
**witnesses** [2] - 21:7, 34:19
**word** [3] - 6:16, 40:11, 40:12
**words** [9] - 6:8, 21:18, 22:21, 24:2, 39:19, 60:3, 60:4, 60:8, 60:10
**workday** [1] - 27:11
**worker** [1] - 27:1
**workplace** [1] - 27:12
**works** [1] - 25:9
**world** [3] - 9:3, 19:25, 60:18
**worse** [1] - 14:4
**worth** [9] - 7:24, 17:23, 19:9, 19:24, 20:3, 23:15, 24:10, 37:11, 53:5
**write** [2] - 6:12, 39:21
**writing** [4] - 39:18, 48:19, 49:1, 49:12
**written** [5] - 23:22, 48:8, 49:1, 50:1, 50:8
**wrongfully** [1] - 5:6
**wrote** [1] - 16:16

## Y

**YAMAZULA** [1] - 1:5
**year** [1] - 21:22
**years** [1] - 13:15
**York** [7] - 1:14, 1:17, 1:25, 2:4, 2:6, 13:12, 22:7
**you-all** [1] - 61:22